## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| Blenheim Capital Holdings Ltd. and Blenheim Capital Partners Ltd., <br><br> Plaintiffs, <br><br> v. <br><br> Lockheed Martin Corporation, Airbus Defence and Space SAS, Republic of Korea, Defense Acquisition Program Administration, <br><br> Defendants. | Case No. 1:20-cv-_____ <br><br> **DEMAND FOR JURY TRIAL** |

### COMPLAINT AND DEMAND FOR JURY TRIAL

1.     Plaintiffs Blenheim Capital Holdings Limited ("Blenheim Holdings") and Blenheim Capital Partners Limited ("Blenheim Capital") hereby file this Complaint for tortious interference with contract and with prospective business relations, and common law and statutory civil conspiracy against defendants Lockheed Martin Corporation ("Lockheed"), Airbus Defence and Space SAS ("Airbus France"), the Republic of Korea ("South Korea"), and South Korea's Defense Acquisition Program Administration ("DAPA").

### INTRODUCTION

2.     Blenheim Capital is a small but innovative company that specializes in developing, structuring, and modeling international "offset" transactions, which are often part of government procurements.  An offset transaction is generally one in which the supplier agrees to undertake activities in order to satisfy a second objective of the procuring entity, distinct from the acquisition of the goods or services that form the core transaction.  These transactions can often be complex,

multi-party deals that involve a subject matter unrelated to the main procurement. Offset transactions are common in defense procurements.

3. For many years, Blenheim Capital has successfully helped companies and countries navigate these complexities by devising, structuring, and executing offset agreements worth billions of dollars. Blenheim Capital's successes include partnering with both Lockheed and Airbus entities on multiple occasions, discharging almost $900 million in offset obligations to Abu Dhabi, and teaming with Boeing to discharge Boeing's offset obligations to South Korea related to the sale of Chinook helicopters. These transactions involved identifying appropriate offset opportunities and developing and implementing complex financing arrangements and corporate structures, all of which reflect Blenheim's substantial expertise in this area.

4. Identifying and structuring offset transactions requires expertise in understanding how such transactions are financed and approved, as well as the investment of significant resources to identify opportunities and to conduct the financial modeling necessary to demonstrate the viability of a proposal. Defense procurement transactions and accompanying offset arrangements are highly complex, and having the ability and talent to structure these high-profile offsets is often critical to the success of the larger defense procurement.

5. In 2007, Lockheed Martin Overseas Corporation ("LMOC"), a subsidiary of Lockheed, entered into a contract with Blenheim Capital, known as the "International Broker Agreement" ("IBA"). Under the IBA, Blenheim Capital was to pursue various offset transactions that would be beneficial for LMOC in defense procurement transactions with foreign sovereigns. If Blenheim Capital proposed an offset deal to LMOC and LMOC approved the deal and received offset credits, then Blenheim Capital would be entitled to receive compensation. Between 2007

and 2015, Blenheim Capital and LMOC executed three offset transactions worth over $3 billion in offset credits.

6.      In late 2011, Lockheed discussed with Blenheim Capital the need for an offset in connection with its potential sale of F-35 fighter jets to South Korea. The proposed F-35 procurement would require Lockheed to satisfy billions of dollars in offset obligations for Lockheed, and South Korea's procurement process requires pre-approval of offset projects. Owing to the sensitivity around the F-35 program and the technology involved, Lockheed was unable to propose an offset solution that involved the direct transfer of the underlying F-35 technology to South Korea. Accordingly, Lockheed, through its aeronautics division, asked Blenheim Capital to provide a solution that would demonstrate to South Korea that Lockheed would be able to meet its offset obligations.

7.      From 2012 through 2016, Blenheim Capital devised and structured an innovative offset deal in which Lockheed would receive a military satellite manufactured by Airbus France and provide that satellite to South Korea as a multi-billion dollar offset for the F-35 transaction. In September 2014, Lockheed, through its aeronautics division, and South Korea executed a Memorandum of Understanding documenting their intention to pursue the transaction as designed by Blenheim Capital. In October 2014, Blenheim Capital and Airbus Defence and Space Ltd. ("Airbus England") entered into a Teaming Agreement to implement the project through the acquisition of a satellite from Airbus France. In December 2014, LMOC formally approved Blenheim Capital's proposed transaction structure, which was dubbed "Project Archer."

8.      In essence, Project Archer was a four-party transaction wherein each party (and/or their corporate affiliates) would reap significant benefit.

3

a. In recognition of Blenheim Capital's work in identifying, designing, and implementing the offset transaction, Lockheed would pay Blenheim Capital $150 million, which Blenheim Capital would use as equity capital for a special purpose vehicle that would raise debt to procure three satellites from Airbus England, one of which would be the military satellite that would satisfy more than $2 billion in offset obligations to South Korea.

b. South Korea would gain a desperately-needed military satellite to replace an existing satellite that was quickly reaching the end of its usable life, as well as technical training and support.

c. Through a financing vehicle designed by Blenheim Capital and built upon the $150 million provided by Lockheed, Airbus England would be paid upwards of a billion dollars for three satellites (one military, two commercial) built by its corporate affiliate, Airbus France.

d. Blenheim Capital and Blenheim Holdings (together and with their commonly controlled subsidiaries, "Blenheim") would acquire the two commercial satellites and use the revenues through the sale of their capacity to retire the debt raised by the special purpose vehicle, retaining the net profits remaining thereafter.

e. The foregoing transaction would have provided a substantial benefit to all four major stakeholders: (1) South Korea would acquire the F-35 jets together with a military satellite, satisfying important procurement needs on a cost effective basis; (2) Lockheed would consummate a valuable multi-billion dollar sale of its F-35 jets to a friendly foreign sovereign; (3) Airbus would generate earnings from the sale

of three satellites; and (4) Blenheim Capital would receive profits in the form of the net earnings generated from the three-satellite transaction.

9.     This lawsuit is brought because Lockheed, Airbus France, and South Korea (through DAPA) tortiously interfered with this transaction and its associated contracts and expected business relations, and conspired to cut Blenheim out of the deal that Blenheim had designed, developed, and successfully presented for approval.  Ultimately, Blenheim—which had conceived, modeled, and begun the implementation of Project Archer—was sidelined as Airbus France, Lockheed, and South Korea secretly built and eventually launched the military satellite, which took flight from Cape Canaveral, Florida in July 2020.  The offset value of that military satellite was determined to be ***more than $3.1 billion***.  These entities—Lockheed, Airbus France, and South Korea—benefitted from years of work and effort by Blenheim and then conspired to wrongly cut Blenheim out of the transaction in order to maximize their own advantages and profits. The result is that corporate giants Lockheed and Airbus misappropriated for themselves hundreds of millions of dollars that should have flowed to Blenheim—and simultaneously eliminated a company they perceived to be a nascent competitor in the satellite industry.  Even South Korea, in a candid moment, recognized that Lockheed's actions were "***kind of criminal***" and that Lockheed "had … an intention to ***misuse or even steal the money*** from their Government."  Blenheim brings this action to remedy this tortious conduct and to recover the hundreds of millions of dollars in damages caused by the conduct of Lockheed, Airbus France, and South Korea.

## PARTIES

10.     Plaintiff Blenheim Capital is a Guernsey company, whose registered office is located at Dorey Court, Admiral Park, St Peter Port, Guernsey, Channel Islands, GY1 3BG. Blenheim Capital is an experienced broker in structuring offsets for defense trade transactions.

11.     Plaintiff Blenheim Holdings is a Guernsey Company, whose registered office is at Dore Court, Admiral Park, St Peter Port, Guernsey, Channel Islands, GY1 2HT. Blenheim Holdings is the 100% owner of Blenheim Capital.

12.     Defendant Lockheed is a Maryland corporation with headquarters at 6801 Rockledge Drive, Bethesda, Maryland 20817, U.S.A. Lockheed is a global security and aerospace company serving both U.S. and international customers with defense, civil, and commercial products and services. Lockheed is one of the largest companies in the world. In 2019, 71% of its $59.8 billion in net sales were to the U.S. government as either a prime contractor or subcontractor, with 61% of its net sales to the Department of Defense. About 28% of Lockheed's net sales were to international customers, with such sales often occurring under contracts administered through the Pentagon. Lockheed has a significant Aeronautics business segment ("LM Aero"), which generated net sales of $23.7 billion in 2019. Lockheed also has a Space business segment ("LM Space"), which generated net sales of $10.9 billion in 2019. Lockheed wholly owns its subsidiary, Lockheed Martin Overseas Corporation ("LMOC").

13.     Defendant Airbus Defence and Space SAS ("Airbus France") is a French company located at 31 rue des Cosmonautes, 1402 Toulouse Cedex 4, France. Airbus France is a wholly-owned subsidiary of Airbus DS Holdings SAS, which is primarily owned by Airbus SAS, which is a division of Airbus SE, a global leader in the defense and space industry. In 2019, Airbus SE had revenues of €7.5 billion. Airbus France's corporate affiliate is Airbus England, which is wholly owned by Airbus SE.

14.     Defendant Republic of Korea ("South Korea") is a foreign sovereign state. Defendant Defense Acquisition Program Administration ("DAPA") is an executive agency of the South Korean government within the Ministry of National Defense. DAPA administers projects

to improve defense capabilities, procures munitions, and fosters South Korea's defense industries. DAPA is the only governmental agency within South Korea that is authorized to negotiate on behalf of the Ministry of Defense for defense procurements and offset packages.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over claims against South Korea and DAPA pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330(a); 28 U.S.C. §§ 1604, 1605(a)(2).

16.     The FSIA provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States in any case … in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]" 28 U.S.C. § 1605(a)(2).

17.     South Korea is a "foreign state," as defined in 28 U.S.C. § 1603(a).

18.     DAPA is an "agency or instrumentality" of South Korea, as defined in 28 U.S.C. § 1603(b).

19.     During the relevant period, South Korea and DAPA were engaged in "commercial activity carried on in the United States by a foreign state," as defined in 28 U.S.C. §§ 1603(d) and (e).

20.     South Korea and DAPA's acquisition of the F-35 fighter planes and the military satellite offset through the "foreign military sales" process, a defense procurement program offered by a U.S. Department of Defense ("DoD") program, falls under the FSIA's "commercial activity" exception.

21.     South Korea and DAPA knew that Blenheim was integrally involved in providing a military satellite offset as part of the F-35 fighter plane acquisition.  Nonetheless, South Korea and DAPA proceeded to support and induce a direct procurement between Lockheed and Airbus France for the military satellite.  In doing so, the funds that South Korea and DAPA provided to the DoD for the military satellite were passed to Lockheed, as the prime contractor, and then directly to Airbus France, and Blenheim was cut out.

22.     South Korea and DAPA officials engaged in numerous discussions with Lockheed regarding the military satellite offset, and also traveled to Virginia to meet with DoD personal regarding offset costs.  South Korea and DAPA also attempted to involve the DoD in contract negotiations related to the military satellite offset, resulting in the DoD fielding numerous questions from South Korea and DAPA during the relevant time period.

23.     Blenheim's claims against South Korea and DAPA are thus based on its commercial activity in the United States, tortious and wrongful acts in the United States that are related to its commercial activities, and tortious and wrongful acts that caused a direct effect in the United States.

24.     The Court has pendent and supplemental jurisdiction over claims against Lockheed and Airbus France pursuant to 28 U.S.C. § 1367 because such claims are related to the claims against South Korea and DAPA and form part of the same case or controversy.

25.     Pursuant to 28 U.S.C. § 1330(b), personal jurisdiction exists over South Korea and DAPA as to every claim over which this Court has jurisdiction pursuant to 28 U.S.C. § 1330(a), once service has been made.  Additionally, South Korea, through DAPA, entered into a contract with DoD to procure F-35 fighter planes, obtained DoD consent for Project Archer, and provided funds to the DoD for Project Archer.  When the funds it had provided to the DoD were not properly

distributed, South Korea tried to involve the DoD in negotiations to re-start workflows related to the contract, including with respect to distribution of funds.

26.     The Court has personal jurisdiction over Lockheed and Airbus France because the claims against them arise out of and relate to their contacts with this forum.

27.     Blenheim's claims center on South Korea's acquisition of F-35 fighter planes and a military satellite, both of which occurred through and were facilitated by the DoD and its F-35 Joint Program Office located in Arlington, Virginia.

28.     Lockheed, which provided the F-35 fighter planes, spent years negotiating with the DoD regarding both the F-35 contract and the related offset agreement. Lockheed entered into a contract with DoD to produce the F-35s for foreign military sale to South Korea, received DoD's approval over the entire structure of the F-35 and military offset arrangement, lobbied DoD to permit offset costs to be charged to the U.S. government—which DoD approved—and then misled Blenheim regarding the availability of those funds. Lockheed also kept the DoD informed regarding the status of Project Archer, and the DoD's Defense and Security and Cooperation Agency was involved in Lockheed's provision of the military satellite to offset its obligation to South Korea. Meeting minutes from an October 21, 2015 meeting show that Lockheed reported to DAPA, Blenheim, and Airbus that it had "verbally informed" the DoD's Joint Program Office of the "[s]ituation" with Project Archer.

29.     Airbus France, which built the military satellite used as an offset for Korea, pursued the direct-procurement arrangement with Lockheed that cut Blenheim out of the project. In doing so, Airbus France intended that Lockheed would lobby DoD to approve the direct procurement arrangement, which would result in DoD releasing additional funds to Lockheed that would be passed through to Airbus France. Additionally, Airbus France sought and received the import and

launch approvals from DoD that were necessary to effectuate the tortious direct-procurement arrangement with Lockheed.

30.     This Court also has personal jurisdiction over each of the Defendants because, as discussed in more detail below, each Defendant conspired with each other Defendant.  The contacts of each conspirator can thus be attributed to each other co-conspirator for purposes of personal jurisdiction.

31.     Venue in this district is proper under 28 U.S.C. § 1391(b) and (f), as a substantial part of the events giving rise to the claim occurred in the district.

## STATEMENT OF FACTS UNDERLYING CLAIMS

### A.  The Pentagon's Foreign Military Sales ("FMS") Program and Offset Transactions

32.     The Foreign Military Sales ("FMS") program is a form of security assistance authorized by the Arms Control Export Act ("AECA"), which allows the United States to sell defense articles and services to foreign countries when doing so will strengthen the security of the United States.

33.     Foreign Military Sales are subject to the AECA, which assigns oversight of these sales to the U.S. Department of Defense.  Within DoD, the Defense Security Cooperation Agency ("DSCA") plays a major role in these sales.  Through the FMS program, the DSCA (which is based in Crystal City, Virginia) may sell items directly from its own stockpile or contract with defense suppliers on a sole-source or competitive basis.  The DoD and DSCA must approve FMS transactions and control and disburse the funds paid by foreign sovereigns for the acquisition of defense articles and services.  Thus, the essential player in all FMS transactions is the Pentagon, located in Arlington County, Virginia.

34.     The United States restricts and controls the export of defense articles and services pursuant to the International Traffic in Arms Regulations ("ITAR"). However, under certain conditions, defense articles and services can qualify for exemptions from ITAR restrictions. In support of defense activities, the DoD can validate whether a proposed export qualifies for an ITAR exemption.

35.     The FMS process begins when a foreign country submits a formal letter of request ("LOR") that typically identifies the desired military capability and an estimate of the country's budget for acquiring that capability. Following review and approval, the DSCA (based in this district) issues a Letter of Offer and Acceptance ("LOA") specifying the defense articles, training, and support being offered for delivery. DSCA notifies Congress and the public regarding major FMS transactions.

36.     As part of the acquisition of defense articles and services, a foreign government may require suppliers to provide an offset. Offsets can take varied forms, including coproduction arrangements and subcontracting, technology transfers, in-country manufacturing, marketing and financial assistance, and public-private partnerships. Foreign governments typically use offsets as a means of reducing the financial impact of their purchases, obtaining technology and manufacturing information, supporting employment, expanding their defense industries, or otherwise making the expenditure of national funds on foreign purchases more politically palatable.

37.     An offset broker, such as Blenheim Capital, provides several important services to an FMS defense contractor. First, the broker works with the sovereign purchaser to identify goods or services that the sovereign purchaser would accept as an offset to the FMS contract. The offset broker then helps structure the transaction—for example, by identifying an original equipment

manufacturer ("OEM") to produce goods that will satisfy the offset, and modeling the financial structure of the transaction to ensure that it will work and provide the desired offset credit. Finally, the offset broker helps execute the transaction—for example, by identifying and securing related financing.

38.     Different sovereigns have different offset processes.   During the relevant time period, South Korea's regulations required that before South Korea could enter into an FMS contract, the contractor had to receive approval from South Korea of the contractor's plan to satisfy its offset obligations that would arise from the FMS contract.

39.     In the FMS context, the United States government is a party to the LOA, but a different entity—typically the prime contractor selected to provide the defense article or service— is obligated to perform any offset agreement.   The U.S. government does not take responsibility for the performance of offset commitments.   However, the prime contractor is permitted to "recover all costs incurred for offset agreements" from the United States government, which in turn bills the foreign purchaser. *See* 48 C.F.R § 225.7303-2(a)(3)(ii).  In other words, even though sovereigns demand offsets as a "sweetener" for defense procurements from foreign suppliers, in the U.S. FMS context, those sovereigns end up footing the bill for the offset, with all monetary transactions flowing through Pentagon.

**B.  Blenheim Capital's Experience and Expertise in Structuring Offset Transactions**

40.     Formed in 2006, Blenheim Capital has significant experience and expertise in helping governments and multinational corporations structure offset transactions.   Blenheim Capital has structured offset solutions for over twenty multinational companies, including Lockheed, Boeing, GEC Marconi, Thales, Airbus, Leonardo (f/k/a Finmeccanica)—helping to satisfy approximately $18.5 billion in offset obligations.  Blenheim Capital has also assisted six

governments in creating offset regulatory frameworks, writing guidelines for offset programs, and training government personnel.

41.     Blenheim Capital crystalized its relationship with Lockheed in 2007, when Blenheim Capital proposed a project to help Lockheed's wholly-owned subsidiary LMOC discharge its offset obligations to Abu Dhabi.

42.     Following their cooperation on that first offset project, Blenheim Capital and LMOC entered into a long-term contract, the International Brokerage Agreement ("IBA"), on October 26, 2007.  Under the IBA, LMOC and Blenheim Capital agreed that Blenheim Capital would develop projects for Lockheed to discharge its offset obligations to foreign governments. In exchange, LMOC would compensate Blenheim Capital.  Each offset project to which LMOC agreed was incorporated into the IBA through a separate appendix.  Each appendix provided the project-level terms and conditions, including the specific services to be provided by Blenheim Capital and the particulars of the compensation arrangement.  In other words, the IBA served as a general framework for the relationship between LMOC and Blenheim Capital, but each offset project also had a more specific contract that was incorporated into the IBA through an appendix. Pursuant to the terms of the IBA, LMOC would also issue a specified "Formal Approval" letter for each particular project, which would serve as an approval for Blenheim Capital to proceed with implementing that project.

43.     After entering into the IBA, Blenheim Capital developed multiple offset projects for Lockheed related to sales to to Kuwait, Oman, Saudi Arabia, South Africa, and the United Arab Emirates.  In total, the value of these offset projects was over $14 billion.

## C. The F-35 Program and South Korea's Fighter Jet Procurement

44.     In the 1990s, the United States established the Joint Strike Fighter Program to develop a new fighter aircraft, versions of which could be procured for the U.S. military and foreign partners.  In 2001, Lockheed prevailed over Boeing to become the prime contractor for the program.  The program now ranks as the Defense Department's most expensive weapons program ever, expected to cost U.S. taxpayers more than $1 trillion over its sixty-year lifespan.

45.     Lockheed began producing F-35 fighter planes in 2006 through a series of low-rate initial production runs ("LRIPs") for the U.S. government and foreign governments.

46.     In 2011, South Korea accelerated its plans to enhance stealth-fighter capabilities in response to public outcry over North Korean aggression.

47.     South Korea sought bids from several aircraft manufacturers for the fighter plane ("F-X") procurement.

48.     Lockheed began to prepare its bid for the F-X procurement through its aerospace division, LM Aero.

49.     In South Korea's assessment of bidders for its F-X fighter plane procurement, proposed offsets and technology transfers accounted for 17% of the total evaluation score, while acquisition costs accounted for only 15%.  Accordingly, including an attractive and viable offset project as part of the proposal was an important component of a competitive bid.  For that reason, LM Aero contacted Blenheim Capital in 2011 regarding potential offset projects that could be used in connection with the F-X procurement bid.

50.     In September 2013, Boeing appeared to be the winner of South Korea's competitive procurement process for the F-X deal.  Unlike the other bids (including LM Aero's), Boeing's bid was the only one within South Korea's stated budget, even after multiple rounds of bidding.  Just

a few weeks later, however, South Korea overturned that decision, citing concerns over the technological capabilities of Boeing's aircraft, and instead accepted Lockheed's bid to supply forty F-35s. The contract was worth $7 billion and required Lockheed to "offset" fifty percent of that cost. To date, South Korea has ordered, or plans to order, a total of sixty F-35s from Lockheed.

### D. Using Its Expertise, Connections, and Know-How, Blenheim Developed an Offset Transaction to Support Lockheed's FMS Sale of F-35s to South Korea: Procurement and Deployment of an Airbus Military Satellite ("Project Archer").

51.    From the beginning of South Korea's F-35 procurement process, LMOC and LM Aero asked Blenheim to assist with developing an offset solution. Using its knowledge of South Korea's defense needs and related political dynamics, its expertise, its experience, and its connections in the defense industry, Blenheim developed an innovative offset transaction for Lockheed whereby Lockheed's obligations would be satisfied through provision of a military communications satellite to South Korea.

52.    By June 23, 2013, LM Aero and Blenheim were in advanced talks regarding the formalization of Project Archer. At this time, South Korea's competitive procurement process was still undergoing multiple bidding rounds, and the proposed military offset project was a critical part of LM Aero's bid, as South Korea's acquisition regulations require that offset proposals be pre-approved prior to awarding a contract.

53.    On November 22, 2013, South Korea accepted the Lockheed bid that was based upon Blenheim's military satellite offset solution. On March 24, 2014, South Korea formally announced that it would pursue an FMS transaction for forty F-35 fighter jets.

54.    On September 9, 2014, LM Aero, DAPA, and South Korea's Agency of Defense Development ("ADD") entered into a Memorandum of Understanding ("MOU"), pursuant to which LM Aero agreed to provide South Korea with a military satellite to satisfy LM Aero's offset

obligations related to the F-35 sale. The MOU required LM Aero to establish a Technical Assistance Agreement ("TAA") with DAPA and ADD that set forth the terms and conditions for fulfilling the military offset project as described in Annex 1. Annex 1 detailed certain required capabilities for the military satellite, including integration with the F-35 fighter planes, as well as other deliverables, technical requirements, schedules, and project details. The MOU also calculated the offset value for each of the deliverable offset components, which at that time was calculated to exceed $2.1 billion.

### E. Lockheed Reviewed and Approved the Structure and Financial Modeling for Project Archer—a Three-Satellite Deal that Would Benefit Lockheed, South Korea, Airbus, and Blenheim.

55.      The idea behind Project Archer was that LMOC would provide $150 million to Blenheim, which Blenheim would then use, in combination with financing, to procure three satellites. One of those satellites, a military satellite, would be transferred to South Korea to satisfy Lockheed's F-35 procurement offset. Blenheim would own the remaining two commercial satellites, from which it expected—based on advanced financial modeling reviewed and approved by Lockheed—to generate sufficient revenue to service and retire its debts and to earn a total profit of at least $500 million.

56.      Specifically, by 2014, Blenheim had devised the following structure to finance Project Archer:

a. Lockheed would pay Blenheim $150 million in fees.

b. Leveraging that $150 million and guarantees from export credit agencies ("ECAs"), Blenheim would raise debt capital.

c. Blenheim would borrow senior debt from banks, and the original equipment manufacturer of the military satellite would provide mezzanine financing.

d. Blenheim would then use these funds to finance production of both the military satellite and two commercial satellites.

e. Blenheim would contract with a service provider to support the operation of the two commercial satellites.

f. Ultimately, Blenheim would sell the communications capacity of the two commercial satellites, providing a revenue stream over the life of the commercial satellites in order to finance its debt obligations and earn profits.

57. As part its due diligence process, Lockheed engaged in a close review of the financial modeling underlying Project Archer. By mid-July 2014, Lockheed had undertaken "a review of Project Archer information to determine ... [t]he reasonableness of the projected plan costs [and t]he structure / schematic of the underlying business arrangement to include the effect on the risks and outcome of the project." Lockheed concluded that "[s]tochastic analysis of the forecast gives a 77% confidence that the project will be completed at or below budget and schedule risk ...."

58. The financial model underlying Project Archer showed that Blenheim expected to make more than $500 million in "outturn net cash generated" over the life of Project Archer.

**F. The Lockheed and Airbus Affiliates Approved Blenheim Capital's Project Archer and Made Concrete Commitments to Implement It with Blenheim and for the Benefit of All Parties.**

59. As discussions regarding the scope of Project Archer became near-final, Blenheim Capital sought an OEM partner to manufacture the satellites.

60. LM Space submitted a proposal to become the OEM partner in Project Archer. Because that proposal was noncompliant and too expensive, Blenheim Capital rejected it.

61.     Blenheim Capital ultimately selected Airbus England as its partner to manufacture the three satellites.

62.     Accordingly, on October 31, 2014, Blenheim Capital entered into a Teaming Agreement with Airbus England.  The purpose of the Teaming Agreement was to develop an approach for production of the satellites required for Project Archer.  The Teaming Agreement's recitals noted that Blenheim Capital was "envisaging to procure three satellites (the 'Programme')" and that Blenheim Capital and Airbus England "believe that their separate and unique capabilities complement each other and wish to team together in order to develop an optimal approach for implementation of the Programme."  Airbus England agreed, among other things, to provide proposals for manufacture and delivery of the satellites, to provide support for promoting the Programme with investors, and to make financing proposals.  The Teaming Agreement also had an exclusivity clause under which Blenheim Capital pledged to work only with Airbus England for the "establishment of the Programme."

63.     On December 4, 2014, Blenheim Capital and LMOC formally introduced Project Archer into the IBA.  They executed Amendment No. 7 ("Amendment 7") to the IBA, which (among other changes) added a new appendix to the IBA detailing the terms, conditions, and compensation specific to Project Archer: Appendix C-5.  Appendix C-5, along with its exhibits, explained that Blenheim Capital had "identified, researched and analyzed, modeled, developed and structured a project designated as Project Archer involving the provision to the Republic of Korea (RoK) of a communications satellite" and associated equipment and support for the satellite launch and orbital test.

64.     Among Appendix C-5's provisions was a schedule for payments from LMOC to Blenheim Capital, as follows:

a. $45 million due April 30, 2015;

b. $37 million due July 31, 2015;

c. $34 million due November 30, 2016;

d. $17 million due March 31, 2017;

e. $17 million due November 30, 2017.

65.     Appendix C-5 further provided that Project Archer would occur following issuance of a Formal Approval Letter by LMOC.  On December 10, 2014, LMOC issued Blenheim Capital a Formal Approval Letter, signed by James O'Neil, the Director and Deputy to Vice President Business Ventures for LMOC, authorizing Blenheim Capital to proceed with Project Archer. Grant Rogan, the CEO of Blenheim Capital, countersigned the Formal Approval Letter on Blenheim's behalf on December 11, 2014.

66.     As part of the Formal Approval Letter, LMOC confirmed that it agreed to pay Blenheim Capital "a compensation amount of US$150 million" as specified in Appendix C-5. Additionally, LMOC provided a funding commitment letter, which confirmed the $150 million was "irrevocable and effective on March 31, 2015," and that the funds were to be paid according to the schedule identified in Appendix C-5.

67.     On February 23, 2015, Blenheim Capital, LM Aero, Airbus England, Airbus France, and SES TechCom Services entered into a nondisclosure agreement (the "Multi-Party NDA") to facilitate the "exchanging of information for the purposes of discussing, reviewing and/or evaluating a project comprising one geostationary military telecommunications satellite for the Government of the Republic of Korea."  Following execution of the Multi-Party NDA, Blenheim Capital began to provide Lockheed, Airbus England, and Airbus France with confidential and competitively sensitive information regarding the progression of Project Archer,

including Blenheim Capital's financial models and details of Blenheim Capital's negotiations regarding the two commercial satellites.

68.     On February 26, 2015, Blenheim Capital and Airbus England entered into a Satellite Procurement Agreement ("SPA").  The SPA created a contractual relationship between Blenheim Capital and Airbus England with respect to the military satellite to be provided to Korea, including the scope of work, the schedule of development activities, and price and delivery terms, among other obligations.  It was executed by Grant Rogan for Blenheim Capital and Hugues de Galzain of Airbus France on behalf of Airbus England.

69.     The SPA provided that Blenheim Capital "undert[ook] to procure and Contractor undert[ook] to provide the KMILSAT 1 Satellite, associated equipment, upgrades to existing ground stations and related technical documents, training, technical support, and launch support services for Project Archer as well as two commercially operated satellites subject to and in accordance with the provisions of the Teaming Agreement."  The SPA also contemplated that a special purpose vehicle would be created to help carry out the transaction.

70.     Blenheim Capital and Airbus England also envisaged the terms and conditions of the SPA being modified over time, as other necessary agreements also became finalized.  Specifically, the SPA stated that "[i]n parallel with the finalization of the TAA between L[ockheed] and [DAPA], the Parties have been and continue to negotiate Performance Specifications (the 'Specifications'), Statements of Work ('SOWs') and Contract Documentation Requirements Lists ('CDRLs') for the K-MILSAT 1 Satellite….  Following agreement of the TAA, the Specifications, the SOWs, and the CDRLs, the Parties shall modify the terms and conditions attached as Appendix J (the 'Terms') so as to be consistent with the foregoing."  Because the TAA, Specifications, SOWs, and CDRLs were not final when the SPA was executed,

Blenheim Capital and Airbus England were not able to specify any terms and conditions in Appendix J. Blenheim Capital and Airbus England also stated in the SPA their plan to detail later the necessary specifications, SOWs, CDRLs, and terms and conditions for the two commercial satellites, which were part of the approved transaction that the parties intended would occur.

### G. After Senior Financial Managers at Lockheed and Airbus Realized Blenheim's Potential Profits under Project Archer, They Conspired to Cut Blenheim Out of the Deal.

71.     After LMOC issued the Formal Approval Letter on December 10, 2014, Blenheim Capital began working to implement Project Archer. For example, Blenheim Capital approached multiple banks regarding senior debt financing. Moreover, even though LMOC's funding commitment had not yet become irrevocable, Blenheim Capital and Airbus England engaged in "Head-Start Activities," which included the initial engineering work and the procurement of "long lead items" that needed to be procured in a timely fashion if the military satellite was to be finished in time to meet Lockheed's obligations to South Korea. In other words, in a show of good faith, Blenheim sought to ensure timely delivery of the military satellite to Lockheed notwithstanding the indeterminate status of Lockheed's funding commitment. Blenheim also worked to establish the special purpose vehicle contemplated in Amendment 7 to help carry out the transaction.

72.     While Blenheim was diligently engaged in these activities, LMOC inexplicably began to delay the initial Project Archer payment, which was originally due no later than April 30, 2015.

73.     On March 30, 2015, representatives from Blenheim Capital, LM Aero, Airbus England, and Airbus France met in Texas to discuss Project Archer. Airbus explained that Lockheed's commitment to moving forward was somehow wavering, and that this uncertainty

regarding "commitment from LMA for initial funding" had "made it impossible to negotiate a full contract between [Blenheim] and [Airbus England]."

74. At that meeting, Airbus France and Airbus England also warned that, starting on April 30, 2015, the Project Archer "schedule will ... slip day for day until initial funding is committed."

75. Despite this warning, LM Aero pressured Blenheim Capital into accepting a revision to Amendment 7 delaying the date of LMOC's initial payment to May 29, 2015. Having already sunk significant time and resources into Project Archer, and having taken on contractual obligations to Airbus England, Blenheim Capital acquiesced to the demand on March 30, 2015. This first revision to Amendment 7 delayed LMOC's initial payment to Blenheim to May 29, 2015, a month later than originally agreed.

76. On March 31, 2015, LMOC's payment obligations to Blenheim became irrevocable, pursuant to the December 10, 2014 funding commitment letter.

77. A month later, on April 30, 2015, Blenheim hosted a dinner in London with Lockheed officials Michael Cain, Vice President of Business Ventures at LM Aero, and Vitol Wiacek, Director of Corporate Treasury at Lockheed. At that dinner, Cain assured Blenheim that LMOC's funding obligations would remain unconditional.

78. Despite that promise, Lockheed withheld the funds that were due on May 29, 2015, and pressured Blenheim Capital into making a second revision to Amendment 7, which was executed on June 1. This revision ("Revision 2"), replaced the compensation provisions of Appendix C-5, keeping *all* payment amounts and dates exactly the same and making only one change. That one change was to make all of LMOC's payment obligations after the initial payment contingent on Blenheim securing "executed term sheets for the mezzanine debt financing to be

provided by Airbus." The initial "Phase One" payment remained unconditional, but all subsequent "Phase Two" payments were subject to Blenheim securing financing by July 31, 2015. LMOC did not take on any new commitments or obligations in exchange for the imposition of this condition.

79. By May 2015, Lockheed had been lobbying the DoD for months regarding a proposed regulation change that would make it easier to charge offset costs to FMS contracts. On June 2, 2015, the DoD promulgated Defense Federal Acquisition Regulation ("DFAR") interim rule 2015-D028, which made securing U.S. government payment for costs associated with providing offsets—for example, the cost of paying an offset broker's fee—significantly easier.

80. By that time, South Korea had also already provided the $150 million in funding for the military satellite offset to the DoD, and the DoD had in turn passed those funds to Lockheed, on top of additional funds as compensation and profit to Lockheed. Despite having these funds in hand, Lockheed misled Blenheim as to the availability of the funds in order to induce Blenheim's agreement to the revised funding conditions.

81. Lockheed delayed and imposed conditions on the Project Archer funding because it saw Blenheim as a nascent competitor in the space industry. LM Space, a Lockheed subsidiary, had been experiencing financial struggles, due largely to its reliance on and commitment to an expensive legacy launch system. Its profits had been declining year-over-year from 2012 through 2014. On information and belief, Lockheed had been forced to pump $1.5 billion into LM Space to shore up its satellite manufacturing unit, and was discussing the possibility of selling off the commercial manufacturing business.

82. Multiple Lockheed executives had complained over the years that, through Project Archer, Lockheed was essentially funding a new competitor for Lockheed's own satellite division,

LM Space. Through Project Archer, Blenheim would own two commercial satellites (which would be produced and launched into orbit at a materially lower cost than would the LM Space satellites), which would generate a revenue stream for Blenheim and increase the supply of satellite bandwidth on the market for years to come.

83.     When Blenheim was assessing OEM providers for Project Archer, LM Space submitted a noncompliant proposal, which Blenheim rejected. Leadership at the LM Space segment, recognizing that their product was too expensive to fit into the transaction, repeatedly derided Project Archer within Lockheed, and this internal discord persisted even after LMOC negotiated and provided a Formal Approval Letter for Project Archer.

84.     In or around May 2014, John Karas, an LM Space executive, complained to George Standridge of LM Aero that LMOC was "giving spacecraft to our competition, [and] also helping them expand into other competitive areas." Again, this reflects LM Space's recognition that it could not compete with Airbus France's costs, in part because Airbus France was willing and able to use the far less expensive launch vehicle provided by SpaceX, which LM Space was not. Further, LM Space was concerned that Project Archer would create a nascent competitor in Blenheim Space, who would be positioned to sell commercial satellite capacity at an affordable price. These by-products of Project Archer were implicit in its structure and took nothing away from the enormous benefits to Lockheed in winning the F-35 procurement, but generated internal strife and a contingent with LM Space and Lockheed that became increasingly committed to wrongfully interfering with the transaction.

85.     For example, LM Space's Karas continued to complain, reportedly telling Karen Hughes of LM Aero that he was "unhappy that [LMOC was] giving away their business to [a]

competitor and not giving [Lockheed's own satellite division] the chance to compete for [the] total package."

86.     In or around December 2014 to January 2015, Rick Ambrose, the Executive Vice President of LM Space, also complained about the structure of the deal to his counterpart at LM Aero, Orlando Carvalho, indicating LM Space's frustration that the transaction would use a competitor's satellites and seed a potential competitor that had a more cost-effective launch solution.

87.     David McReavy of LM Space also stated at an offset industry conference in Cartagena in fall 2014 that LM Space would either kill Blenheim's contract with LMOC/LM Aero or kill the overall military satellite project with South Korea.

88.     Wiacek also complained around the time of the April 30, 2015 dinner that through Project Archer, Lockheed was essentially funding a new competitor for Lockheed's own satellite division, LM Space.

89.     In May 2015, Blenheim provided to Lockheed officials—including, critically, Wiacek—a spreadsheet detailing its financial model, including expected profits.  This spreadsheet made apparent to Lockheed that LMOC's decision to pursue Project Archer not only awarded Airbus England—a competitor of LM Space—with a contract for three satellites, but it also provided Blenheim with huge profits and the means and opportunity to enter into the satellite business.  Unbeknownst to Blenheim at the time, it now appears with the benefit of hindsight that around this point in time, Lockheed began actively and secretly scheming to cut Blenheim out of the transaction.

90.     Under Revision 2 the due date for LMOC's initial payment to Blenheim remained May 29, 2015, but LMOC did not effectuate this payment until on or about June 15, 2015.  Frank

Titzler of Lockheed blamed the delay on the fact that Lockheed had not received "the LRIP 10 contract modification from the [U.S. government]" until June 4, 2015. Yet, LMOC had, by this point, already received the $150 million from the DoD and, in any event, LMOC's contractual obligation to pay Blenheim was not conditioned on the receipt of any contract modification from the United States government. In other words, despite knowing since March from Airbus that delayed payment would cause Project Archer's progression to "slip day for day," and despite having all funding in hand from the DoD, Lockheed caused an additional two-week delay in the transfer of funds critical to moving Project Archer forward.

91.     Blenheim had no choice but to accept the payment delays and new funding conditions that were imposed unilaterally by Lockheed and included in Revision 2. Blenheim Capital had expended years of effort, significant internal resources, and millions of dollars in developing and progressing Project Archer, including entering into extensive contractual commitments with Airbus England. Lockheed was coercing it into accepting modifications that did not make sense and appear now to have been taken in bad faith.

92.     On May 28, 2015, Airbus England and Blenheim executed Appendix J to the SPA, as contemplated by the SPA and following Lockheed's finalization of other key documents such as the TAA and SOWs. Appendix J further fleshed out the parties' obligations with respect to Project Archer. Among other things, Airbus England and Airbus France committed to "provid[ing] a signed letter to [Blenheim] setting out the terms upon which [Airbus would] be prepared to provide the mezzanine debt financing for the satellite for the ROK and two commercial satellites by July 15, 2015."

93.     In reliance on Appendix J and the commitment for mezzanine financing, Blenheim paid Airbus England $20 million as soon as it received the initial Phase One payment from LMOC, on or around June 16, 2020.

94.     Much like Lockheed, multiple Airbus entities had by this time become increasingly concerned that Blenheim was a potential competitor in the satellite industry and specifically for business from the English government, which was a significant source of business for Airbus England.  At one point, Colin Paynter, Airbus England's CEO, informed Blenheim that Airbus's CEO considered Blenheim's decision to enter the English satellite business a threat because it jeopardized Airbus England's £150 million in government funding per year.

95.     Accordingly, while unknown to Blenheim at the time, it now appears that by July 2015, while Blenheim, LMOC, and Airbus England were continuing to move forward with Project Archer, Lockheed and Airbus France had begun to take the view that they did not like the deal and could reap greater profits and advantages if LMOC and Airbus England proceeded without Blenheim.  With the benefit of hindsight, it is now clear that the course of dealing over the next two years demonstrates how these motivations drove Lockheed and Airbus France to wrongfully cut Blenheim out of the offset deal, thereby keeping the profits for themselves and depriving Blenheim of the fees and profits it would have made.

96.     Between July 8 and July 9, 2015, Lockheed, Airbus England, Airbus France, and Blenheim held a Project Archer kick-off conference in Toulouse, France.  At that conference, LMOC called Airbus executives to a meeting and barred Blenheim's senior executives and legal counsel from attending.  While Blenheim did not know what was discussed in that meeting at the time, it was later told that LMOC asked Airbus France to guarantee that it would deliver the

military satellite regardless of Blenheim's status, and Airbus France likewise sought assurances that the project could proceed even without Blenheim.

97.     Meanwhile, pursuant to Appendix J of the SPA, Airbus England had committed to provide to Blenheim, by July 15, 2015, the terms on which it would provide mezzanine debt financing for the military satellite and the two commercial satellites.  On July 17, 2015, however, Arthur Blick of Airbus England informed Blenheim that it would not provide the mezzanine financing term sheet required under Appendix J.

98.     Airbus England disingenuously tried to shift the blame away from itself for the failure to present the contractually-required terms for mezzanine financing.  On July 17, 2015— two days after the Mezzanine term sheet was due—Blick asserted to Blenheim "that despite previous mutual understandings and substantial internal efforts, it is not possible for us to seek internal approval for a mezzanine term sheet when we are unable to present any mature plan for closing of the off-take contract for the commercial satellite capacity and the principal terms and structure of the senior debt financing and associated ECA arrangements that would normally underpin the mezzanine debt arrangements."  As Airbus England knew, however, Blenheim was working to secure senior debt and ECA commitments in tandem with finalizing the mezzanine financing with Airbus.  Nothing in the SPA or Appendix J required Blenheim to secure senior debt financing and ECA commitments before Airbus England would offer mezzanine terms.

99.     On information and belief, the real reason for Airbus's failure offer the required mezzanine financing terms was that Airbus had not, prior to signing Appendix J, obtained the necessary internal approvals.  This fact that was fraudulently concealed from Blenheim at the time Appendix J was signed.  Once presented with the request in July and August 2015, senior

executives at Airbus England and Airbus Corporate Financial refused to provide mezzanine financing terms.

100.     Between July 24–28, 2015, Lockheed, LM Aero, Airbus France, and Blenheim held a second series of meetings in Toulouse, France, this time with officials from South Korea in attendance.   As before, Blenheim was excluded from meetings.   On information and belief, unbeknownst to Blenheim at the time, it now appears that at these meetings Michael Cain of Lockheed and Arnaud de Rosnay, Senior Vice President and Head of Telecommunication Satellites at Airbus France began in earnest to secretly discuss cutting Blenheim completely out of the satellite transaction, though it would take them until the end 2016 to commence the scheme and until July 2020 to consummate it.   Indeed, for many months thereafter, Lockheed and Airbus France kept Blenheim moving forward on Project Archer.

101.     Around the time of the second Toulouse conference, Lockheed began contriving road-blocks to prevent Blenheim from securing the financing that Revision 2 required by July 31, 2015—the due date for the first Phase Two payment of $37 million.   In mid-July, Lockheed demanded that Blenheim receive Lockheed's "consent as to the form and contents" of the required term sheets and threatened that future payments would be delayed "because [Lockheed] needed to get internal aero and corporate approvals / sign offs on the docs themselves."   Lockheed had no basis under the IBA, Amendment 7, or Revision 2 to make this demand.

102.     Additionally, on July 30—one day before the first Phase Two payment was due— James O'Neil of LM Aero informed Blenheim that in order to release the payment on July 31, Lockheed would have needed to receive the required term sheets *four weeks* beforehand.   No such conditions appeared in Revision 2 or any other provision of the IBA, nor did any Lockheed official

attempt to raise this issue with Blenheim previously (including at the two sets of Toulouse meetings earlier in July 2015).

103.    On July 29, 2015—one day after the second set of Toulouse meetings that excluded Blenheim and two days before Lockheed's first Phase 2 payment was due—Airbus France tried to blame the delays in Project Archer on Blenheim. Specifically, Phillipe Saint Aubert of Airbus France cited a six-week delay in receiving the first $20 million payment from Blenheim as having caused "difficulties" for "the project stakeholders," which led to delays in the "delivery schedule [that] would not be acceptable to" South Korea. However, as Airbus France must have known, the delay in Blenheim making an initial payment to Airbus England was due to LMOC delaying the initial payment to Blenheim, and then missing the May 29 deadline by two weeks.

104.    In other words, for Airbus to advance its obligations under Project Archer, monies had to timely flow from Lockheed to Blenheim to Airbus. When Lockheed wrongfully and inexplicably delayed those payments, Airbus cited that as an excuse for why it failed to satisfy its obligation to Blenheim to provide financing terms (when, in fact, the real reason was that Airbus could not secure the internal approvals that it had previously, and falsely, represented had been secured). Lockheed, in turn, cited Airbus's failure to provide the financing terms as an excuse not to make further payments to Blenheim.

105.    Blenheim—the broker between LMOC and Airbus England who had designed, developed, and modeled the whole transaction—was wrongfully squeezed at both ends of the relationship, as the affiliates of the two parties it had brought together now conspired to cut Blenheim out entirely so that they could maximize their own profits from the transaction.

106.    On August 17, 2015, Saint Aubert sent Blenheim another letter, noting that it had not yet received additional funding from Blenheim. Saint Aubert informed Blenheim that Airbus

France "has today taken the difficult decision to suspend all activities on [the military satellite], effective close of business 21 August." As Airbus France was well aware, the Lockheed's actions earlier in 2015 had caused funding delays that rippled down the chain. However, Airbus France was not a party to the SPA and its decision to stop work due to the alleged funding issue intruded on the Blenheim's contractual relationships.

107.     Meanwhile, Lockheed continued to pile additional, untenable requirements on Blenheim that had no basis in the IBA or Revision 2. For example, at the beginning of Project Archer, Lockheed had been told by Airbus Corporate Finance that COFACE, the French export credit agency, would support Project Archer. In late August 2015, Lockheed, through LM Aero, unilaterally demanded that Blenheim secure written confirmation of COFACE's support, despite knowing that COFACE does not, as a general practice, provide such written approval. Lockheed insisted for months that, until this demand was met, it would provide no additional funding for Project Archer. Lockheed ultimately backed down only when Blenheim presented proof of the impossibility of meeting the demand.

108.     Lockheed also continued to misrepresent the status of the offset funding that it had received from the U.S. government and that was due to Blenheim. As Soo Jung Kim, Action Officer in Offset Trade Division of DAPA, wrote to Blenheim in mid-December 2015:

> As we all know, LM got the funding from the US Government already, but they haven't provided [it] either to you or to Airbus to proceed [with] the Program. We think **this is kind of criminal because they had or have an intention to misuse or even steal the money from their Government**. So, we are considering reporting this to the US Government to have them investigate, and to have them to use [the money] for the right purpose as agreed between the ROK Government and the US Government.

109.     By the end of 2015, Lockheed and Airbus France were deep in negotiations for a direct procurement deal with each other—and without Blenheim. Arnaud de Rosnay, Senior Vice

President and Head of Telecommunications Satellites at Airbus France, wrote in an internal December 31, 2015 email (later acquired by Blenheim): "LM does not believe in project Archer anymore. They are going to write to BL accordingly! ... The plan A for LM now is direct procurement of K-MILSAT. M[ichael] C[ain] [of LM Aero] has convinced his management that the best option was a direct procurement from LM to ADS."

110. By early 2016, Lockheed began floating direct inducements to Airbus France as enticement for cutting Blenheim out, and offered Airbus France a share of additional offset credits that Lockheed was seeking from Korea.

111. Airbus France, having realized that its interests were also best served by seeking a direct procurement deal with Lockheed, also provided incentives for Lockheed to cut Blenheim out and to move forward with a direct procurement. In particular, despite having represented to Blenheim that it had made a best offer, Airbus France offered Lockheed (i) additional fuel for the military satellite, which extended its life by 20% and made it more valuable, and (ii) a $10 million price reduction over what it had negotiated with Blenheim.

112. Airbus France and Lockheed knew that their actions pursuing a direct procurement and cutting Blenheim out were wrongful under the existing contractual frameworks between and among Blenheim, LMOC, and Airbus England. Indeed, fear of interfering with those contracts seems to have prevented Airbus France and Lockheed from inking their direct-procurement arrangement—at least for a time.

113. On January 1, 2016, de Rosnay of Airbus France emailed Cain of LM Aero, writing: "[T]he Airbus team is all geared up and prepared to support the proposed discussions in Toulouse next week on a form of a direct procurement for the [military satellite]. In preparation for this we do need to recognize *the existing contractual framework between LM, BL and ADS which would*

*need to be amended*. You mentioned to me yesterday that you were going to inform BL of the new plan. As advised to me by my team, ***it would be appropriate to have the written agreement of BL*** from either LM or direct from BL before the discussions between our two teams commence next week."

114. On February 26, 2016, Martyn Braime, Head of Operations at Airbus France, wrote to Vincent Panzera, Director of Business Ventures at LM Aero, regarding the direct procurement with Lockheed: "ADS ha[s] an ***existing contractual framework for Project Archer*** and the procurement of [the military satellite] with BL. LM has similar arrangements under the IBA. ***These would need to be resolved*** and ADS would need to be assured that there was neither prospect of any legal action against ADS arising from these previous agreements nor the termination of them."

### H. South Korea (through DAPA) Also Conspired To Cut Blenheim Out of the Deal.

115. By at least early 2015, South Korea was well aware of Blenheim's role in Project Archer. The May 2015 amendment to the Memorandum of Agreement between South Korea and Lockheed recognized that Blenheim was Lockheed's "financial partner" and required Lockheed to "take reasonable action including making its contractual payments ... to ensure the 3rd parties properly perform their respective obligations."

116. In December 2015, South Korean officials, frustrated by Lockheed's progress to date, engaged in a series of communications with Blenheim. Initially, South Korea—in an effort to get detailed information from Blenheim, which it was not receiving from Lockheed—expressed sympathy for, and frustration with, the untenable position in which Lockheed had placed Blenheim. A DAPA official told Blenheim that Lockheed's withholding of the funding for Project Archer (which originated with South Korea) was "kind of criminal."

117.     Over a series of weeks, and through numerous communications, Blenheim provided South Korea and DAPA with the information it sought.  DAPA officials used that information in its ongoing discussions with Lockheed.

118.     Despite recognizing Blenheim Capital's existing contractual rights and future economic expectations, it now appears that South Korea also simultaneously placed pressure on Lockheed and Airbus to proceed with a direct procurement.

119.     On November 10, 2015, Chang Myoung-jin, Minister of Defense Acquisition for Korea, wrote to Michael Cain of LM Aero, stating that South Korea's existing satellite's "lifetime is nearing end in an urgent manner," and "DAPA could not understand the delays in satellite execution schedule, given the well-known urgency" of its replacement.  Myoung-jin obliquely suggested that Blenheim's participation in Project Archer was unnecessary: "My understanding is that LM has its own reasons regarding the present situation such as financing solution issues relating to the international broker agreement with a 3rd party.  However, I would like to point out that DAPA signed the Offset MOA with Lockheed Martin Corporation based upon the good faith relationship between both parties, but not with the 3rd party."

120.     At a December 2015 meeting among DAPA, LM Aero, Blenheim Space, and an entity identified only as "Airbus DS," a DAPA officials demanded that "LM must provide, before the end of Dec. 2015 direct funding to Airbus," questioned "whether the current project is not viable for implementation as offset project," and threatened LM Aero with press exposure that would "have significant negative impact on LM's other businesses."

121.     Around this same time, South Korea also wrote to Stephane Vesval of Airbus France, noting that a concrete solution to the issues with Project Archer had yet to be reached and

requesting a "comparison between the required period for Korea-MILSATCOM production and the period that is required to manufacture two commercial satellites for LM."

122.     In late December 2015, DAPA abruptly ceased its friendly communications with Blenheim.  Despite its belief that Lockheed's actions with respect to distribution of the funds to Blenheim were "kind of criminal," in 2016 DAPA started taking definitive action to undermine Blenheim's role in Project Archer.  Among other things, DAPA began discussions with Lockheed about providing an additional $500 million in offset credits if Lockheed restarted the military satellite project as a direct Lockheed-Airbus France procurement.

123.     In early January 2016, Blenheim reached out to its contact at DAPA—the one to whom it had provided information throughout December 2015.  Blenheim reported that it had heard from Lockheed that South Korea had made a new funding offer to Lockheed and that South Korea "had no confidence in Blenheim."  The DAPA official responded that she had been "ordered" off the project after a December 24 meeting between South Korea and LM Aero and could not "even give you a reply for your Christmas greeting around that time."  The DAPA official also apologized "for not giving you any information *that you need now*" because "everything . . . is confidential as far as [I] know."  She closed by saying that "[t]his will remain the same from now on" and that this "would be our last contact."

124.     Following this communication, South Korea and DAPA had no further contact with Blenheim regarding Project Archer.

**I.     After Improperly Cutting Blenheim Out, Lockheed, Airbus, and South Korea Implemented the Satellite Deal, and Obtained Approval from the DSCA.**

125.     Blenheim was never able to recover from the concerted actions of Lockheed, Airbus France, and South Korea to undermine Blenheim's financial position and cut it out of Project Archer.

126. On January 6, 2016, Blenheim sent a letter to Lockheed regarding the status of Project Archer. Blenheim explained that Project Archer "requires ... cash from Lockheed Martin (provided, via FMS, by the ROK)," that "there were multiple delays in Lockheed Martin's signing of the F-35 contract with the Joint Program Office" that did not lead to concurrent extensions in Project Archer, and that the start of Project Archer "was always conditioned on Lockheed Martin's investment."

127. Blenheim further noted that "Airbus and Blenheim in good faith initiated at risk on 15 January 2015 a 'Head Start' program some 6 months prior to the first payment by LM ... in order to ensure that we could meet LM's commitment on delivery of the ROK Satellite" and that "Blenheim has performed its obligations in good faith."

128. Blenheim also noted that "Lockheed Martin's unilateral decision to change the terms of its payment has proven to be detrimental, as it impacts Blenheim's ability to secure pre-launch commitments sufficient to meet requirements to obtain senior debt in the timeframe required." Additionally, "Lockheed Martin's decision has also caused Airbus to stop working on the satellite."

129. Later that month, Lockheed sent Blenheim, by way of response, a proposed Restart Agreement. Far from a "restart," the draft agreement was instead an attempt to get Blenheim to agree to the theft of its intellectual property and profits that was underway. Under the proposed agreement's terms, Lockheed demanded that Blenheim pay over the balance of the initial Phase One payment and then exit Project Archer. Blenheim refused.

130. Another draft re-start agreement for Project Archer reached an advanced form around May 2016. In that version of the re-start agreement, LM Aero would make payments to Airbus England directly and Blenheim would be required to reimburse LM Aero; if Blenheim

failed to do so, Blenheim would lose all rights in Project Archer while still being on the hook for reimbursing LM Aero. In effect, this proposed re-start agreement required Blenheim to assume all financial risk for Project Archer, and was never signed.

131. As 2016 wore on, Lockheed and LMOC's communications with Blenheim about Project Archer became increasingly infrequent and its efforts to perform more or less ceased. For example, Blenheim continued to work on securing funding partners for the two commercial satellites and invited Lockheed to attend meetings in line with these efforts. Lockheed declined.

132. On October 6, 2016, LMOC provided Blenheim with a purported "formal notice ... of the immediate termination" of the IBA for cause, including Appendix C-5 and Project Archer. Blenheim disputed the termination in an October 25, 2016 letter. On January 9, 2017, LM Aero reiterated its position that the IBA had been terminated and further purported to provide a thirty-day notice of termination without cause.

133. For its part, in a November 11, 2016 letter to Blenheim and LM Aero, Arthur Blick on behalf of Airbus France expressed concern about contractual obligations to Blenheim under the SPA. He sought a release of liability so that Airbus France could pursue a direct procurement with LM Aero. Blenheim declined. Airbus France nevertheless proceeded to enter into a direct procurement agreement with LM Aero.

134. Having conspired to cut Blenheim out of the offset transaction, Lockheed, Airbus France, and South Korea proceeded with the military satellite procurement and obtained the necessary approvals and permits from the DSCA to do so. On July 20, 2020, the satellite was launched from Cape Canaveral, Florida. Lockheed paid Airbus for the satellite (all of which was charged back to South Korea via the Pentagon) and South Korea credited billions of dollars to

Lockheed's offset obligation. Though the launch was the fruit of Blenheim's labors, it received nothing.

**J. The Defendants' Wrongful Conduct with Respect to Blenheim Was Part of a Pattern of Suspect Behavior Related to the F-35 Procurement and Defense Procurements and Offsets Generally.**

135. The wrongful scheme that Lockheed, Airbus France, and South Korea concocted to cut Blenheim out of Project Archer was, unfortunately, part of a larger pattern for each Defendant during this same time period.

136. For Lockheed, the overall F-35 procurement has, from its inception, been characterized by problems and scandals. As late Senator John McCain, then-Chair of the Senate Armed Services Committee, put it in April 2016, "[t]he F-35 program's record … has been both a scandal and a tragedy with respect to cost, schedule, and performance." Hearing on F-35 Joint Strike Fighter Program Before the S. Comm. on Armed Servs., 114th Cong. 2 (2016) (statement of Sen. John McCain, Chairman, S. Comm. on Armed Servs.).

137. South Korea's F-35 procurement has been no exception. From the outset, it was characterized by irregularity because "the Pentagon got sick and tired of talking with Lockheed" about the price and took the highly unusual step of imposing a unilateral contract in which the Pentagon set the terms.[1] South Korea's subsequent F-35 acquisition process, including the offset arrangement, has been the subject of controversy, official investigations, and accusations and findings of misconduct. In late 2017, South Korea's Board of Audit and Inspection launched an intensive investigation with regard to possible influence-peddling over the Lockheed Martin-built F-35's selection process and price lobbying. In 2019, the Board issued a report concluding that

---

[1] Colin Clark, *F-35: DoD Forces Lockheed To Accept Its Price For LRIP 9*, BREAKING DEFENSE (Nov. 2, 2016), https://breakingdefense.com/2016/11/jpo-to-lockheed-no-more-talkie-heres-lrip-9-deal/.

the DAPA officials in charge of the project made false reports in 2014 and 2015 regarding the results of negotiations with competitors including Boeing and Lockheed. The report also concluded that DAPA "was not compliant with relevant laws and it made false reports to defense ministry's defense project promotion committee regarding the facts of the results of the negotiations for the offset trading for the F-X project in 2014, and of the implementation process of the offset trading involving a military satellite in 2015."

138.   As for Airbus SE, its misconduct from at least 2008 to 2015 in procurements governed by the ACEA and ITAR led to major investigations from several prosecutorial authorities and the imposition of more than $3.9 billion in penalties. According to the U.S. Department of Justice, "Airbus engaged in a multi-year and massive scheme to corruptly enhance its business interests" and "admitted to a years-long campaign of corruption around the world[.]" From at least 2008 to 2015, "Airbus engaged in and facilitated a scheme to offer and pay bribes to decision makers and other influencers, including to foreign officials, in order to obtain improper business advantages and to win business from both privately owned enterprises and entities that were state-owned and state-controlled." Airbus also failed to provide the U.S. government with accurate information related to the sale of defense articles and services.

### K.  By Cutting Blenheim Out of the Deal, the Defendants All Blocked Blenheim From Earning the Profits It Would Have Earned on a Transaction that Blenheim Created, Modelled, and Put Together for the Benefit of All Parties.

139.   Lockheed and Airbus France each came to see Blenheim as a nascent competitor and sought to cut Blenheim out of Project Archer to boost their own profits. South Korea and DAPA came to see a direct procurement arrangement without Blenheim's involvement as a preferable means of obtaining a desperately-needed military satellite.

140. Lockheed, Airbus France, South Korea, and DAPA individually and in concert, caused LMOC to first violate, and then terminate, the IBA.

141. By causing LMOC to violate, and then terminate, the IBA, Lockheed, Airbus France, South Korea, and DAPA individually and in concert, caused LMOC to fail to pay to Blenheim the $105 million owed to Blenheim under that contract.

142. Lockheed, Airbus France, South Korea, and DAPA individually and in concert, caused Airbus England to cease performing under the SPA.

143. By causing Airbus England to cease performing under the SPA, Lockheed, Airbus France, South Korea, and DAPA individually and in concert, prevented Blenheim from consummating contracts whereby the full potential of Project Archer would have been realized. The model for Project Archer that Lockheed itself had found was likely to be achieved showed that Blenheim would have earned over $500 million.

144. At the time that Lockheed, Airbus France, South Korea, and DAPA individually and in concert, caused Airbus to cease performing under the SPA, Blenheim was reasonably certain of realizing the full potential of Project Archer.

145. In its July 25, 2014 review of Project Archer, Lockheed noted that "Four governments already identified as candidates for replacement satellites" and concluded that Project Archer had a 77% chance of success at or below budget.

146. By October 2015, Blenheim had engaged in significant negotiations with a sovereign nation to purchase the communications capacity of both commercial satellites involved in Project Archer. These negotiations had progressed to the point of a draft Memorandum of Agreement having been transmitted to the sovereign nation.

147.    In December 2015, at a meeting between Airbus France, Airbus England, LM Aero, Blenheim, and Korea, Lockheed told South Korea, in relation to Project Archer's two commercial satellites: "We are confident that our current efforts with the government and other commercial operators stand a high percentage of success."

148.    Through Lockheed, Airbus France, and South Korea's actions, Blenheim was cut out and prevented from earning substantial profits on Project Archer.

## COUNT I
### Tortious Interference with Contract/
### Inducing Breach of Contract
### (Lockheed)

149.    Each of the allegations set forth herein is restated and incorporated by reference.

150.    Lockheed is liable for tortiously interfering with and inducing breach of the SPA because Lockheed knew of the existence of that contract and intentionally interfered with it, which induced termination, and caused Blenheim to suffer injury.

151.    Lockheed knew of the existence of the SPA between Blenheim and Airbus England.

152.    Lockheed induced or procured Airbus England to terminate the SPA and intended that Airbus England do so.

153.    Lockheed came to believe that a direct procurement without Blenheim's involvement was more favorable and profitable than continuing with Project Archer.

154.    Beginning in 2015, Lockheed engaged in a series of acts to interfere with and induce breach of the SPA, including misrepresentations, delays, and secret conversations with Airbus France.

155.     Among other things:

   a.   Lockheed misrepresented the status of funding it had received from the Pentagon to create artificial and harmful delays in the progression of Project Archer under the SPA.

   b.   Lockheed excluded Blenheim from Project Archer meetings with Airbus France and engaged in secret meetings with Airbus France in order to conspire with Airbus France to pursue a direct procurement arrangement (*i.e.*, Lockheed directly procuring from Airbus) without Blenheim's involvement.

   c.   Lockheed induced Airbus France to pursue a direct procurement arrangement by promising it greater advantage than it could obtain under its existing contractual arrangement with Blenheim.

   d.   Lockheed convinced South Korea to support a direct procurement arrangement.

156.     Lockheed acted willfully, maliciously, and in conscious disregard of Blenheim's contractual rights in order to kill off a nascent competitor.

157.     Airbus England in fact wrongfully terminated the SPA with Blenheim as a result of Lockheed's actions.

158.     In addition, Lockheed tortiously and intentionally interfered with and procured the bad faith breach of the IBA by its own subsidiary, LMOC.

159.     Due to the wrongful termination of the SPA procured or induced by Lockheed, as well as the wrongful termination of the IBA by LMOC, Blenheim suffered damages.  Those damages include the full amount of profits Blenheim would have earned had Project Archer been implemented as proposed by Blenheim, and as approved and contemplated by all parties prior to the wrongful interference.

## COUNT II
### Tortious Interference with Prospective Business Expectancy/
### Causing Loss by Unlawful Means
### (Lockheed)

160.    Each of the allegations set forth herein is restated and incorporated by reference.

161.    Lockheed is liable for tortiously interfering with Blenheim's business expectancy and causing loss by unlawful means because Lockheed knew of Blenheim's expected business relations regarding the two commercial satellites, intentionally interfered with those opportunities, and caused Blenheim to suffer damages because of that loss of opportunity.

162.    Lockheed knew Blenheim expected to earn hundreds of millions of dollars through the two commercial satellites.

163.    Lockheed intentionally interfered with Blenheim's opportunity to pursue the two-commercial-satellite opportunity by pursuing and inducing a direct procurement with Airbus France and cutting Blenheim out of Project Archer.

164.    Lockheed acted willfully and maliciously in order to kill off a nascent competitor.

165.    Lockheed's unlawful actions caused Blenheim to suffer damages.  Those damages include the full amount of profits Blenheim would have earned had Project Archer been implemented as proposed by Blenheim, and as approved and contemplated by all parties prior to the wrongful interference.

## COUNT III
### Tortious Interference with Contract/
### Inducing Breach of Contract
### (Airbus France)

166.    Each of the allegations set forth herein is restated and incorporated by reference.

167.    Airbus France knew of the IBA between Blenheim and LMOC.

168.	Airbus France tortiously and intentionally interfered with the IBA, causing LMOC to terminate the IBA.

169.	Among other actions, Airbus France induced LMOC to enter into a direct procurement by offering extra fuel and a price reduction for the South Korean military satellite.

170.	Airbus France knew that its pursuit of a direct procurement arrangement was in violation of the IBA's existing contractual framework and suggested obtaining written agreement from Blenheim in order to pursue a direct procurement.  When no such agreement was forthcoming, Airbus France simply ignored the existing contractual framework.

171.	Airbus France acted willfully, maliciously, and in conscious disregard of Blenheim's contractual rights in order to kill off a nascent competitor.

172.	Airbus France's actions caused Blenheim to suffer damages.

**COUNT IV**
**Tortious Interference with Prospective Business Expectancy/**
**Causing Loss by Unlawful Means**
**(Airbus France)**

173.	Each of the allegations set forth herein is restated and incorporated by reference.

174.	Airbus France knew Blenheim had an opportunity to earn substantial profits through Project Archer and the two commercial satellites.

175.	Airbus France intended to cause Blenheim to lose out on the profits of Project Archer and the two commercial satellites.

176.	Airbus France effected this loss by pursuing a direct procurement deal and interfering with Blenheim's contractual relations and expected future contractual with LMOC, under the IBA and any and all related amendments or potential amendments, as well as with Airbus England, under the SPA and any and all related contracts for the acquisition of the three satellites, including the two commercial satellites.

177.    Airbus France's actions tortiously interfering and causing this loss were unlawful, as described above. Among other things, Airbus France induced Airbus England to refuse to provide promised mezzanine financing term sheets and sought to prevent Blenheim from entering the satellite market as a competitor.

178.    Airbus France acted willfully and maliciously in order to kill off a nascent competitor.

179.    Airbus France's actions caused Blenheim to suffer damages. Those damages include the full amount of profits Blenheim would have earned had Project Archer been implemented as proposed by Blenheim, and as approved and contemplated by all parties prior to the wrongful interference.

### COUNT V
**Tortious Interference with Contract/**
**Inducing Breach of Contract**
**(South Korea and DAPA)**

180.    Each of the allegations set forth herein is restated and incorporated by reference.

181.    Blenheim had a valid contract with LMOC under the IBA.

182.    Blenheim had a valid contract with Airbus England under the SPA.

183.    South Korea and DAPA knew of the existence of the IBA between LMOC and Blenheim.

184.    South Korea and DAPA knew of the existence of the SPA between Blenheim and Airbus England.

185.    South Korea and DAPA intentionally interfered with the IBA, causing LMOC to terminate the IBA.

186.    South Korea and DAPA intentionally interfered with the SPA, causing Airbus England to terminate the SPA.

45

187. Among other actions, South Korea and DAPA:

   a. obtained business information from Blenheim under false pretenses in order to use that information in negotiations meant to induce LMOC and Airbus England to breach their contracts and cut Blenheim out of the military satellite procurement;

   b. advised and encouraged LMOC and Airbus England to engage in a direct procurement agreement for production of the military satellite and to terminate existing contractual relationships with Blenheim;

   c. threatened Lockheed with embarrassing public disclosures and resulting business harm in order to induce Lockheed to abandon its contractual relationship with Blenheim; and

   d. offered LMOC an additional $500 million in offset credits to pursue a direct procurement, which Lockheed later offered to share with Airbus.

188. South Korea and DAPA's actions caused Blenheim to suffer damages.

## COUNT VI
## Tortious Interference with Prospective Business Expectancy/ Causing Loss by Unlawful Means
## (South Korea and DAPA)

189. Each of the allegations set forth herein is restated and incorporated by reference.

190. South Korea and DAPA knew that Blenheim had an opportunity to earn substantial profits through Project Archer's two commercial satellites.

191. South Korea and DAPA knowingly caused Blenheim to lose out on the profits of Project Archer.

192. South Korea and DAPA believed that their own interests would be better served if the provision of South Korea's military satellite was not intertwined with provision of two commercial satellites to Blenheim.

193.   South Korea and DAPA tortiously and intentionally interfered with Blenheim's prospective business relations.  Among other actions, South Korea and DAPA:

   a.   obtained business information from Blenheim under false pretenses in order to use that information in negotiations meant to induce LMOC and Airbus England to abandon the commercial satellite portions of Project Archer;

   b.   advised and encouraged LMOC and Airbus England to abandon the commercial satellite portions of Project Archer;

   c.   threatened Lockheed with embarrassing public disclosures and resulting business harm in order to induce Lockheed to abandon the commercial satellite portions of Project Archer; and

   d.   offered LMOC an additional $500 million in offset credits to pursue a direct procurement of the military satellite instead of Project Archer's three-satellite structure, which Lockheed later offered to share with Airbus.

194.   South Korea and DAPA's actions causing this loss were unlawful, as described above.

195.   South Korea's and DAPA's actions caused Blenheim to suffer damages.

### COUNT VII
**Conspiracy to Tortiously Interfere with Business Relations/
Unlawful Means Conspiracy
(Lockheed, Airbus France, South Korea, DAPA)**

196.   Each of the allegations set forth herein is restated and incorporated by reference.

197.   Lockheed (through LM Aero), Airbus France, South Korea (through DAPA) (collectively, "the Conspirators") entered into an agreement or combination with each other to intentionally interfere with Blenheim's contracts and prospective business relations, carried out acts in furtherance of that agreement, and caused Blenheim to suffer damages as a result.

198. The Conspirators were all aware of Blenheim's involvement in Project Archer but agreed that they preferred to pursue a direct procurement approach without Blenheim.

199. As described above, the Conspirators, individually and in concert, achieved a direct procurement of the military satellite by inducing Airbus England to terminate the SPA, LMOC to terminate the IBA, and both Airbus England and LMOC to abandon the commercial satellite portion of Project Archer.

200. Each of the Defendants took actions in furtherance of the conspiracy to interfere with Blenheim's contractual and prospective relations and proceed with a direct procurement without Blenheim's involvement, as described above.

201. Blenheim suffered damages due to actions pursuant to the conspiracy entered into by Lockheed, Airbus France, and South Korea (through DAPA).

## COUNT VIII
### Statutory Civil Conspiracy
### Virginia Code §§ 18.2-499 and 18.2-500
### (Lockheed, Airbus France, South Korea, DAPA)

202. Each of the allegations set forth herein is restated and incorporated by reference

203. Lockheed, Airbus France, and South Korea (through DAPA) combined, associated, agreed, mutually undertook, and concerted together for the purpose of willfully and maliciously injuring Blenheim in its reputation, trade, and business.

204. Lockheed, Airbus France, and South Korea (through DAPA) also attempted to procure the participation, cooperation, agreement, or assistance of each other Defendant to willfully and maliciously injure Blenheim in its reputation, trade or business.

205. The actions of Lockheed, Airbus France, South Korea, and DAPA in furtherance of this conspiracy, as described above, resulted in damages to Blenheim.

## COUNT IX
### Unjust Enrichment
### (Lockheed, Airbus France)

206.     Each of the allegations set forth herein is restated and incorporated by reference.

207.     Blenheim conferred a benefit on Lockheed and Airbus France by developing Project Archer and the arrangements for providing a military satellite as an offset for a defense trade procurement for South Korea.

208.     Lockheed and Airbus France knew that Blenheim developed the idea for Project Archer and proceeded to cut Blenheim out and secure a direct procurement.

209.     The military satellite produced through Lockheed and Airbus France's direct procurement was launched on or around July 20, 2020.

210.     The value of the military satellite in offset credits was over $3.1 billion.

211.     Lockheed and Airbus France have earned millions of dollars in profits through Project Archer and the military satellite.

212.     Lockheed and Airbus France have each been unjustly enriched by cutting Blenheim out and proceeding with a direct procurement.  It would be inequitable for Lockheed and Airbus France to retain the profits they each earned through the Project Archer.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief as follows:

A.  For general and special compensatory damages;

B.  For treble and punitive damages;

C.  For an order awarding Plaintiff its reasonable attorneys' fees;

D.  For costs of suit incurred herein;

E.  For prejudgment interest; and

F.  For such other and further relief as is just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Katherine M. Cheng*
_____

**BOIES SCHILLER FLEXNER LLP**
Hamish P.M. Hume*
Jesse Panuccio*
Katherine M. Cheng (Virginia Bar #87391)
Simon Leen*
1401 New York Ave, NW
Washington, D.C. 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
hhume@bsfllp.com
jpanuccio@bsfllp.com
kcheng@bsfllp.com
sleen@bsfllp.com

* *Pro hac vice* applications to be filed

*Counsel for Blenheim Capital Holdings*
*Limited and Blenheim Capital Partners*
*Limited*