**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **BLENHEIM CAPITAL HOLDINGS LTD., ET AL.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **Civil Action No. 1:20-cv-1608-LO-JFA** |
| v. ) | |
| ) | |
| **LOCKHEED MARTIN CORPORATION, ET AL.,** ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**LOCKHEED MARTIN CORPORATION'S MOTION TO DISMISS**

Brian Tully McLaughlin, VA Bar No. 71258
Cheryl A. Falvey, *pro hac vice*
Astor H.L. Heaven, *pro hac vice*
Lyndsay A. Gorton, VA Bar No. 80409
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
BMcLaughlin@crowell.com
CFalvey@crowell.com
AHeaven@crowell.com
LGorton@crowell.com

*Counsel for Defendant Lockheed Martin Corporation*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND .................................................................................................3

ARGUMENT .......................................................................................................................8

I.   THE COMPLAINT MUST BE DISMISSED FOR LACK OF
     JURISDICTION UNDER RULE 12(B)(1) .................................................................8

     A.   There Is No FSIA Jurisdiction for Tortious Interference Claims
          Unless the Commercial Activity Exception Applies ............................................9

     B.   The Claims Are Not "Based Upon" a "Commercial Activity" by
          South Korea ................................................................................................10

          1.   South Korea Did Not Engage in Commercial Activity .........................11

          2.   Blenheim's Claims Are Not "Based Upon" the FMS
               Transaction............................................................................................13

     C.   Jurisdiction Is Dependent Upon Service of South Korea ...................................15

II.  THE COURT LACKS PERSONAL JURISDICTION OVER LOCKHEED
     MARTIN ...............................................................................................................15

III. THE COMPLAINT MUST BE DISMISSED FOR IMPROPER VENUE...................18

IV.  BLENHEIM'S CLAIMS AGAINST LOCKHEED MARTIN MUST BE
     ARBITRATED ........................................................................................................21

V.   BLENHEIM'S CLAIMS MUST BE DISMISSED UNDER THE IBA'S
     FORUM-SELECTION CLAUSE...............................................................................23

VI.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER RULE
     12(B)(6)..................................................................................................................24

     A.   The IBA's Limitation of Liability Clause Precludes Blenheim's
          Claims ........................................................................................................25

     B.   Counts I and II Should Be Dismissed Because Blenheim Has Not
          Adequately Alleged Tortious Interference Against Lockheed
          Martin.........................................................................................................26

          1.   Lockheed Martin Is No Stranger to the Business
               Relationship Here....................................................................................28

2.     Lockheed Martin's Contractual Actions Do Not Support a Tort Claim.................................................................30

3.     Blenheim's Allegations of Intentional Interference Are Implausible and Fail to Establish Intent, Interference, or Causation.................................................................31

4.     Blenheim Fails to Allege Facts to Demonstrate That Lockheed Martin Tortiously Interfered with Any Business Expectancy.................................................................34

C.     Counts VII and VIII for Civil and Statutory Conspiracy Fail...........................35

D.     Count IX for Unjust Enrichment Fails.................................................................38

1.     Blenheim's Unjust Enrichment Claim Is Untimely...............................38

2.     The Unjust Enrichment Claim Is Precluded by an Express Contract.................................................................39

3.     Blenheim Did Not Confer a Benefit on Lockheed Martin that Was Retained Without Payment...................................................39

CONCLUSION.................................................................40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Gordon,*
No. DKC 09-0372, 2009 WL 2426052 (D. Md. Aug. 6, 2009)..............................26

*Acorn Structures, Inc. v. Swantz,*
846 F.2d 923 (4th Cir. 1988) .............................................................................39

*Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.,*
650 A.2d 260 (Md. 1994) ....................................................................................28

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,*
293 F.3d 707 (4th Cir. 2002) .............................................................................16

*Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.,*
367 F.3d 212 (4th Cir. 2004) ...............................................................................4

*Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,*
96 F.3d 88 (4th Cir. 1996) ...........................................................................22, 23

*Am. W. Airlines, Inc. v. GPA Grp., Ltd.,*
877 F.2d 793 (9th Cir. 1989) .............................................................................14

*Arbaugh v. Y & H Corp.,*
546 U.S. 500 (2006).......................................................................................9, 15

*Argentine Republic v. Amerada Hess Shipping Corp.,*
488 U.S. 428 (1989)..............................................................................................9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).................................................................................24, 25, 35

*Ass'n for Supervision & Curriculum Dev., Inc. v. Int'l Council for Educ. Reform & Dev., Inc.,*
No. 1:10cv74, 2011 WL 1225750 (E.D. Va. Mar. 14, 2011) ...............................27

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.,*
571 U.S. 49 (2013)..............................................................................................24

*Babiak v. Mizuho Bank, Ltd.,*
No. 1:18-cv-352, 2018 WL 4473584 (E.D. Va. Sept. 17, 2018) ..........................16

*Baron Fin. Corp. v. Natanzon,*
471 F.Supp.2d 535 (D. Md. 2006) ................................................................34, 35

*Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC,*
261 F.Supp.2d 483 (E.D. Va. 2003) .............................................................36

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).................................................................... *passim*

*Best Med. Belgium, Inc. v. Kingdom of Belgium,*
913 F.Supp.2d 230 (E.D. Va. 2012) .............................................................11

*Blankenship v. Consolidation Coal Co.,*
850 F.3d 630 (4th Cir. 2017) .............................................................38

*Blondell v. Littlepage,*
968 A.2d 678 (Md. Ct. Spec. App. 2009) .............................................................26

*Blumenthal-Kahn Elec. Ltd. v. Am. Home Assurance Co.,*
236 F.Supp.2d 575 (E.D. Va. 2002) .............................................................22

*Brass Metal Prods., Inc. v. E-J Enters., Inc.,*
984 A.2d 361 (Md. Ct. Spec. App. 2009) .............................................................26

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985).............................................................16

*Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.,*
454 A.2d 367 (Md. Ct. Spec. App. 1983) .............................................................36

*CEM Corp. v. Pers. Chemistry, AB,*
55 F. App'x 621 (4th Cir. 2003) .............................................................18

*Cent. Va. Aviation, Inc. v. N. Am. Flight Servs., Inc.,*
23 F.Supp.3d 625 (E.D. Va. 2014) .............................................................17

*Chaves v. Johnson,*
335 S.E.2d 97 (Va. 1985).............................................................26

*Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.,*
252 F.3d 707 (4th Cir. 2001) .............................................................22

*Cicippio v. Islamic Republic of Iran,*
30 F.3d 164 (D.C. Cir. 1994) .............................................................11, 13

*CMA CGM (Am.), LLC v. RLI Ins. Co.,*
No. 12-cv-03306, 2013 WL 588978 (D. Md. Feb. 13, 2013).............................................................19

*Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.,*
747 A.2d 600 (Md. 2000) .............................................................39

*Cole v. Daoud*,
No. 2:15cv419, 2016 WL 11410410 (E.D. Va. Feb. 17), *report & recommendation adopted*, 2016 WL 1213230 (E.D. Va. Mar. 24, 2016) ........................28, 29

*Com. Bus. Sys., Inc. v. Halifax Corp.*,
484 S.E.2d 892 (Va. 1997).........................................................34, 35

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
561 F.3d 273 (4th Cir. 2009) ...............................................................16

*Crosby v. City of Gastonia*,
635 F.3d 634 (4th Cir. 2011) ...............................................................15

*Deckelbaum v. Cooter, Mangold, Tompert & Chapman, P.L.L.C.*,
292 B.R. 536 (D. Md. 2003) .................................................................36

*Dunlap v. Cottman Transmission Sys., LLC*,
754 S.E.2d 313 (Va. 2014)....................................................................26

*E. W. LLC v. Rahman*,
873 F.Supp.2d 721 (E.D. Va. 2012) .....................................................38

*Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*,
189 F.Supp.2d 385 (E.D. Va. 2002) .....................................................25

*Fare Deals, Ltd. v. World Choice Travel.Com, Inc.*,
180 F.Supp.2d 678 (D. Md. 2001) ........................................................36

*Feeley v. Total Realty Mgmt.*,
660 F.Supp.2d 700 (E.D. Va. 2009) .....................................................31

*Firestone v. Wiley*,
485 F.Supp.2d 694 (E.D. Va. 2007) ................................................35, 36

*Flexible Benefits Council v. Feltman*,
No. 1:08CV371, 2008 WL 2465457 (E.D. Va. June 16, 2008)..............21

*FLF, Inc. v. World Publ'ns, Inc.*,
999 F.Supp. 640 (D. Md. 1998) ............................................................39

*Ford Motor Co. v. Nat'l Indem. Co.*,
972 F.Supp.2d 850 (E.D. Va. 2013) .....................................................25

*Fox v. Deese*,
362 S.E.2d 699 (Va. 1987).....................................................................28

*France.com, Inc. v. French Republic*,
992 F.3d 248 (4th Cir. 2021) ..........................................................11, 14

*Francis Hosp., Inc. v. Read Props., LLC*,
  820 S.E.2d 607 (Va. 2018)................................................................................28

*Freedman v. Am. Online, Inc.*,
  325 F.Supp.2d 638 (E.D. Va. 2004) ..................................................................24

*Gatekeeper Inc. v. Stratech Sys., Ltd.*,
  718 F.Supp.2d 664 (E.D. Va. 2010) ......................................................16, 17, 18

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA,
  LLC*,
  140 S.Ct. 1637 (2020)......................................................................................22

*Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*,
  533 F. App'x 200 (4th Cir. 2013) .....................................................................25

*Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*,
  893 F.Supp.2d 761 (E.D. Va. 2012), *aff'd*, 533 F. App'x 200 (4th Cir. 2013).......35

*Glasson v. Children's Surgical Specialty Grp., Inc.*,
  73 Va.Cir. 480 (2007) ......................................................................................30

*Goulmamine v. CVS Pharmacy, Inc.*,
  138 F.Supp.3d 652 (E.D. Va. 2015) ..............................................................32, 33

*Gov't Emps. Ins. Co. v. Google, Inc.*,
  330 F.Supp.2d 700 (E.D. Va. 2004) ..................................................................38

*Grayson v. Anderson*,
  816 F.3d 262 (4th Cir. 2016) .......................................................................15, 16

*Greenberry's Franchising Corp. v. Park*,
  No. 3:10-cv-00045, 2010 WL 5141285 (W.D. Va. Dec. 10, 2010) .......................19

*Gulf Ins. Co. v. Glasbrenner*,
  417 F.3d 353 (2d Cir. 2005)..............................................................................19

*Hallinan v. Republic Bank & Tr. Co.*,
  No. 06 Civ. 185, 2006 WL 1495232 (S.D.N.Y. June 1, 2006).........................29, 30

*HCI Techs., Inc. v. Avaya, Inc.*,
  446 F.Supp.2d 518 (E.D. Va. 2006) ..............................................................22, 23

*Heroth v. Kingdom of Saudi Arabia*,
  565 F.Supp.2d 59 (D.D.C. 2008), *aff'd*, 331 F. App'x 1 (D.C. Cir. 2009)............12

*Hunt v. Branch Banking & Tr. Co.*,
  480 F. App'x 730 (4th Cir. 2012) ...................................................................9, 15

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,*
    206 F.3d 411 (4th Cir. 2000) ...........................................................................22

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,*
    863 F.2d 315 (4th Cir. 1988) ...........................................................................23

*Jam v. Int'l Fin. Corp.,*
    139 S.Ct. 759 (2019) .........................................................................................11

*Jason v. Nat'l Loan Recoveries, LLC,*
    134 A.3d 421 (Md. Ct. Spec. App. 2016) ........................................................38

*K & K Mgmt., Inc. v. Lee,*
    557 A.2d 965 (Md. 1989) ..................................................................................28

*Kumar v. Republic of Sudan,*
    880 F.3d 144 (4th Cir. 2018) ...........................................................................15

*L-3 Commc'ns Corp. v. Serco, Inc.,*
    926 F.3d 85 (4th Cir. 2019), *reh'g denied* (July 16, 2019)..................21, 28, 29

*Lawson v. Merscorp Holdings, Inc.,*
    No. 1:18-cv-640, 2018 WL 10156105 (E.D. Va. Oct. 24, 2018) .....................21

*Leutwyler v. Office of Queen Rania Al-Abdullah,*
    184 F.Supp.2d 277 (S.D.N.Y. 2001) ...............................................................10

*Lovern v. Edwards,*
    190 F.3d 648 (4th Cir. 1999) .............................................................................9

*Lyon v. Campbell,*
    707 A.2d 850 (Md. Ct. Spec. App. 1998) ...................................................32, 33

*McDonald's Corp. v. Turner-James,*
    No. 05CV804, 2005 WL 7873649 (E.D. Va. Nov. 29, 2005) ..........................35

*McDonnell Douglas Corp. v. Islamic Republic of Iran,*
    758 F.2d 341 (8th Cir. 1985) ...........................................................................13

*Milton v. IIT Rsch. Inst.,*
    138 F.3d 519 (4th Cir. 1998) ...........................................................................25

*Mitrano v. Hawes,*
    377 F.3d 402 (4th Cir. 2004) ...........................................................................19

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983)..........................................................................................21, 22

*MTGLQ Invs., L.P. v. Guire*,
    286 F.Supp.2d 561 (D. Md. 2003) ..................................................................21

*Murray v. United Food & Com. Workers Int'l Union*,
    289 F.3d 297 (4th Cir. 2002) .......................................................................22

*Myers v. Bright*,
    609 A.2d 1182 (Md. 1992) ..........................................................................34

*Nedrich v. Jones*,
    429 S.E.2d 201 (Va. 1993)...........................................................................39

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009)..................................................................24, 25

*Newbauer v. Jackson Hewitt Tax Serv. Inc.*,
    No. 2:18cv679, 2019 WL 1398172 (E.D. Va. Mar. 28, 2019) ...................18, 19, 21

*Nichols v. G.D. Searle & Co.*,
    991 F.2d 1195 (4th Cir. 1993) .....................................................................19

*NorthStar Aviation, LLC v. Alberto*,
    332 F.Supp.3d 1007 (E.D. Va. 2018) ............................................................35

*OBB Personenverkehr AG v. Sachs*,
    577 U.S. 27 (2015).............................................................................11, 13, 14

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,
    905 F.Supp.2d 675 (D. Md. 2012).................................................................35

*Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*,
    397 S.E.2d 804 (Va. 1990)...........................................................................24

*Power Paragon, Inc. v. Precision Tech. USA, Inc.*,
    605 F.Supp.2d 722 (E.D. Va. 2008) ..............................................................19

*Priority Auto Grp., Inc. v. Ford Motor Co.*,
    757 F.3d 137 (4th Cir. 2014) ...................................................................30, 31

*Punchbowl, Inc. v. AJ Press LLC*,
    No. 1:21-cv-00136, 2021 WL 1178070 (E.D. Va. Mar. 26, 2021)...................19, 21

*RAR, Inc. v. Turner Diesel, Ltd.*,
    107 F.3d 1272 (7th Cir. 1997) .....................................................................18

*Regency Photo & Video, Inc. v. Am. Online, Inc.*,
    214 F.Supp.2d 568 (E.D. Va. 2002) ..............................................................26

*Republic of Argentina v. Weltover, Inc.*,
　504 U.S. 607 (1992)...................................................................................10, 11

*Rosetta Stone Ltd. v. Google, Inc.*,
　676 F.3d 144 (4th Cir. 2012) .....................................................................39, 40

*Run Them Sweet, LLC v. CPA Glob. Ltd.*,
　224 F.Supp.3d 462 (E.D. Va. 2016) ................................................................24

*Salman v. Saudi Arabian Cultural Mission*,
　No. 1:16cv1033, 2017 WL 176576 (E.D. Va. Jan. 17, 2017)...............................9

*Saudi Arabia v. Nelson*,
　507 U.S. 349 (1993).............................................................................11, 13, 14

*Schlegel v. Bank of Am., N.A.*,
　505 F.Supp.2d 321 (W.D. Va. 2007) .....................................................36, 37, 38

*Sec'y of State for Def. v. Trimble Navigation Ltd.*,
　484 F.3d 700 (4th Cir. 2007) .........................................................................12, 13

*SecureInfo Corp. v. Telos Corp.*,
　387 F.Supp.2d 593 (E.D. Va 2005) ...............................................................31, 33

*Simmons v. Miller*,
　544 S.E.2d 666 (Va. 2001)..................................................................................37

*Size, Inc. v. Network Sols., Inc.*,
　255 F.Supp.2d 568 (E.D. Va. 2003) ....................................................................26

*Skillstorm, Inc. v. Elec. Data Sys., LLC*,
　666 F.Supp.2d 610 (E.D. Va. 2009) ...............................................................35, 37

*Southprint, Inc. v. H3, Inc.*,
　208 F. App'x 249 (4th Cir. 2006) ..................................................................34, 35

*Spengler v. Sears, Roebuck & Co.*,
　878 A.2d 628 (Md. Ct. Spec. App. 2005) ............................................................30

*State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*,
　381 F.Supp.3d 536 (D. Md. 2019).................................................................38, 40

*Straight Line Drive, Inc. v. Vanatta*,
　No. 3:20CV779, 2020 WL 7647637 (E.D. Va. Dec. 23, 2020)............................17

*Stratton v. Mecklenburg Cty. Dep't of Soc. Servs.*,
　521 F. App'x 278 (4th Cir. 2013) .......................................................................15

*Symbology Innovations, LLC v. Lego Sys., Inc.*,
282 F.Supp.3d 916 (E.D. Va. 2017) ...............................................18

*Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*,
299 F.Supp.2d 565 (E.D. Va. 2004) ...............................................38

*Tech. & Supply Mgmt., LLC v. Johnson Controls Bldg. Automation Sys., LLC*,
No. 1:16-cv-303, 2017 WL 57134 (E.D. Va. Jan. 4, 2017).....................30

*Terra Holding GmbH v. Unitrans Int'l, Inc.*,
124 F. Supp. 3d 745 (E.D. Va. 2015) .............................................23

*Thornapple Assocs., Inc. v. Izadpanah*,
No. 1:14cv767, 2014 WL 4925838 (E.D. Va. Sept. 30, 2014)................16

*TKA Inc. v. Bowers*,
No. 1185, 2019 WL 517209 (Md. Ct. Spec. App. Feb. 11, 2019)..................26, 27

*Tower Oaks Blvd., LLC v. Va. Com. Bank*,
223 Md. App. 781 (2015) ...........................................................27

*Tribalco, LLC v. Hue Tech., Inc.*,
No. CIV. JFM-11-935, 2011 WL 3821074 (D. Md. Aug. 26, 2011) ....................27

*Tysons Toyota, Inc. v. Commonwealth Life Ins.*,
20 Va. Cir. 399 (1990) ..............................................................33

*United Mine Workers of Am. v. Gibbs*,
383 U.S. 715 (1966)....................................................................9

*Volcjak v. Wash. Cnty. Hosp. Ass'n*,
723 A.2d 463 (Md. Ct. Spec. App. 1999) ........................................30

*Walden v. Fiore*,
571 U.S. 277 (2014).............................................................16, 18

*Wallace v. Baylouny*,
No. 1:16-cv-0047, 2016 WL 3059996 (E.D. Va. May 31, 2016)...........33

*William v. AES Corp.*,
28 F.Supp.3d 553 (E.D. Va. 2014) .................................................36

*Willis v. Clark*,
No. 3:05CV325, 2005 U.S. Dist. LEXIS 25877 (E.D. Va. Oct. 31, 2005) ............18

*Wilmington Tr. Co. v. Clark*,
424 A.2d 744 (Md. 1981) ............................................................28

*Wye Oak Tech., Inc. v. Republic of Iraq*,
    666 F.3d 205 (4th Cir. 2011) ..................................................................11, 13

*Wye Oak Tech., Inc. v. Republic of Iraq*,
    No. 1:09CV793, 2010 WL 2613323 (E.D. Va. June 29, 2010), *aff'd*, 666 F.3d
    205 (4th Cir. 2011)..........................................................................................19

*Zamma Canada Ltd. v. Zamma Corp.*,
    No. 3:20cv353, 2020 WL 7083940 (E.D. Va. Dec. 3, 2020) ................................30

**Statutes**

9 U.S.C. § 2 ...........................................................................................................21

22 U.S.C. § 2751-54 ..............................................................................................13

22 U.S.C. § 2753 ....................................................................................................12

22 U.S.C. § 2778 ...............................................................................................12, 13

28 U.S.C. § 1330 ..............................................................................................8, 15

28 U.S.C. § 1332 ......................................................................................................8

28 U.S.C. § 1367 ................................................................................................9, 15

28 U.S.C. § 1391 .........................................................................................8, 19, 20

28 U.S.C. § 1406(a) ...............................................................................................18

28 U.S.C. § 1441 ......................................................................................................8

28 U.S.C. § 1602 ......................................................................................................8

28 U.S.C. § 1603 ....................................................................................................10

28 U.S.C. § 1604 ......................................................................................................9

28 U.S.C. § 1605 .........................................................................................9, 10, 12

28 U.S.C. § 1608(a) ...............................................................................................15

D.C. Code § 12-301 ................................................................................................8

Md. Code, *Cts. & Jud. Proc.* § 5-101 ..............................................................7, 23

Va. Code § 8.01-328.1(A).................................................................................17, 18

**Regulations**

48 C.F.R. § 225.7303-2 (2019) .............................................................................3, 21

48 C.F.R. § 225.7306 (2019) ......................................................................................21

**Rules**

Fed. R. Civ. P. 12(b)(1).................................................................................................8

Fed. R. Civ. P. 12(b)(2)...............................................................................................15

Fed. R. Civ. P. 12(b)(3)...............................................................................................18

Fed. R. Civ. P. 12(b)(6)...............................................................................................24

<u>**INTRODUCTION**</u>

Defendant Lockheed Martin Corporation ("Lockheed Martin") submits this Memorandum in support of its Motion to Dismiss the Complaint filed by Plaintiffs Blenheim Capital Holdings Limited and Blenheim Capital Partners Limited (collectively "Blenheim") against Lockheed Martin and co-Defendants the Republic of Korea ("South Korea"), South Korea's Defense Acquisition Program Administration ("DAPA"),[1] and Airbus Defense and Space SAS ("Airbus"), alleging tortious interference with contract and with prospective business expectancy, common law and statutory civil conspiracy, and unjust enrichment.

This is a case that should not have been filed. Blenheim blames Lockheed Martin and Airbus for its doomed offset project, but the reality is that Blenheim failed to obtain the commercial financing and insurance that it expressly agreed were prerequisites for moving the overarching offset project among the parties—then partners—forward. Blenheim does not contest this at any point in its Complaint. Instead, Blenheim seeks to mask its own conceded non-performance by alleging that Lockheed Martin and Airbus interfered with each other's respective contracts, all for fear of Blenheim as a "nascent competitor in the satellite industry." This speculative assertion is nonsensical and implausible, especially given Blenheim's self-description as "an experienced broker in structuring offsets" and the fact that it had never before sold or manufactured a satellite. At bottom, Blenheim's Complaint is a desperate, thirteenth-hour attempt to achieve a windfall for a job that Blenheim never completed due to its own failings—not any action or inaction on the part of Airbus or Lockheed Martin.

Blenheim's Complaint is also forum shopping at its worst. Tellingly, Blenheim brings no claim for breach of contract, even while asserting in conclusory fashion that Lockheed Martin

---

[1] South Korea and DAPA are hereinafter collectively referred to as "South Korea."

and Airbus "breached" their agreements with Blenheim. Nor could it, as the controlling provisions of an International Broker Agreement between Blenheim and Lockheed Martin require the application of Maryland law under which the statute of limitations has long since run for contract and tort claims. Blenheim thus brings this contract dispute masquerading as a tort action here, in Virginia, seeking a more favorable limitation period. Even so, Blenheim fails to demonstrate that its claims are founded upon events occurring in this District. None of the parties to this action are located in Virginia, nor does Blenheim plead any relevant activity here.

Blenheim's forum shopping and implausible pleading compels dismissal of the Complaint for multiple reasons. **First**, the Court does not have subject matter jurisdiction because South Korea's acquisition of F-35 fighter aircraft from the U.S. Government and the offset obligations deriving therefrom are not commercial activity under the Foreign Sovereign Immunity Act's sovereign immunity exception and, in any event, do not form the basis for Blenheim's claims. **Second**, the Court lacks personal jurisdiction over Lockheed Martin because none of the claims against it arise out of ties that Lockheed Martin has with the Eastern District of Virginia. **Third**, for largely the same reasons, venue is improper because no substantial part of the events giving rise to Blenheim's claims occurred in this District—in fact, *none* of the events material to the causes of action pleaded occurred in Virginia at all. **Fourth**, Blenheim's claims are subject to mandatory arbitration and forum-selection clauses that apply to all disputes arising out of or in connection with Blenheim's offset agreements with Lockheed Martin. **Finally**, Blenheim wholly fails to state a claim against Lockheed Martin for tortious interference, conspiracy, or unjust enrichment. Blenheim's agreements with Lockheed Martin render Blenheim's claims of tortious conduct implausible and bar them as a matter of law.

Accordingly, Blenheim's claims should be dismissed with prejudice.

<u>**FACTUAL BACKGROUND**</u>[2]

In 2013, Lockheed Martin was awarded a contract by the United States to manufacture F-35 fighter aircraft under a Foreign Military Sales ("FMS") transaction between the U.S. Department of Defense ("DoD") and South Korea. Compl. ¶¶ 32, 47, 53. Due to the highly sensitive and classified technology of the aircraft and its related intellectual property, the F-35s could only be procured by South Korea through a unique government-to-government FMS transaction with DoD rather than via a direct commercial agreement with Lockheed Martin. *See, e.g.*, *id.* ¶¶ 6, 32-34; Security Assistance Management Manual, DCSA Manual 5105.38-M ("SAMM") §§ C4.3.5, C4.3.5.2 (FMS-Only list), C4.3.5.3-4, *available at* https://samm.dsca.mil/ (last visited April 29, 2021).

Coincident with the FMS transaction, South Korean law required Lockheed Martin to provide South Korea with a prescribed amount of "offset" (the "Offset Transaction"). Compl. ¶¶ 38, 53.[3] The offset obligation "would arise from the FMS contract," (*id.* ¶ 38), and its costs were allowable as part of Lockheed Martin's separate contract with the U.S. government in support of the FMS transaction, (*id.* ¶ 39) (citing 48 C.F.R. § 225.7303-2(a)(3)(ii)).

Pursuant to a 2007 International Broker Agreement ("IBA") between Lockheed Martin and Blenheim governing Lockheed Martin's non-exclusive use of Blenheim's services to design, perform, and fulfill offset obligations in various defense procurement transactions, Blenheim proposed "Project Archer" to deliver the majority of the offset obligation for the F-35 sale. *Id.*

---

[2] Lockheed Martin also joins the "Background" section in Airbus' Memorandum of Law in Support of Its Motion to Dismiss.

[3] As described by Blenheim, an "offset transaction is generally one in which the supplier agrees to undertake activities in order to satisfy a second objective of the procuring entity, distinct from the acquisition of the goods or services that form the core transaction." Compl. ¶ 2.

¶¶ 5, 7, 40-43; Ex. 1A (2007 IBA).[4] Project Archer was a "four-party transaction" involving Blenheim, Lockheed Martin, Airbus, and South Korea that was effectuated through a series of underlying agreements, most pertinently the Lockheed Martin-Blenheim IBA and the Satellite Purchase Agreement ("SPA") between Airbus and Blenheim that itself made specific reference to the IBA. *See* Compl. ¶ 8; Ex. 1A (IBA); Airbus Ex. 5 (SPA).[5] Under the terms of Project Archer, Blenheim would secure financing, insurance, and related assurances through approved investors and banks to procure from Airbus one military satellite and two additional commercial satellites, at a total price of "upwards of a billion dollars." Compl. ¶¶ 8, 9, 55; Ex. 2A at 92-93 (Original Amend. 7 to the IBA); Airbus Ex. 5 at 4 (SPA). Lockheed Martin would pay Blenheim $150 million total for the Offset Transaction, Airbus would manufacture and deliver the military satellite, South Korea would provide offset credits to Lockheed Martin, and Blenheim would keep the commercial satellites for its own gain. Compl. ¶¶ 6-8, 56; Ex. 2A at 113.

Amendments 5 through 7 to the IBA formalized the terms of the portions of Project Archer that were between Lockheed Martin and Blenheim. Exs. 2A (Amend. 7), 3A (Amendment 5 to the IBA). Amendment 7, executed on December 4, 2014, set forth the military satellite requirements ("MILSATCOM project"), (Ex. 2A at 3-13), the funding and commercial satellite financing approach (*id*. at 113-14, 116-20), and the ongoing negotiations among Lockheed Martin, Blenheim, "the Satellite System Supply contractor" (which would become

---

[4] True and correct copies of Exhibits 1-7 are attached to the Declaration of Brian Tully McLaughlin filed as Appendix A to this Memorandum. The Complaint refers to and necessarily relies on these documents, and their terms are integral to the Complaint's allegations. *See, e.g.*, Compl. ¶¶ 5, 42, 63, 101-02. They are thus properly before the Court on this Motion to Dismiss. *See Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 235 (4th Cir. 2004).

[5] All citations to the SPA in this Memorandum refer to Ex. 5 of the Declaration of Robert Longtin attached to Airbus' Memorandum of Law in Support of Its Motion to Dismiss.

Airbus), and South Korea related to the military satellite (*id.* at 4, 113-14).[6]  Blenheim's primary

obligations in the Project Archer arrangement were (1) to establish a Special Purpose Vehicle

("SPV") to secure financing to build the military and commercial satellites; (2) procure the

satellites from a satellite system supplier; and (3) provide insurance for the satellite production

and launch.  Compl. ¶¶ 8(c), 56, 68-69, 71; Ex. 2A at 113-14.  These terms were critical to the

requirement that the military satellite be "produced, delivered, launched and orbit tested no later

than December 31, 2017."  Ex. 2A at 4.

The original IBA Amendment 7 contemplated a series of five payments by Lockheed

Martin to Blenheim from April 30, 2015 through November 30, 2017, totaling $150 million.  *Id.*

at 116.  On March 31, 2015, Blenheim and Lockheed Martin mutually agreed to modify the

payment schedule, with the initial $45 million payment to be issued on May 29, 2015, rather than

April 30th.  Ex. 4 (Amend. 7 (Rev. – 1)).  On June 1, 2015, Blenheim and Lockheed Martin

again agreed to modify the IBA to incorporate a Phased Payment structure.  Phase One was the

initial $45 million payment and Phase Two would include the remaining four payments that

would be subject to express milestones as preconditions that Blenheim was to meet to ensure

reasonable progression of Project Archer.  Compl. ¶ 78; Ex. 5 (Amend. 7 (Rev. – 2)).  The first

Phase Two Payment was scheduled for July 31, 2015, "or such subsequent date as the parties

may agree," and required Blenheim, *inter alia*, to produce executed term sheets for the senior

debt financing, executed term sheets for the mezzanine debt financing, and satisfactory

confirmation that the combination of financing and Lockheed Martin's payments would

constitute all funds required to complete Project Archer.  Ex. 5 at 1-2.[7]

---

[6]  The DoD is not mentioned in IBA Amendment 7.

[7]  Blenheim was also required to procure commercial insurance by July 31, 2015, to cover all
risk of loss with respect to the military satellite.  Ex. 5 at 2.  It never did so.

On June 15, 2015, Lockheed Martin paid Blenheim the substantial $45 million Phase One Payment. Compl. ¶ 90. The Phase Two Payments, however, were not issued, as Blenheim failed to meet the IBA's conditions and milestones for release of those payments, starting with the securing of senior debt financing essential to Project Archer's progression and December 31, 2017 deadline to produce, deliver, launch, and orbit test the military satellite for South Korea. Ex. 2A at 4; Ex. 5 at 4.[8]

Airbus began manufacturing the military satellite even before receiving initial payments from Blenheim. Compl. ¶¶ 71, 127. However, Blenheim failed to make required payments to Airbus pursuant to the SPA in June and July 2015. *See id.* ¶ 106. This was in spite of its receipt of the $45 million Phase One Payment from Lockheed Martin in June, only $20 million of which Blenheim passed on to Airbus. *Id.* ¶ 93.[9] After several meetings with Blenheim about its default, Airbus stopped work on the military satellite because it had not been paid by Blenheim as required. *Id.* ¶ 106. With the project stalled, South Korea in late 2015 threatened Lockheed Martin with negative press if the military satellite did not progress. *Id.* ¶ 120.

In spite of Blenheim's default to both Lockheed Martin and Airbus, Lockheed Martin engaged with Blenheim, proposing several "restart agreements" in 2016 to salvage Project Archer so that Lockheed Martin could meet its offset obligation. *Id.* ¶¶ 129-30. Blenheim refused, insisting instead on restart proposals which transferred the risk of failure to secure

---

[8] Absent from Blenheim's conjecture that Lockheed Martin "began contriving road-blocks to prevent Blenheim from securing the financing," (Compl. ¶ 101), is any factual allegation that Blenheim *ever* met the Phase Two Payment conditions to produce executed term sheets, confirm that the secured financing would be sufficient, or obtain any of the required insurances. *See* Ex. 5 at 2-3.

[9] Per Amendment 7, "[a]ny compensation received by [Blenheim from Lockheed Martin] for Project Archer will be used solely for progression and implementation of Project Archer." Ex. 5 at 2. Blenheim has never provided a detailed accounting of the other $25 million it retained.

financing to Lockheed Martin. Blenheim apparently "continued to work on securing funding partners" but does not allege that it secured one. *Id.* ¶ 131. As a result, on October 6, 2016, Lockheed Martin terminated the IBA for cause. *Id.* ¶ 132; Ex. 6 (Oct. 2016 Correspondence). Lockheed Martin reiterated this in a second letter to Blenheim, noting that "[t]he Korean government has withheld any award of credits . . . as a direct consequence of Blenheim's failure to arrange financing." Ex. 7 (Jan. 2017 Correspondence); Compl. ¶ 132.

Ultimately, Lockheed Martin was required to enter into a more expensive, direct procurement with Airbus to obtain the military satellite owed to South Korea. Lockheed Martin and Airbus informed Blenheim of the direct procurement. Compl. ¶¶ 133; 209; Ex. 7 ("Project Archer failed and has been replaced (at great expense to Lockheed Martin) with a direct procurement approach[.]"). As a result, Lockheed Martin did not obtain the lower cost of the Project Archer approach and Airbus sold only one satellite, not three.[10]

In response to the terminations of the IBA and SPA in 2016—which Blenheim now characterizes as "breaches"—Blenheim took no action. Now, years later, and out of time to bring a breach claim, Blenheim filed this Complaint on December 31, 2020, asserting that the true cause of those terminations was tortious interference by the same parties involved in the single Project Archer transaction. Because even tort-based claims against Lockheed Martin are untimely under the governing law and agreed forum for disputes, Blenheim filed in Virginia.[11]

---

[10] Without the financing arrangement that Blenheim had promised, Lockheed Martin's cost for the military satellite was far greater than the $150 million agreed to in Project Archer. *See, e.g.*, Airbus Ex. 5 § 3 (providing a military satellite not to exceed price of $370 million).

[11] For instance, Lockheed Martin resides in Maryland, (Compl. ¶ 12), but the statute of limitations for tortious interference there is 3 years. Md. Code, *Cts. & Jud. Proc.* § 5-101. With respect to South Korea, under the FSIA, the District of Columbia is an available jurisdiction, 28 U.S.C. § 1391(f)(4), but the same 3-year statute of limitation on tortious interference claims applies. D.C. Code § 12-301.

The IBA is "governed by, subject to, and interpreted according to the laws of the State of Maryland." Ex. 1A ¶ 15. Amendment 5 modified the IBA's Disputes Clause to require Blenheim and Lockheed Martin to arbitrate any dispute "arising out of or in connection with this Agreement." Ex. 3A at 2, ¶ 21. Further, Amendment 7 (Revised – 2) attached an "Undertaking" assigning rights and duties of the IBA to its SPV and which stated that "[t]he exclusive forum for any and all disputes arising out of or in connection with this Undertaking shall be the US Federal District Court located in the City of Baltimore, State of Maryland, USA." Ex. 5 at Undertaking. Finally, the parties also agreed in the IBA to a Limitation of Liability clause (at ¶ 7):

> LMOC's liability for costs or damages allegedly incurred by BROKER arising out of, or in connection with, BROKER's performance of its duties under this Agreement shall be strictly limited to broker fees which may be deemed owing . . . In no event shall either party be liable for lost profits, or any other consequential, indirect, incidental, or punitive damages arising out of, or in connection with, claims made against it by the other party, whether such claims are alleged to arise in contract or in tort.

## ARGUMENT

Blenheim's Complaint is deficient for a host of reasons. As discussed below, the Court should dismiss this action for lack of subject-matter jurisdiction, lack of personal jurisdiction, improper venue, the parties' arbitration/forum-selection clauses, and failure to state a claim.

## I.    The Complaint Must Be Dismissed for Lack of Jurisdiction Under Rule 12(b)(1)

The Complaint alleges no independent basis for federal jurisdiction over Lockheed Martin or Airbus. Rather, Blenheim claims that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391, 1441, and 1602-1611, provides this Court with jurisdiction over its claims against South Korea, and it bootstraps supplemental jurisdiction over its state law claims against Lockheed Martin and Airbus. Despite South Korea being the only source for original jurisdiction, Blenheim has not even bothered to serve the Complaint—filed in December 2020—on South Korea. Even had it done so, the FSIA provides no exception to

sovereign immunity that would permit Blenheim's claims here. Without any federal question, supplemental jurisdiction is improper and the entire Complaint must be dismissed.

The FSIA is the sole basis for obtaining jurisdiction over a foreign state. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). Unless an enumerated exception applies, a foreign state is immune from suit. *See* 28 U.S.C. §§ 1604, 1605. A court has "an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). A court is "obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). The plaintiff bears the burden of proving jurisdiction. *Salman v. Saudi Arabian Cultural Mission*, No. 1:16cv1033, 2017 WL 176576, at *2 (E.D. Va. Jan. 17, 2017).

Blenheim pleads primary subject-matter jurisdiction over South Korea based on the commercial activity exception of the FSIA and asserts supplemental jurisdiction over Lockheed Martin and Airbus France pursuant to 28 U.S.C. § 1367. Compl. ¶¶ 15, 24. But the commercial activity exception does not apply here. The Court must therefore dismiss the entire Complaint. *See Arbaugh*, 546 U.S. at 514 ("when a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety"); *Hunt v. Branch Banking & Tr. Co.*, 480 F. App'x 730, 732 (4th Cir. 2012) ("[W]hen 'federal claims are dismissed before trial . . . state claims should be dismissed as well.'") (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

### A.    There Is No FSIA Jurisdiction for Tortious Interference Claims Unless the Commercial Activity Exception Applies

The FSIA expressly precludes a waiver of immunity for claims "arising out of . . . interference with contract rights." 28 U.S.C. § 1605(a)(5)(B). Blenheim therefore alleges, as it must, that its tortious interference claims are instead based upon South Korea engaging in

"commercial activity" under § 1605(a)(2). *See id*. § 1605(a)(5) (referring to (a)(2)'s commercial activity exception). Any such commercial activity must bear a "clear and strong connection" to the tort alleged, lest Blenheim be allowed "to sneak [a tort claim] into federal court under the 'commercial activity' exception[.]" *Leutwyler v. Office of Queen Rania Al-Abdullah*, 184 F.Supp.2d 277, 295 (S.D.N.Y. 2001). Here, South Korea did not engage in commercial activity in the United States, nor are Blenheim's tort claims based on the sovereign activity of South Korea in the FMS transaction for F-35 jets and its requisite offset obligation.

      **B.**      **The Claims Are Not "Based Upon" a "Commercial Activity" by South Korea**

A foreign state is not immune from suit under the FSIA where "the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). Commercial activity is "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). To be "carried on in the United States by a foreign state" requires "substantial contact with the United States." *Id*. § 1603(e). Further, the "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id*. § 1603(d); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (same).

At its core, the test is a determination of whether the actions performed are the type of actions in which a private party could engage. *Id.* "A foreign sovereign engages in 'commercial activity' *only* when it exercises 'those powers that can also be exercised by private citizens,' not when it employs 'powers peculiar to sovereigns.'" *France.com, Inc. v. French Republi*c, 992 F.3d 248, 252 (4th Cir. 2021) (quoting *Weltover*, 504 U.S. at 614) (emphasis added). On the other hand, "no commercial activity occurs where a foreign state acts in a manner unique to a sovereign." *Best Med. Belgium, Inc. v. Kingdom of Belgium*, 913 F.Supp.2d 230, 237 (E.D. Va. 2012); *see Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994) ("When two

governments deal directly with each other *as governments*, even when the subject matter may relate to the commercial activities of its citizens or governmental entities, or even the commercial activity conducted by government subsidiaries, those dealings are *not* akin to that of participants in a marketplace.") (second emphasis added).

An action is "based upon" commercial activity if that "particular conduct . . . constitutes the gravamen of the suit." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) (internal quotation marks omitted). The "basis" or "foundation" for a claim is conduct that includes "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993); *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 216 (4th Cir. 2011) (the commercial activity "must form the basis of the claim for which [plaintiff] seeks relief on the merits"); *Sachs*, 577 U.S. at 35 (commercial activity in United States did not constitute the gravamen of suit concerning tort that occurred abroad); *cf. Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 772 (2019) ("[I]f the 'gravamen' of a lawsuit is tortious activity abroad, the suit is not 'based upon' commercial activity within the meaning of the FSIA's commercial activity exception.") (citing *Sachs*, 577 U.S. at 34-35).

### 1. <u>South Korea Did Not Engage in Commercial Activity</u>

Blenheim alleges that "South Korea and DAPA's acquisition of the F-35 fighter planes and the military satellite offset through the 'foreign military sales' process, a defense procurement program offered by a U.S. Department of Defense ('DoD') program," constitutes "commercial activity carried on in the United States by a foreign state" under § 1605(a)(2). Compl. ¶¶ 19-20; *see id.* ¶¶ 21-23.[12] The notion that an FMS transaction to purchase F-35

---

[12] Plaintiff does not allege jurisdiction based on the second or third versions of the commercial activity in § 1605(a)(2), and thus Lockheed Martin does not address them.

fighter jets with classified weapons technology, coupled with the requisite offset obligation, could be a commercial activity is implausible on its face. Rather, this is precisely the type of unique, government-to-government activity reserved only to sovereigns.

In fact, the D.C. Circuit has already held that FMS sales are *not* commercial activity. *See Heroth v. Kingdom of Saudi Arabia*, 565 F.Supp.2d 59 (D.D.C. 2008), *aff'd*, 331 F. App'x 1 (D.C. Cir. 2009). In *Heroth*, the district court held that a foreign sovereign's "participation in the FMS program, which is limited to foreign governments and international organizations, is the type of activity in which a private player cannot participate." 565 F.Supp.2d at 68 n.9. On appeal, the D.C. Circuit affirmed, holding that participation in the FMS program is a "quintessentially sovereign activit[y]." 331 F. App'x at 2. *Heroth* is on point here.

Indeed, the nature of the FMS program demonstrates why South Korea's FMS acquisition, including the requisite offset obligation, is not commercial activity. Unlike a direct commercial sale, FMS transactions are exclusively between the U.S. Government and a foreign government; private citizens in the marketplace may not participate, and there is no privity of contract between the contractor and the foreign sovereign. *See, e.g.*, *Heroth*, 331 F. App'x at 2; *Heroth*, 565 F.Supp.2d at 62; SAMM §§ C4.1, C4.3.5.3-4; 22 U.S.C. §§ 2753, 2778.[13] Second, such transactions are subject to national security and defense policies and the foreign sovereign must meet a host of conditions not applicable to direct commercial sales to be eligible for an

---

[13] In contrast to a direct commercial sale, any dispute between the foreign sovereign and the defense contractor supporting the U.S. Government in an FMS transaction—such as concerning an offset—would have to be addressed using the U.S. Government as an intermediary. *See, e.g.*, *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 707 (4th Cir. 2007) (distinguishing FMS transactions from direct commercial sales and explaining that affording third-party beneficiary status to a foreign state participating in an FMS transaction would undermine the FMS structure and run counter to United States policy and national security interests).

FMS-Only transaction.  *See, e.g.*, SAMM §§ C.4.1-4.3 (FMS criteria and policies); C.4.3.5

(FSM-Only Determinations); 22 U.S.C. §§ 2751-54, 2778.  Third, while DoD is "generally

neutral" as to whether a country purchases defense articles commercially or through FMS

channels, certain military-end items "are sold only via FMS" as designated by the President

based on DoD recommendations.  *See, e.g.*, SAMM §§ C4.3.4, C4.3.5.  The SAMM Manual

contains a list of items available "solely on an FMS-Only basis" that expressly includes "fighter

aircraft" such as the F-35 jets at issue.  *Id*. § C4.3.5.2; *see also Trimble*, 484 F.3d at 703 ("Some

items . . . because of their sensitive nature can only be purchased through the FMS program.").[14]

In short, FMS transactions in general, and particularly this "FMS-Only" acquisition and its offset

component, are sovereign, and not commercial activity.  *See Cicippio*, 30 F.3d at 168.

## 2. Blenheim's Claims Are Not "Based Upon" the FMS Transaction

Even if South Korea's involvement in the FMS program could be deemed "commercial

activity carried on in the United States," Blenheim's claims against South Korea for tortious

interference are not "based upon" that activity.  The commercial activity alleged must constitute

"the gravamen of the suit," *Sachs*, 577 U.S. at 35; it must be conduct "that, if proven, would

entitle [the] plaintiff to relief under his theory of the case."  *Nelson*, 507 U.S. at 357.  For

example, in *Nelson*, the Supreme Court found that a claim for tortious conduct outside the United

States was not based upon commercial activity because facts of that activity "alone entitle

[plaintiffs] to nothing under their theory of the case."  *Id.* at 358; *see Am. W. Airlines, Inc. v.

GPA Grp., Ltd.*, 877 F.2d 793, 797 (9th Cir. 1989) (upholding sovereign immunity because the

---

[14]  In contrast to FMS sales, direct commercial sales between domestic contractors and foreign
governments may involve items more typically available commercially.  *See, e.g.*, *Wye Oak*, 666
F.3d at 216 (holding that military scrap sales between private company and foreign sovereign
were commercial); *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 343
(8th Cir. 1985) (basic ordering agreement between private company and foreign state for
damaged aircraft parts involved commercial activity).

commercial acts did not include the "*specific* acts that form the basis of the suit") (internal quotation marks and citation omitted); *France.com*, 992 F.3d at 253 (court must examine the "core of the suit, that is, the acts that actually injured the plaintiff") (citations omitted).

Just as in *Nelson*, the alleged commercial activity by South Korea in the United States— the government-to-government FMS transaction—does not form the basis for Plaintiff's claims of tortious interference by South Korea. Indeed, proof of South Korea's activities with the U.S. Government would not entitle Plaintiff to any relief on its tortious interference claims against South Korea. And, like in *Nelson*, the alleged tortious conduct by South Korea occurred outside of the United States, further separating it from South Korea's engagement in the FMS transaction. *See, e.g.*, Compl. ¶¶ 115-24, 187, 193. Because South Korea's allegedly "commercial" activity is not the basis of Blenheim's tortious interference claims, the FSIA exception to immunity does not apply. *See Nelson*, 507 U.S. at 358; *Sachs*, 577 U.S. at 35; *Am. W. Airlines*, 877 F.2d at 797.

*          *          *

In sum, the commercial activity exception of the FSIA does not apply here because (1) South Korea's activity was sovereign, not commercial; and (2) that activity is not the gravamen of Blenheim's tort claims. As a result, the Court lacks subject matter jurisdiction and must dismiss the Complaint in its entirety, including all counts against Lockheed Martin and Airbus. *See* 28 U.S.C. § 1367(a); *Stratton v. Mecklenburg Cty. Dep't of Soc. Servs.*, 521 F. App'x 278, 291 n.25 (4th Cir. 2013) ("When a district court dismisses federal claims for lack of subject matter jurisdiction, there was never a valid claim to which the state claims could be considered supplemental, and dismissal of the state claims is also required.") (citing *Crosby v. City of Gastonia,* 635 F.3d 634, 644 (4th Cir. 2011)); *Arbaugh*, 546 U.S. at 514 ("when a federal

court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety). For the same reasons, the Court should dismiss under 28 U.S.C. § 1367(c)(3). *See, e.g., Hunt*, 480 F. App'x at 732.

## C.  Jurisdiction Is Dependent Upon Service of South Korea

Even if the Court finds subject matter jurisdiction under the FSIA, it should nevertheless dismiss the entire Complaint based on Blenheim's failure to serve South Korea. Four months after filing this suit, Blenheim has yet to serve South Korea by any of the required methods listed in 28 U.S.C. § 1608(a). Strict compliance is required for personal jurisdiction over South Korea. *See Kumar v. Republic of Sudan*, 880 F.3d 144, 154, 160 (4th Cir. 2018); 28 U.S.C. § 1330(b). Blenheim should not be permitted to exploit the FSIA to create supplemental jurisdiction over Lockheed Martin and Airbus while failing to make any reasonable effort to bring South Korea into this suit. If the Court dismisses the claims against South Korea for failure to effect service, as it should, it should also exercise its discretion to decline taking supplemental jurisdiction over the claims against Lockheed Martin and Airbus under 28 U.S.C. § 1367(c)(3).

## II.  The Court Lacks Personal Jurisdiction Over Lockheed Martin

Rule 12(b)(2) authorizes dismissal of an action where the court lacks personal jurisdiction. It is plaintiff's "burden [to] demonstrate[e] personal jurisdiction at every stage [after a defendant raises] a challenge" to personal jurisdiction. *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016).[15] The court must examine whether (1) personal jurisdiction is authorized by state law and (2) the exercise of jurisdiction comports with constitutional due process. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). Virginia's long-arm statute extends personal jurisdiction to the limits permitted by constitutional

---

[15]  The Court may consider pleadings, affidavits, legal memoranda, and other evidence outside the pleadings to evaluate jurisdiction. *Grayson*, 816 F.3d at 268.

due process. *Id.* The constitutional due process inquiry considers: "(1) the extent to which the defendant 'purposefully avail [ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Babiak v. Mizuho Bank, Ltd.*, No. 1:18-cv-352, 2018 WL 4473584, at *2 (E.D. Va. Sept. 17, 2018) (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).

Specific personal jurisdiction is a claim-specific analysis. *Thornapple Assocs., Inc. v. Izadpanah*, No. 1:14cv767, 2014 WL 4925838, at *3 (E.D. Va. Sept. 30, 2014); *see also Gatekeeper Inc. v. Stratech Sys., Ltd.*, 718 F.Supp.2d 664, 667-68 (E.D. Va. 2010). To adequately allege it, "the litigation [must] result[ ] from alleged injuries that arise out of" the defendant's activities in the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985) (internal quotation marks and citation omitted); *Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."). Virginia's long-arm statute provides specific personal jurisdiction over a person as to a *cause of action arising from the person's*: transacting any business in Virginia; causing tortious injury by an act or omission in Virginia; or causing tortious injury in Virginia by an act or omission outside Virginia if the person regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in Virginia. Va. Code § 8.01-328.1(A)(1), (3), (4). Whether the alleged acts had foreseeable effects in Virginia is not dispositive. *Gatekeeper*, 718 F.Supp.2d at 668. Instead, a plaintiff must show "an act or omission" in Virginia causing tortious injury or "an act or omission" outside Virginia causing tortious injury in Virginia. *Cent. Va. Aviation, Inc. v. N. Am. Flight Servs., Inc.*,

23 F.Supp.3d 625, 629 (E.D. Va. 2014); *Straight Line Drive, Inc. v. Vanatta*, No. 3:20CV779, 2020 WL 7647637, at *4 (E.D. Va. Dec. 23, 2020) (same requirement for personal jurisdiction over conspiracy claims).

Blenheim fails to allege that Lockheed Martin committed tortious interference or conspired to do so in Virginia or caused tortious injury in Virginia by an act or omission outside the Commonwealth. Blenheim's claims are derived from the alleged interference with two contracts regarding the offset transaction—the IBA and the SPA. Neither of these contracts (1) were negotiated or executed in Virginia; (2) involved contacting a contracting party in Virginia by telephone, e-mail, or otherwise;[16] or (3) required performance in Virginia. And, most importantly, no alleged tortious action is alleged to have occurred in Virginia. Compl. ¶ 155. Rather, the alleged interference and terminations or breaches of the IBA and SPA occurred entirely outside Virginia (and the United States, for the most part), and Blenheim alleges no injury in Virginia (nor could it). *Id.* ¶¶ 132-33; Exs. 6-7; s*ee Cent. Va. Aviation*, 23 F.Supp.3d at 629 ("[p]laintiff must establish the tortious conduct occurred while [d]efendant was in Virginia"); *Gatekeeper*, 718 F.Supp.2d at 668 (no personal jurisdiction where acts giving rise to tortious interference claim occurred outside Virginia). The FMS transaction that lies in the backdrop does not form the basis of Blenheim's claims and, thus, cannot confer jurisdiction for the claims here. *See, e.g.*, *CEM Corp. v. Pers. Chemistry, AB*, 55 F. App'x 621, 625 (4th Cir. 2003) (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277-78 (7th Cir. 1997) (additional unrelated contacts cannot be aggregated for purposes of specific personal jurisdiction

---

[16] The IBA between Lockheed Martin and Blenheim was negotiated between parties located in Maryland and England, respectively. The SPA between Airbus and Blenheim was negotiated between parties located in England and France. Blenheim does not allege any communications went to either contracting party in Virginia.

and, in breach cases, only the dealings between the parties with respect to the contract *at issue* are relevant)); *id.* at 624 (affirming dismissal where alleged contacts "have nothing to do with the dispute at issue in this case and thus are irrelevant in any consideration of *specific* personal jurisdiction"); *Walden*, 571 U.S. at 284.[17]

In sum, neither Virginia's long-arm statute nor constitutional due process provide specific personal jurisdiction over Lockheed Martin. Dismissal should result.

## III.   The Complaint Must Be Dismissed for Improper Venue

Pursuant to Rule 12(b)(3), the "plaintiff bears the burden of establishing that venue is proper." *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F.Supp.3d 916, 925 (E.D. Va. 2017) (citations omitted). Where there are multiple defendants and claims, venue must be proper as to each. *Newbauer v. Jackson Hewitt Tax Serv. Inc.*, No. 2:18cv679, 2019 WL 1398172, at *4-5 (E.D. Va. Mar. 28, 2019). The district court "shall dismiss" a case laying venue in the wrong district or transfer it to a district in which it could have been brought. 28 U.S.C. § 1406(a). Where a plaintiff's venue choice is "an attempt at forum-shopping," this Court has found that "dismissal is the appropriate result." *Punchbowl, Inc. v. AJ Press LLC*, No. 1:21-cv-00136, 2021 WL 1178070, at *3 (E.D. Va. Mar. 26, 2021) (citation omitted); *see Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1201 (4th Cir. 1993) (dismissal appropriate where plaintiff's attorney "could reasonably have foreseen that the forum in which he/she filed was improper").

Like in *Punchbowl*, Blenheim is transparently forum-shopping to avoid statute of limitation bars. No party resides in Virginia, nor did the allegedly tortious conduct occur there.

---

[17] For the same reasons, no personal jurisdiction exists over Blenheim's conspiracy and unjust enrichment claims. *See, e.g.*, *Willis v. Clark*, No. 3:05CV325, 2005 U.S. Dist. LEXIS 25877, at *7-8 (E.D. Va. Oct. 31, 2005) (no personal jurisdiction over common law fraud and civil conspiracy allegations under Va. Code § 8.01-328.1(A)(3) where "Plaintiff can not establish that Defendants caused tortious injury while present in the Commonwealth of Virginia").

Venue is therefore improper and all claims against Lockheed Martin should be dismissed.

28 U.S.C. § 1391 governs the venue of civil actions where jurisdiction is not founded solely on diversity of citizenship. *Greenberry's Franchising Corp. v. Park*, No. 3:10-cv-00045, 2010 WL 5141285, at *2 (W.D. Va. Dec. 10, 2010). In assessing venue, a court should "review the entire sequence of events underlying the claim." *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (internal quotation marks and citation omitted). However, courts "take seriously the adjective 'substantial.'" *Newbauer*, 2019 WL 1398172, at *8 (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005)). Events or omissions "that might only have some tangential connection with the dispute in litigation are not enough." *Id.* (quoting *CMA CGM (Am.), LLC v. RLI Ins. Co.*, No. 12-cv-03306, 2013 WL 588978, at *2 (D. Md. Feb. 13, 2013)). Rather, "*significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question[.]" *Gulf Ins. Co.*, 417 F.3d at 357 (substantial part test requires more than minimum contacts test employed in personal jurisdiction inquiries).[18]

Blenheim alleges that venue is proper in Virginia under §§ 1391(b) and (f) because "a substantial part of the events giving rise to the claim occurred in th[is] district." Compl. ¶ 31. The factual allegations in the Complaint demonstrate, however, that *none* of the key events occurred in Virginia. To the contrary, Blenheim's claims all center on a series of agreements comprising a single overarching transaction—Project Archer—that were negotiated, performed, and allegedly interfered with entirely outside of the Commonwealth. In fact, Blenheim's

---

[18] *See also Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:09CV793, 2010 WL 2613323, at *11 (E.D. Va. June 29, 2010), *aff'd*, 666 F.3d 205 (4th Cir. 2011) (venue improper because no actions in the district "g[ave] rise to the [breach of contract] claim"; and finding plaintiff failed to explain how the Pentagon's "generally described and unquantifiable" role gave rise to the claims asserted); *Power Paragon, Inc. v. Precision Tech. USA, Inc.*, 605 F.Supp.2d 722, 726 (E.D. Va. 2008) (improper venue under § 1391(a)(2) where negotiation and execution of a contract; delivery and manufacture of a product; and performance all took place outside the district).

Complaint admits that: (1) all of the parties are located outside Virginia, *id*. ¶¶ 10-14; (2) the

IBA and SPA were negotiated and executed in Maryland, England, and France, *id*. ¶¶ 42, 52-54,

57, 61-63, 68-70, 115, 132-33; (3) Blenheim's alleged business expectancy was developed in

England where Blenheim is located and through the IBA and SPA, *id*. ¶¶ 161-62, 175; (4) the

Defendants learned of one another and the IBA and the SPA through meetings held outside

Virginia, *id*. ¶¶ 73, 96, 116-17, 119, 121, 123; (5) the alleged interference inducing or causing

the alleged breach or termination of the IBA, SPA, or Blenheim's business expectancy occurred

in France, England, Maryland, and South Korea, *id*. ¶¶ 96, 97, 100-03, 106, 108-11, 113-14; and

(6) all parties' performance obligations were in England, Maryland, or France, *id*. ¶¶ 29, 64, 66,

90, 93. In short, venue would sooner be proper anywhere *but* here.

As noted above, the only events that Blenheim alleges involve some contact with

Virginia are not "substantial" to Blenheim's claims. Blenheim refers to the FMS agreement

between South Korea and the U.S. DoD, *id*. ¶¶ 22, 25, 27, 28, 33, 38, but cannot show how that

transaction is material to claims of interference with the Project Archer agreements. In fact,

Blenheim concedes that the DoD was not responsible for the offset transaction. *Id*. ¶ 39.[19] *See,*

*e.g.*, *Newbauer*, 2019 WL 1398172, at *8 (tangential connection with the claims "not enough" to

confer venue); *MTGLQ Invs., L.P. v. Guire*, 286 F.Supp.2d 561, 565 (D. Md. 2003)

(distinguishing factual background from the elements of an action relevant to the "substantial

part" analysis). Blenheim also cites Lockheed Martin's alleged lobbying of the DoD regarding

how offset costs would be applied within FMS transactions generally, Compl. ¶¶ 28, 79; but this,

---

[19] DoD does not administer or satisfy obligations associated with offset agreements, and "the decision whether to engage in offsets, and the responsibility for negotiating and implementing offset arrangements, reside with the companies involved." 48 C.F.R. § 225.7303-2(a)(3) (2019); 48 C.F.R. § 225.7306 (2019).

too, has no bearing on Blenheim's claims.[20]  Nor could Blenheim's allegation, (*id.* ¶ 29), that "Airbus France sought and received the import and launch approvals from DoD" for the 2020 satellite launch, which occurred years after the alleged tortious conduct, give rise to its claims.[21]

Because Blenheim's own allegations demonstrate that a substantial part—if not all—of the events giving rise to its claims occurred *outside* Virginia, all claims against Lockheed Martin must be dismissed.  *Punchbowl*, 2021 WL 1178070, at *3 (dismissing for improper venue); *Lawson v. Merscorp Holdings, Inc.*, No. 1:18-cv-640, 2018 WL 10156105, at *1 (E.D. Va. Oct. 24, 2018) (dismissing for improper venue even if the court had personal jurisdiction).

## IV.     Blenheim's Claims Against Lockheed Martin Must Be Arbitrated

Blenheim's claims must also be dismissed because they are subject to mandatory arbitration.  The Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, provides "a congressional declaration of a liberal federal policy favoring arbitration agreements[.]"  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  Where parties consent to a valid, enforceable agreement to arbitrate and their dispute falls within the scope of that agreement, the court must compel arbitration.  *Murray v. United Food & Com. Workers Int'l Union*, 289 F.3d 297, 301 (4th Cir. 2002).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]"  *Moses*, 460 U.S. at 24-25.  "Dismissal is the appropriate remedy when all claims in a case are governed by an enforceable arbitration agreement."  *HCI Techs., Inc. v. Avaya, Inc.*, 446 F.Supp.2d 518, 525 n.4 (E.D. Va. 2006) (citing *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001)).

---

[20]  *Cf. Flexible Benefits Council v. Feltman*, No. 1:08CV371, 2008 WL 2465457, at *4 (E.D. Va. June 16, 2008) (petitioning federal government irrelevant to personal jurisdiction analysis).

[21]  *See, e.g., L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 93 (4th Cir. 2019), *reh'g denied* (July 16, 2019) (tortious interference claim accrues at breach or termination of the relationship and conspiracy accrues when plaintiff suffers an injury giving rise to the underlying tort claim).

In the IBA, Blenheim and Lockheed Martin agreed to the following arbitration clause:

> *Any dispute, controversy or claim between the Parties arising out of or in connection with this Agreement shall be finally settled by arbitration* in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce . . . *The arbitrators shall have the power to rule on their own jurisdiction, including whether or not the claims asserted are arbitrable. This Paragraph shall survive any termination or expiration of this Agreement and shall apply to any dispute, controversy or claim relating to events or occurrences occurring (or alleged to have occurred) prior to such termination or expiration.*

Ex. 3A at 2 (emphasis added).[22]  Such broad language applying to all claims that "arise out of" or "in connection with" the IBA gives it an "expansive reach."  *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996).  The IBA expresses the material terms and relationships at issue in Project Archer, including Airbus' role as the satellite manufacturer.  *See* Compl. ¶¶ 42, 63-67.  As such, the IBA bears a significant relationship to all of Blenheim's claims against Lockheed Martin, each of which is centered on Project Archer, Lockheed Martin's alleged failures to perform under the IBA, and alleged interference with Blenheim's SPA with Airbus.  That Blenheim's claims primarily sound in tort, not contract, is of no moment.  *See Am. Recovery Corp.*, 96 F.3d at 94 (tortious interference claims bearing a "significant relationship" to the agreement were arbitrable, even if arising out of a second contract); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 319-20 (4th Cir. 1988) (affirming arbitration referral of tortious interference with contract claims).

---

[22]  Lockheed Martin, as the parent of wholly-owned subsidiary Lockheed Martin Overseas Corporation ("LMOC"), may utilize the IBA arbitration clause to compel arbitration where LMOC was the signatory and where, as here, the claims rely on the terms of the agreement. *See, e.g.*, *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S.Ct. 1637, 1643-44 (2020); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416-18 (4th Cir. 2000) (collecting cases); *Blumenthal-Kahn Elec. Ltd. v. Am. Home Assurance Co.*, 236 F.Supp.2d 575, 582 (E.D. Va. 2002).

Should Blenheim dispute whether its claims are arbitrable, the IBA "clearly and unmistakably" requires that question to be decided by the arbitrators, not the court. Ex. 3A at 2 (providing authority to decide arbitrability); *see, e.g., Terra Holding GmbH v. Unitrans Int'l, Inc.*, 124 F. Supp. 3d 745, 748-49 (E.D. Va. 2015) (finding "clear and unmistakable" standard to delegate arbitrability question to arbitrator was met when parties included explicit language to that effect). In sum, the IBA's arbitration clause requires dismissal of all claims against Lockheed Martin. *HCI Techs.*, 446 F.Supp.2d at 525 n.4.

## V.    **Blenheim's Claims Must Be Dismissed Under the IBA's Forum-Selection Clause**

In the alternative to the IBA's arbitration clause, the IBA's Undertaking also contains a forum selection clause that required Blenheim to file its claims in federal district court in Maryland, not here. Ex. 1A ¶ 20 ("The exclusive forum for the resolution of any and all disputes arising out of or in connection with this Undertaking shall be the US Federal District Court located in the City of Baltimore, State of Maryland, USA.").[23] A forum-selection clause should be given controlling weight "in all but the most exceptional cases." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013). Where the parties have agreed to a forum for their disputes, the plaintiff's choice of forum is given no weight. *Id.*

Forum-selection clauses are appropriately extended to tortious interference, unjust enrichment, and conspiracy claims where those claims are sufficiently related to a contract

---

[23] The forum selection clause appears in an "Undertaking" executed in June of 2015, and is an attachment to the IBA assigning certain of Blenheim's rights and obligations under the IBA to its affiliate Special Purpose Vehicle ("SPV"). Ex. 5 at Undertaking. It appears that while the IBA was amended to add the arbitration provision in 2013, the parties executed the 2015 Undertaking with the Maryland forum selection provision. While the assignment in the Undertaking does not change the provisions of the controlling IBA agreement and its arbitration clause, whether by the arbitration provision or by forum selection provision, the case is not appropriately filed here. And, regardless, Maryland law, as controlling precedent under either scenario, dictates that the case is time barred given the three-year limitations period under Maryland law for the various torts Blenheim has alleged. *See* Md. Code, *Cts. & Jud. Proc.* § 5-101.

between the plaintiff and the defendant or where contractual language demonstrates that the provision applies to tort as well as contractual claims. *See Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.2d 804, 806 (Va. 1990) (extending forum selection clause to intentional interference with contractual and economic relations and conspiracy to injure the plaintiffs in its reputation and business); *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F.Supp.3d 462, 466 (E.D. Va. 2016) (applying forum-selection clause to contractually-based tort claims); *Freedman v. Am. Online, Inc.*, 325 F.Supp.2d 638, 653 (E.D. Va. 2004) (applying forum selection clause to a tort claim arising from plaintiff's rights under the agreement). As discussed above, that test is met here. Accordingly, if the IBA's overarching arbitration provision does not control, the forum-selection clause in the Undertaking requires that Blenheim's claims be filed in Maryland federal court. The Court should therefore dismiss them.

## VI.     The Complaint Fails to State a Claim Under Rule 12(b)(6)

To adequately state a claim, a complaint must be plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "[T]he complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 680). "[F]acts that are "'merely consistent with' a defendant's liability . . . 'stop[ ] short of the line between possibility and plausibility of 'entitlement to relief.'"" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). In reviewing a complaint, the Court need not accept legal conclusions, unwarranted inferences, or unreasonable conclusions. *Nemet*, 591 F.3d at 253 (citation omitted).

A district court entertaining pendent state claims follows the choice of law rules of the forum state. *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F.Supp.2d 385, 390 n.6 (E.D. Va. 2002). Virginia courts apply *lex loci delicti*, the law of the place of the wrong, to tort actions. *Milton v. IIT Rsch. Inst.*, 138 F.3d 519, 521 (4th Cir. 1998). The place of the wrong is "the place the last event necessary to make an actor liable for an alleged tort takes place." *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F.Supp.2d 850, 856 (E.D. Va. 2013) (alterations, internal quotation marks and citations omitted).

In this case, the *lex loci deliciti* for the claims against Lockheed Martin is presumably Maryland, its principal place of business, and the applicable law in the IBA's choice of law provision. Ex. 1A ¶ 15. Because Blenheim brought this action in Virginia and claims violations of Virginia statutes, Lockheed Martin cites Virginia substantive law as well. Regardless of which jurisdiction's law this Court applies, Blenheim's claims fail to state a claim. *See Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*, 533 F. App'x 200, 207 (4th Cir. 2013) (declining to decide choice of law because tort claims failed irrespective state law applied).

## A.     The IBA's Limitation of Liability Clause Precludes Blenheim's Claims

In the IBA, the parties agreed to the following, express Limitation of Liability clause:

> LMOC's liability for costs or damages allegedly incurred by BROKER arising out of, or in connection with, BROKER's performance of its duties under this Agreement shall be strictly limited to broker fees which may be deemed owing . . . In no event shall either party be liable for lost profits, or any other consequential, indirect, incidental, or punitive damages arising out of, or in connection with, claims made against it by the other party, whether such claims are alleged to arise in contract or in tort.

Ex. 1A ¶ 7. In the IBA, Blenheim agreed that Lockheed Martin's liability for damages arising out of or in connection Project Archer, *regardless of whether sounding in contract or tort*, is "strictly limited to broker fees which may be deemed owing." *Id.* Blenheim concedes that it received the Phase One Payment and does not allege that it met any of the multiple conditions

precedent to receive the Phase Two Payments, after which point Lockheed Martin availed itself of its right to terminate the IBA. Even if Blenheim could state a claim, the IBA limitation clause's repudiation of any damages or lost profits would nullify it. The plain language of the IBA precludes Blenheim's claims and prayer for relief.[24]

### B. Counts I and II Should Be Dismissed Because Blenheim Has Not Adequately Alleged Tortious Interference Against Lockheed Martin

Blenheim alleges two counts of tortious interference, one with contract and the other with business expectancy. Both lack merit. To state a claim for tortious interference, a plaintiff must allege: "'(1) a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy by the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.'" *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014) (quoting *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)); *TKA Inc. v. Bowers*, No. 1185, 2019 WL 517209, at *5 (Md. Ct. Spec. App. Feb. 11, 2019) (citing *Brass Metal Prods., Inc. v. E-J Enters., Inc.*, 984 A.2d 361, 383 (Md. Ct. Spec. App. 2009); *Abbott v. Gordon*, No. DKC 09-0372, 2009 WL 2426052, at *5 (D. Md. Aug. 6, 2009) (citing *Blondell v. Littlepage*, 968 A.2d 678 (Md. Ct. Spec. App. 2009)). The intentional interference prong itself requires (1) intent, (2) interference, (3) breach or termination, and, importantly, (4) causation. *Ass'n for Supervision & Curriculum Dev., Inc. v. Int'l Council for Educ. Reform & Dev., Inc.*, No. 1:10cv74, 2011 WL 1225750, at *9 (E.D. Va. Mar. 14, 2011);

---

[24] *Cf. Regency Photo & Video, Inc. v. Am. Online, Inc.*, 214 F.Supp.2d 568, 573-74 (E.D. Va. 2002) (enforcing limitation of liability); *see also Size, Inc. v. Network Sols., Inc.*, 255 F.Supp.2d 568, 574 (E.D. Va. 2003) (granting motion to dismiss where a limitation of liability clause precluded potential damages award sufficient to meet the $75,000 threshold for diversity jurisdiction).

*see Tower Oaks Blvd., LLC v. Va. Com. Bank*, 223 Md. App. 781, at *5 (2015); *Tribalco, LLC v. Hue Tech., Inc.*, No. CIV. JFM-11-935, 2011 WL 3821074, at *8 (D. Md. Aug. 26, 2011).[25]

Blenheim alleges that Lockheed Martin "interfere[d] with and induce[d] breach of the SPA" by: (1) "misrepresent[ing] the status of funding it had received from the Pentagon to create artificial and harmful delays in the progression of Project Archer under the SPA[;]" (2) "exclud[ing] Blenheim from Project Archer meetings with Airbus France and engag[ing]ed in secret meetings with Airbus France in order to conspire with Airbus France to pursue a direct procurement arrangement . . . without Blenheim's involvement[;]" (3) "induc[ing] Airbus France to pursue a direct procurement arrangement by promising it greater advantage than it could obtain under its existing contractual arrangement with Blenheim[;]" and (4) "convinc[ing] South Korea to support a direct procurement arrangement." Compl. ¶¶ 154-55.

None of these allegations support a plausible claim for tortious interference. To the contrary, they highlight Blenheim's transparent attempt to turn what is (if anything) a contract matter into a tort case. Indeed, Blenheim tellingly avoids mentioning its own nonperformance in addressing Lockheed Martin's termination of the IBA, which in turn rendered the SPA with Airbus obsolete. Blenheim does so because these facts demonstrate that Lockheed Martin's actions were intended not to harm Blenheim but to mitigate the damages caused by Blenheim's failure to deliver its offset obligation. They further undermine the alleged causal link between the so-called tortious conduct and Airbus' legitimate termination of the SPA. Lockheed Martin's contractual actions provide an "obvious alternative explanation" for what Blenheim labels tortious conduct. *See Twombly*, 550 U.S. 568.

---

[25] Maryland case law also specifies that the plaintiff must show that the defendant's conduct was "without justification." *TKA*, 2019 WL 517209, at *5.

1. **Lockheed Martin Is No Stranger to the Business Relationship Here**

Blenheim's tortious interference claims fail at the outset because Lockheed Martin is a party to the overall contractual relationship among Airbus, Blenheim, and Lockheed Martin—the Project Archer offset transaction. Tortious interference does not lie where a plaintiff pleads facts demonstrating that the defendants were "part of the same series of related agreements that, together, would constitute a single transaction." *Cole v. Daoud*, No. 2:15cv419, 2016 WL 11410410, at *7 (E.D. Va. Feb. 17), *report & recommendation adopted*, 2016 WL 1213230 (E.D. Va. Mar. 24, 2016). The "single transaction" concept derives from the well-established proposition that a party cannot intentionally interfere with its own contract. *Francis Hosp., Inc. v. Read Props., LLC*, 820 S.E.2d 607, 610 (Va. 2018) ("An action for tortious interference with a contract or business expectancy . . . does not lie against parties to the contract, but only lies against those outside the contractual relationship, i.e., strangers to the contract or business expectancy."); *see also Fox v. Deese*, 362 S.E.2d 699 (Va. 1987); *L-3 Commc'ns*, 926 F.3d at 91-92 ("[O]nly a party outside the contractual or business-expectancy relationship with the plaintiff may be held liable as an interferor."); *Wilmington Tr. Co. v. Clark*, 424 A.2d 744, 754 (Md. 1981); *see also Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269-70 (Md. 1994) (Maryland courts have "refused to adopt any theory of tortious interference with contract or with economic relations that 'converts a breach of contract into an intentional tort.'") (quoting *K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 981 (Md. 1989)).

In *Cole*, although there were multiple agreements at issue, the defendants were all "party to the same contractual relationship" and that "series of related agreements" constituted a single "contractual relationship and/or expectancy" that was the relationship "underlying [plaintiff's] tortious interference claim." 2016 WL 11410410, at *7-8. As a result, the court held that "while these defendants may have breached, failed to perform or violated corporate duties, none of them

could have 'interfered with' [plaintiff's] contract."  *Id*. at *8 (citation omitted); *see also Hallinan v. Republic Bank & Tr. Co.*, No. 06 Civ. 185, 2006 WL 1495232, at *5 (S.D.N.Y. June 1, 2006) ("To determine if multiple contracts constitute a single agreement for purposes of tortious interference, all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even though they were not all between the same parties.") (alterations, quotation marks, and citation omitted).

Cole and *Hallinan* are instructive here.  Blenheim's allegations concede that the IBA and the SPA are interrelated agreements making up the overarching Project Archer offset transaction to provide a military satellite to South Korea.  Indeed, the agreements specifically refer to each other.  *See, e.g.*, Compl. ¶ 8 ("[i]n essence, Project Archer was a four-party transaction wherein each party . . . would reap significant benefit"); *id*. ¶ 62 (Blenheim-Airbus teaming agreement for satellite production); *id*. ¶ 67 (four-party NDA re Project Archer); *id*. ¶¶ 68, 92 (SPA between Blenheim and Airbus, which specifically references Lockheed Martin's IBA with Blenheim); *id*. ¶¶ 78, 97 (IBA between Lockheed Martin and Blenheim, including references to the SPA); *see also* Exs. 1A and Airbus Ex. 5.  Because Lockheed Martin was a party to the same overall relationship that is the subject of the SPA between Airbus and Blenheim, it could not have tortiously interfered with the SPA.[26]  *See Cole*, 2016 WL 11410410, at *8 (parties to same

---

[26]  Blenheim's additional claim, (Compl. ¶ 158), that Lockheed Martin intentionally interfered with the IBA fails for the same reasons.  *See L-3 Commc'ns*, 926 F.3d at 91-92.  Indeed, the notion that Lockheed Martin interfered with its subsidiary's contract makes no sense at all.  *See* Compl. ¶¶ 5, 12 (LMOC is wholly-owned subsidiary of Lockheed Martin).  Even at face value, a parent company can only tortiously interfere with a subsidiary's contract when "the interference is 'contrary to the subsidiary's economic interest or . . . employs wrongful means.'"  *Tech. & Supply Mgmt., LLC v. Johnson Controls Bldg. Automation Sys., LLC*, No. 1:16-cv-303, 2017 WL 57134, at *5 (E.D. Va. Jan. 4, 2017) (quoting *Glasson v. Children's Surgical Specialty Grp., Inc.*, 73 Va.Cir. 480, at *1 (2007)).  No factual allegations support this far-fetched claim.  To the contrary, the termination of the IBA freed Lockheed Martin from making further payments to a party, Blenheim, that had failed to satisfy the conditions precedent to the Phase Two payments.

overall transaction could not tortiously interfere with plaintiff's contract even if they breached their respective agreements or violated duties); *Hallinan*, 2006 WL 1495232, at *5 (same).

## 2. Lockheed Martin's Contractual Actions Do Not Support a Tort Claim

Blenheim's tortious interference claims also fail because they rely on actions authorized by the IBA between Blenheim and Lockheed Martin. "[W]hen a defendant is 'engaged in the lawful exercise of [its] statutory and contractual rights which incidentally may have interfered with the [plaintiff's] private negotiations[, such conduct] is not actionable and will not support recovery for tortious interference with contractual relations.'" *Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 144 (4th Cir. 2014) (citation omitted); *Spengler v. Sears, Roebuck & Co.*, 878 A.2d 628, 642 (Md. Ct. Spec. App. 2005) (Maryland courts have "declined to recognize that there exists such a wrongful act when there is merely a breach of contract that has an incidental effect on the plaintiff's business relations with third parties") (quoting *Volcjak v. Wash. Cnty. Hosp. Ass'n*, 723 A.2d 463, 479 (Md. Ct. Spec. App. 1999)). Lockheed Martin's exercise of its contractual rights under the IBA cannot be an "improper method" of interference for a tort suit. *Priority Auto Grp.*, 757 F.3d at 144; *see also Zamma Canada Ltd. v. Zamma Corp.*, No. 3:20cv353, 2020 WL 7083940, at *3-4 (E.D. Va. Dec. 3, 2020) (same).

For instance, Blenheim claims that Lockheed Martin "misrepresented the status of funding it had received from the Pentagon to create artificial and harmful delays in the progression of Project Archer under the SPA." Compl. ¶ 155. But the "delays" Blenheim posits are none other than the IBA's payment schedule and milestones to ensure progress of Project Archer. Blenheim *expressly agreed* to them. *See, e.g., id.* ¶¶ 75, 78, 101-02, 107; Ex. 5 at 7. Blenheim's conclusory assertion of harm from "artificial delays" is belied by its plain agreement

to the payment schedule in the IBA.[27]

### 3. Blenheim's Allegations of Intentional Interference Are Implausible and Fail to Establish Intent, Interference, or Causation

Blenheim's claims are also subject to dismissal because they are based on inconsistent, inaccurate factual allegations, and fail to plausibly demonstrate the intent, interference, or causal link required. *See, e.g., SecureInfo Corp. v. Telos Corp.*, 387 F.Supp.2d 593, 617 (E.D. Va 2005) (Rule 8 does not permit plaintiff to allege inconsistent factual allegations in same claim); *see also Feeley v. Total Realty Mgmt.*, 660 F.Supp.2d 700, 708, 710 (E.D. Va. 2009) (granting motion to dismiss because allegations were "simply implausible" and "flawed on [their] face").

**First,** Blenheim claims that "Lockheed misrepresented the status of funding it had received from the Pentagon to create artificial and harmful delays in the progression of Project Archer under the SPA." Compl. ¶¶ 155, 90. The claim fails for the reasons discussed above. But the allegation is also implausible because, accepting the allegations as true, this means that Lockheed Martin made the initial $45 million payment at the same time that it was intentionally jeopardizing an offset transaction that was a critical component of the company's $7 billion sale of F-35 jets to South Korea, even though Lockheed Martin had no direct procurement "plan" in place with Airbus. *See id.* ¶ 50. That is simply not plausible. *See Twombly*, 550 U.S. at 556.

In any event, Blenheim fails to connect Lockheed Martin's alleged "delayed" payment with Blenheim's issues related to the SPA. Instead, Blenheim asserts that it was not delays by Lockheed Martin but, allegedly, Airbus' inability to obtain internal approvals that led to

---

[27] At most, Blenheim alleges that Lockheed Martin made the Phase I payment two weeks late. *Id.* ¶ 90. There is no basis for attributing this to Airbus' termination of the SPA. Further, that Lockheed Martin *made* the payment ($45 million) renders implausible any suggestion that its timing was intended as interference. Moreover, Blenheim's recourse for this "delay," if anything, was to assert a breach of contract, not to accept the payment and claim tortious interference nearly six years later. *Priority Auto Grp.*, 757 F.3d at 144 (proper recourse for dispute with a defendant's exercise of a contractual right is an action in contract, not tort).

Blenheim's failure to provide term sheets to Lockheed Martin and delayed progress.  Compl.

¶ 104; *see also id*. ¶¶ 92, 99.  Blenheim's own allegations undermine causation.  *See*

*Goulmamine v. CVS Pharmacy, Inc.*, 138 F.Supp.3d 652, 672-73 (E.D. Va. 2015) (dismissing

tortious interference claim where Plaintiff failed to "plead facts that show that [defendant]'s

conduct was the cause of the loss alleged in the Complaint"); *Lyon v. Campbell*, 707 A.2d 850,

861-63 (Md. Ct. Spec. App. 1998) (reversing verdict finding tortious interference where

plaintiffs failed to show causation of alleged loss).

**Second**, Blenheim alleges that Lockheed Martin conducted "secret meetings" in order "to

conspire with Airbus France to pursue a direct procurement arrangement" and speculates that it

"induced Airbus France to pursue a direct procurement by promising it greater advantage than it

could obtain under its existing contractual arrangement with Blenheim."  *Id*. ¶ 155.  But

Blenheim does not explain how a procurement for one satellite instead of three was of "greater

advantage" to Airbus.  Nor does Blenheim's allegation that Lockheed Martin asked Airbus "to

guarantee that it would deliver the military satellite regardless of Blenheim's status" support its

desired conclusion.  *Id.* ¶ 96.  It is hardly improper for Lockheed Martin to seek an alternative in

the event that Blenheim defaulted, having failed to produce any financing or insurance as

required, and already in default on payments Blenheim owed to Airbus.

Nevertheless, Blenheim claims "on information and belief" that during the July 24-28

meetings, Lockheed Martin and Airbus "began in earnest to secretly discuss cutting Blenheim

completely out of the satellite transaction."  *Id*.  Such speculative, conclusory statements are

insufficient under *Twombly and Iqbal*.  And having a meeting among partners to a project is not

tortious conduct.  *See Wallace v. Baylouny*, No. 1:16-cv-0047, 2016 WL 3059996, at *7 (E.D.

Va. May 31, 2016) (attendance at a meeting does not constitute tortious conduct without

additional factual allegations).  Blenheim provides no information about anything unlawful being discussed and "without some further factual enhancement it stops short of the line between possibility and plausibility[.]"  *See Twombly*, 550 U.S. at 557.

Moreover, in light of Blenheim's failure to satisfy *any* of the milestone or conditions precedent to Phase Two Payments under the IBA, including the financing critical to Project Archer, it was proper and lawful for Lockheed Martin to discuss an alternate path forward with Airbus.  *See Tysons Toyota, Inc. v. Commonwealth Life Ins*., 20 Va. Cir. 399 (1990) (economic self-interest does not sustain a conspiracy allegation).  Blenheim cannot show otherwise.

**Third,** Blenheim claims that Lockheed Martin tortiously interfered by "convinc[ing] South Korea to support a direct procurement arrangement."  Compl. ¶ 155.  The Complaint alleges the opposite:  that South Korea was not receiving information pertaining to the offset from Lockheed Martin, (*id*. ¶ 116); that "it now appears that South Korea . . . placed pressure on Lockheed and Airbus to proceed with a direct procurement," (*id*. ¶ 118); and that DAPA "demanded that 'LM must provide . . . direct funding to Airbus'" and "threatened LM Aero with press exposure" if it did not concede, (*id.* ¶ 120).  In other words, Blenheim unambiguously alleges that Lockheed Martin had *no* role in "convincing" South Korea to support a direct procurement.  *SecureInfo Corp.*, 387 F.Supp.2d at 617.  Nor can Blenheim show that South Korea's "support" caused the termination of the SPA or IBA.  *Goulmamine*, 138 F.Supp.3d at 672 ("the absence of causation means that . . . [the] Complaint does not state a set of facts entitling [plaintiff] to relief on . . . tortious interference cause of action"); *Lyon*, 707 A.2d at 863 ("causation evidence that is wholly speculative is not sufficient") (citing *Myers v. Bright*, 609 A.2d 1182, 1186 (Md. 1992)).

4. **Blenheim Fails to Allege Facts to Demonstrate That Lockheed Martin Tortiously Interfered with Any Business Expectancy**

Count II, claiming tortious interference with business expectancy, fails for all the reasons above. It also fails because the "mere proof of a plaintiff's belief and hope" of a business relationship or result is inadequate to sustain a tortious interference with business expectancy cause of action. *Southprint, Inc. v. H3, Inc.*, 208 F. App'x 249, 253 (4th Cir. 2006) (citing *Com. Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 897 (Va. 1997)). Rather, a plaintiff must establish "a probability of future economic benefit, not a mere possibility." *Id.*; *Baron Fin. Corp. v. Natanzon*, 471 F.Supp.2d 535, 546 (D. Md. 2006) ("plaintiffs must identify a possible future relationship which is likely to occur, absent the interference, with specificity"). Blenheim's speculative aspirations fail to meet this threshold requirement.

Blenheim asserts that it "expected" to earn profits from the two commercial satellites included in the Project Archer transaction. *E.g.*, Compl. ¶¶ 8, 55, 161. But Blenheim fails to identify even a *prospective* buyer of any commercial satellite airtime, much less any contracts or agreements related to the commercial satellites. *See, e.g.*, *id.* ¶¶ 92-93, 97-98. In fact, Blenheim cannot even allege that it obtained the financing term sheets or met its other obligations under the Project Archer agreements that were critical prerequisites to the commercial satellites being manufactured or procured in the first place. *See, e.g.*, *id.* ¶¶ 78, 97. Blenheim's conceded failures doom any theoretical business expectancy it hoped to create.

At best, Blenheim alleges that it "had engaged in significant negotiations with a sovereign nation to purchase the communications capacity of both commercial satellites involved in Project Archer" that "had progressed to the point of a draft Memorandum of Agreement having been transmitted to the sovereign nation." *Id.* ¶ 146. This vague, conclusory allegation need not be accepted as true under *Twombly* and *Iqbal*. Even at face value, it is a concession that

Blenheim had no more than a "mere possibility" of future economic benefit. *Com. Bus. Sys., Inc.*, 484 S.E.2d at 897; *see McDonald's Corp. v. Turner-James*, No. 05CV804, 2005 WL 7873649, at *5 (E.D. Va. Nov. 29, 2005) (unidentified "potential" buyers insufficient to demonstrate expectancy); *Baron Fin.*, 471 F.Supp.2d at 546 (plaintiff failed to allege specific business relationships with unidentified organizations that "at some future time in some future business he might have"); *NorthStar Aviation, LLC v. Alberto*, 332 F.Supp.3d 1007, 1019 (E.D. Va. 2018) (plaintiff failed to allege that expectancy was "reasonably certain").[28]

In sum, Blenheim's tortious interference claims must be dismissed.

### C.      Counts VII and VIII for Civil and Statutory Conspiracy Fail

Blenheim's two conspiracy counts also fail to state a claim.  Compl.  ¶¶ 196-205. Common law conspiracy in Virginia and Maryland requires (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act through unlawful means; and (3) resulting injury to the plaintiff.  *Firestone v. Wiley*, 485 F.Supp.2d 694, 703 (E.D. Va. 2007); *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F.Supp.2d 675, 696 (D. Md. 2012). Statutory conspiracy in Virginia requires (1) a combination of two or more persons "for the purpose of willfully and maliciously injuring the plaintiff in his business[;]" and (2) resulting damage.  *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F.Supp.2d 610, 618 (E.D. Va. 2009).

First, Blenheim's statutory claim fails at the outset because "none of the acts on which the claim arises occurred in Virginia."  *Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*, 893 F.Supp.2d 761, 777-80 (E.D. Va. 2012), *aff'd*, 533 F. App'x 200 (4th Cir. 2013) ("the Virginia Business Conspiracy Act is powerless to proscribe commercial activity allegedly constituting a

---

[28]  Plaintiff also fails to allege that Lockheed Martin was aware of the negotiations with the mysterious "foreign sovereign."  *See Southprint, Inc.*, 208 F. App'x at 252 ("To support a claim for tortious interference with . . . business expectancy in Virginia, a plaintiff must show . . . knowledge of the relationship or expectancy on the part of the interferor[.]").

business conspiracy where, as here, that activity took place entirely outside Virginia").

Second, both conspiracy claims fail because Blenheim fails to plead an underlying wrong—here, tortious interference. "[W]here 'there is no actionable claim for the underlying alleged wrong, there can be no action for civil conspiracy based on that wrong.'" *Firestone*, 485 F.Supp.2d at 703 (citation omitted); *see also William v. AES Corp.*, 28 F.Supp.3d 553, 574 (E.D. Va. 2014) (dismissing conspiracy claim for failure to allege tortious interference); *Fare Deals, Ltd. v. World Choice Travel.Com, Inc.*, 180 F.Supp.2d 678, 692 (D. Md. 2001) (same).

Third, for both counts, a plaintiff must "allege that the defendants combined together to effect a 'preconceived plan and unity of design and purpose.'" *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F.Supp.2d 483, 499 (E.D. Va. 2003) (no conspiracy where plaintiff alleged "certain actions" by one defendant and "others" by another defendant but no improper actions in concert); *Schlegel v. Bank of Am., N.A.*, 505 F.Supp.2d 321, 325-26 (W.D. Va. 2007) ("Concerted action" means that a party "'combined, associated, agreed, mutually undertook, or concerted together' with someone else in the injurious conduct.") (citation omitted); *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 372 (Md. Ct. Spec. App. 1983) ("A plaintiff must establish 'a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'") (citation omitted); *Deckelbaum v. Cooter, Mangold, Tompert & Chapman, P.L.L.C.*, 292 B.R. 536, 541 (D. Md. 2003) (same). Blenheim's Complaint does not meet this standard.

Blenheim claims that from July 24-28, 2015, Lockheed Martin and Airbus "began in earnest to secretly discuss cutting Blenheim completely out of the satellite transaction" and that Lockheed Martin "creat[ed] artificial and harmful delays in the progression of Project Archer under the SPA" in support of that "conspiracy." Compl. ¶¶ 100, 155. Blenheim ignores that, far

from any conspiratorial purpose, Lockheed Martin had an entirely legitimate reason to meet with Airbus—Blenheim's failure to provide financing to progress the offset transaction. And, as noted above, the "delays" by Lockheed Martin (to the extent a contractual payment schedule could constitute a delay) occurred ***prior to*** these meetings with Airbus, and thus do not support any meeting of the minds. Finally, to the extent that Blenheim's allegations pertain to activity after the meeting in Toulouse, Blenheim provides no factual allegations that Lockheed Martin's direct procurement with Airbus was other than a legal act to deliver on Lockheed Martin's offset obligation to South Korea in spite of Blenheim's failures. None of this shows a preconceived plan to participate in tortious conduct. *Skillstorm*, 666 F.Supp.2d at 618 ("[T]here can be no conspiracy to do an act the law allows.") (citation omitted).[29]

Finally, Blenheim's statutory conspiracy claim fails because it has not plausibly alleged that Lockheed Martin acted with malice. *See id*. (legal malice requires "that the defendant acted intentionally, purposefully, and without lawful justification" to injure the plaintiff) (citing *Schlegel*, 505 F.Supp.2d at 326); *see also Simmons v. Miller*, 544 S.E.2d 666, 677 (Va. 2001) (plaintiff must prove by clear and convincing evidence that the conspirators acted with legal malice). Conspiracy, "like fraud, must be pleaded with particularity, and with more than mere conclusory language" to "prevent[] every business dispute [from] becoming a business conspiracy claim." *Schlegel*, 505 F.Supp.2d at 329 (citing *Gov't Emps. Ins. Co. v. Google, Inc.*,

---

[29] The allegations that Korea participated in an alleged conspiracy are even less plausible. Blenheim alleges that Korea sought "detailed information from Blenheim, which it was not receiving from Lockheed," (*id*. ¶ 91); that "DAPA could not understand the delays in satellite execution schedule," (*id*. ¶ 119); and that Korea "threatened LM Aero with press exposure" that it claimed would have had "significant negative impact on LM's other businesses," (*id*. ¶ 120). Blenheim also alleges that "a DAPA official told Blenheim that Lockheed's withholding of the funding for Project Archer . . . was 'kind of criminal.'" *Id*. ¶ 116. Blenheim's factual allegations show that what limited communication occurred between Lockheed Martin and South Korea reflected their arms-length positions, not any "meeting of the minds" to harm Blenheim.

330 F.Supp.2d 700, 706 (E.D. Va. 2004)).  The Complaint has no factual allegations that Lockheed Martin acted to purposefully injure Blenheim's reputation, trade, or business. Blenheim instead alleges that the parties sought to pursue a direct procurement arrangement to "boost their own profits," (Compl. ¶ 139)—not to harm Blenheim's business.  This alone defeats Blenheim's claim, as does the obvious conclusion that Lockheed Martin acted unilaterally and in its own interest to salvage its offset obligation to South Korea.  Blenheim's allegations are plainly insufficient and its conspiracy claim thus fails.

### D.    Count IX for Unjust Enrichment Fails

#### 1.    <u>Blenheim's Unjust Enrichment Claim Is Untimely</u>

In Virginia, the statute of limitations for an unjust enrichment claim is three years.  *E. W. LLC v. Rahman*, 873 F.Supp.2d 721, 730 (E.D. Va. 2012); *Blankenship v. Consolidation Coal Co.*, 850 F.3d 630, 635 (4th Cir. 2017).[30]  The limitation period "begins to run at the time the unjust enrichment occurred . . . not when a party 'knew or should have known' of the unjust enrichment."  *Rahman*, 873 F.Supp.2d at 730; *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F.Supp.2d 565, 576 (E.D. Va. 2004) (accrual begins "at the moment defendants received a benefit . . . without paying for its value").

Blenheim claims that Lockheed Martin was "unjustly enriched by cutting Blenheim out and proceeding with a direct procurement."  Compl. ¶ 212.  The Complaint alleges that Lockheed Martin did not make any of the "Phase Two" payments to Blenheim under the IBA, the first of which was due on July 31, 2015.  *Id*. ¶¶ 102-04; Ex. 5 at 2.  Blenheim alleges that Lockheed Martin formally "cut[ ] Blenheim out" on October 6, 2016, (Compl. ¶ 132), and it

---

[30]  Maryland also has a three-year statute of limitations.  *See Jason v. Nat'l Loan Recoveries, LLC*, 134 A.3d 421, 429 (Md. Ct. Spec. App. 2016); *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F.Supp.3d 536, 555 (D. Md. 2019).

formally "proceed[ed] with a direct procurement" with Airbus in December 2016, (*see id.* ¶ 111). Blenheim's unjust enrichment claim, therefore, accrued at the *latest* by the end of 2016, more than four years prior to Blenheim bringing its claim on December 31, 2020.  It is time-barred.

### 2.  The Unjust Enrichment Claim Is Precluded by an Express Contract

A claim for unjust enrichment cannot stand where there is an express contract governing the underlying transaction.  *See Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 166 (4th Cir. 2012) ("[T]he concept of an implied-in-law contract, or quasi contract, applies only when there is not an actual contract[.]"); *Nedrich v. Jones*, 429 S.E.2d 201, 207 (Va. 1993) ("The law will not impose an implied contractual relationship upon parties in contravention of an express contract."); *FLF, Inc. v. World Publ'ns, Inc.*, 999 F.Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland . . . that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").[31]

As set forth above, the Project Archer offset transaction that is the basis of Blenheim's claims is governed by multiple agreements between the parties, including the IBA between Blenheim and Lockheed Martin setting forth the terms with respect to the benefit that Blenheim was to confer upon Lockheed Martin through the offset transaction.  *See* Ex. 1A.  Because Blenheim's claim against Lockheed Martin is governed by the IBA, it fails as a matter of law.

### 3.  Blenheim Did Not Confer a Benefit on Lockheed Martin that Was Retained Without Payment

Blenheim also fails to plead that it conferred a benefit on Lockheed Martin for which it was not compensated.  A plaintiff asserting unjust enrichment must show (1) it conferred a

---

[31]  *See also Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988) ("unjust enrichment . . . may not be brought in the face of an express contract"); *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000) ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists.").

benefit on the defendant; (2) the defendant knew of the benefit and should have reasonably expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value. *Rosetta Stone*, 676 F.3d at 165-66; *State Farm*, 381 F.Supp.3d at 559 (same).

Even taking as true the allegation that Blenheim developed the idea for Project Archer, Blenheim's claim for unjust enrichment for a transaction it did not perform is implausible. Blenheim concedes that it did not provide the financing at the heart of Project Archer; in fact, Blenheim never even met the conditions necessary to warrant *any* of the Phase Two payments under the IBA, milestones that far preceded the ultimate goal of the project—delivery of the military satellite and the resulting offset credits from South Korea. Compl. ¶¶ 97-98. Instead, Lockheed Martin had to take it upon itself to procure the military satellite directly from Airbus. *See id.* ¶ 113. This alone renders Blenheim's claim implausible. Blenheim further admits that Lockheed Martin *paid* Blenheim $45 million, with Blenheim retaining $25 million. *Id.* ¶¶ 90, 93. To the extent that Blenheim's "develop[ment of] the idea for Project Archer," (*id.* ¶ 208), conferred a benefit on Lockheed Martin, Blenheim has been handsomely compensated. In fact, if there is any viable unjust enrichment claim here, it is for Blenheim to return the $25 million *it* has unjustly retained on a financing project to which it admittedly provided no financing.

For all of the above reasons, Blenheim's unjust enrichment claim should be dismissed.

## **CONCLUSION**

For the reasons set forth herein, Lockheed Martin respectfully requests that this Court dismiss the Complaint.

Dated: April 30, 2021

Respectfully Submitted,

/s/ Brian Tully McLaughlin
Brian Tully McLaughlin, VA Bar No. 71258
Cheryl A. Falvey, *pro hac vice*
Astor H.L. Heaven, *pro hac vice*
Lyndsay A. Gorton, VA Bar No. 80409
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
BMcLaughlin@crowell.com
CFalvey@crowell.com
AHeaven@crowell.com
LGorton@crowell.com

*Counsel for Defendant Lockheed Martin Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of April 2021, I electronically filed the foregoing

Memorandum of Law in Support of Lockheed Martin Corporation's Motion to Dismiss using the

Court's NextGen CM/ECF system, which caused service on all counsel of record.

*/s/ Brian Tully McLaughlin*
Brian Tully McLaughlin, VA Bar No. 71258
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
BMcLaughlin@crowell.com

*Counsel for Lockheed Martin Corporation*