**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |
|---|---|
| **BLENHEIM CAPITAL HOLDINGS LTD. and BLENHEIM CAPITAL PARTNERS LTD.,** | |
| *Plaintiffs*, | The Honorable Liam O'Grady |
| vs. | Case No.: 1:20-cv-1608-LO-JFA |
| **LOCKHEED MARTIN CORPORATION, AIRBUS DEFENCE AND SPACE SAS, REPUBLIC OF KOREA, and DEFENSE ACQUISITION PROGRAM ADMINISTRATION,** | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT AIRBUS DEFENCE AND SPACE SAS'S MOTION TO DISMISS**

K. Kevin Chu (VSB # 85746)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Ste. 900
Washington, D.C. 20005
(202) 538-8000
(202) 538-8100 (Fax)
kevinchu@quinnemanuel.com

Marc Greenwald (*pro hac vice*)
Robert Longtin (*pro hac vice*)
Shira Steinberg (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, N.Y. 10010
(212) 849-7000
(212) 849-7100 (Fax)
marcgreenwald@quinnemanuel.com
robertlongtin@quinnemanuel.com
shirasteinberg@quinnemanuel.com

*Counsel for Defendant Airbus Defence And Space SAS*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ..........................................................................................................................2

    A.    Airbus DS France And Plaintiffs .............................................................................2

    B.    Airbus's Introduction To Project Archer And Related Contracts............................3

        1.    2013 NDA And Teaming Agreement ..........................................................3

        2.    2015 NDA And Satellite Procurement Agreement......................................5

    C.    Airbus Commences Work; Blenheim Falls Short......................................................6

    D.    The Parties Attempt To Work With Blenheim ........................................................9

    E.    Lockheed Terminates The IBA And The Parties Enter Into A Direct Procurement Agreement With Blenheim's Knowledge ...............................................................9

ARGUMENT ...............................................................................................................................10

I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION .....................................10

II.    PLAINTIFFS' ALLEGATIONS FAIL TO ESTABLISH JURISDICTION OVER AIRBUS ..........................................................................................................................11

    A.    Plaintiffs Fail To Allege Airbus Is Subject To General Jurisdiction ....................11

    B.    Airbus's Alleged Contacts With Virginia Are Insufficient To Establish Specific Jurisdiction ...........................................................................................................12

        1.    Plaintiffs Have Not Alleged Airbus Purposefully Availed Itself Of Jurisdiction in Virginia. ........................................................................12

        2.    Plaintiffs' Claims Do Not Arise Out Of Contacts With Virginia .............15

        3.    Exercising Jurisdiction Over Airbus Would Not Be Constitutionally Reasonable .............................................................................................16

    C.    In Any Event, Airbus's Alleged Connections To DoD Cannot Establish Jurisdiction Under The Government Contacts Principle .......................................18

III.   PLAINTIFFS' ALLEGATIONS FAIL TO ESTABLISH VENUE IN THE EASTERN DISTRICT OF VIRGINIA .............................................................................................18

IV.   PLAINTIFFS SHOULD BE COMPELLED TO ARBITRATE THEIR CLAIMS AGAINST AIRBUS ......................................................................................................20

    A.    Two Agreements Compel the Parties to Arbitrate ................................................21

i

    B.     The Arbitration Provisions in Both Agreements Encompass This Dispute...........22

V.     PLAINTIFFS FAIL TO STATE A CLAIM AGAINST AIRBUS.................................23

    A.     Plaintiffs' Claims Are Precluded By Agreed-Upon Limitations On Liability ......23

    B.     Plaintiffs' Claim For Inducing Breach of Contract Fails......................................24

    C.     Plaintiffs' Claim For Causing Loss by Unlawful Means Fails .............................26

    D.     Plaintiffs' Claim For Unjust Enrichment Fails ....................................................27

    E.     Plaintiffs' Conspiracy Claims Fail......................................................................29

CONCLUSION.................................................................................................................30

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Adams v. White,*
 2011 WL 3875422 (E.D. Va. Aug. 31, 2011)................................................. 25

*ADESA, Inc. v. Lewis,*
 2021 WL 201283 (W.D. Va. Jan. 20, 2021) ................................................. 23

*Aggarao v. MOL Ship Mgmt. Co.,*
 675 F.3d 355 (4th Cir. 2012) ....................................................................... 22

*Alkanani v. Aegis Def. Servs., LLC,*
 976 F. Supp. 2d 13 (D.D.C. 2014) ............................................................... 18

*Am. Bankers Ins. Grp., Inc. v. Long,*
 453 F.3d 623 (4th Cir. 2006) ....................................................................... 22

*Am. Chiropractic Ass'n v. Trigon Healthcare,*
 367 F.3d 212 (4th Cir. 2004) ......................................................................... 4

*Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,*
 96 F.3d 88 (4th Cir. 1996) ........................................................................... 23

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)..................................................................................... 25

*AT&T Mobility LLC v. Concepcion,*
 563 U.S. 333 (2011)..................................................................................... 20

*Babiak v. Mizuho Bank, Ltd.,*
 2018 WL 4473584 (E.D. Va. Sept. 17, 2018).............................................. 14

*Bank of Am. v. Lykes,*
 2010 WL 2640454 (W.D.N.C. May 20, 2010), *report and recommendation
 adopted,* 2010 WL 2640411 (W.D.N.C. June 30, 2010) ............................... 25

*Baxendale-Walker v Middleton*
 [2011] EWHC 998 ....................................................................................... 29

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007)............................................................... 25, 26, 27, 29

*Benedetti v Sawiris*
 [2013] UKSC 50 ........................................................................................... 28

*Blankenship v. Consolidation Coal Co.,*
 850 F.3d 630 (4th Cir. 2017) ....................................................................... 27

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.,*
 137 S. Ct. 1773 (2017) ................................................................................. 16

iii

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)........................................................................................ 12

*CEM Corp. v. Pers. Chemistry, AB*,
   55 F. App'x 621 (4th Cir. 2003) ................................................................ 15

*Cent. Virginia Aviation, Inc. v. N. Am. Flight Servs., Inc.*,
   23 F. Supp. 3d 625 (E.D. Va. 2014) .......................................................... 15

*Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*,
   252 F.3d 707 (4th Cir. 2001) ...................................................................... 21

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
   561 F.3d 273 (4th Cir. 2009) ........................................................ 11, 13–16

*Costello v MacDonald*
   [2011] EWCA Civ 930 ......................................................................... 27, 28

*Curry v. Trustmark Ins. Co.*,
   600 F. App'x 877 (4th Cir. 2015) .............................................................. 24

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)...................................................................................... 11

*Decision Insights, Inc. v. Quillen*,
   2005 WL 2757930 (E.D. Va. Oct. 21, 2005) ........................................... 14

*Dennie v. MedImmune, Inc.*,
   2017 WL 2930462 (D. Md. July 10, 2017)............................................... 22

*In re Dental Supplies Antitrust Litig.*,
   2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017) ......................................... 17

*Deutsche Morgan Grenfell Plc v IRC*
   [2005] EWCA Civ 78 ................................................................................. 28

*Deutsche Morgan Grenfell Plc v Inland IRC*
   [2006] UKHL 49 .......................................................................................... 28

*ECPI Univ., LLC v. Med. Career Inst., Inc.*,
   2020 WL 469661 (E.D. Va. Jan. 29, 2020) ........................................ 13, 16

*Feeley v. Total Realty Mgmt.*,
   660 F. Supp. 2d 700 (E.D. Va. 2009) .................................................. 25, 29

*Fidrych v. Marriott Int'l, Inc.*,
   952 F.3d 124 (4th Cir. 2020) ...................................................................... 12

*Fiona Trust & Holdings Corp v Privalov*
   [2007] EWCA Civ 20 ................................................................................. 23

*Flexible Benefits Council v. Feltman*,
   2008 WL 2465457 (E.D. Va. June 16, 2008) ........................................... 18

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) ................................................................. 12

*Future Investments SA v Federation Internationale de Football Association*
   [2010] EWHC 1019 (Ch) .............................................................. 27

*Galustian v. Peter*,
   750 F. Supp. 2d 670 (E.D. Va. 2010) ........................................... 17

*Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*,
   893 F. Supp. 2d 761 (E.D. Va. 2012), *aff'd*, 533 F. App'x 200 (4th Cir. 2013) ............. 29

*Goldstein v. Bank of Am., N.A.*,
   2010 WL 1252641 (W.D.N.C. Jan. 19, 2010), *aff'd*, 2010 WL 1252629
   (W.D.N.C. Mar. 24, 2010) .................................................... 25, 29

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ..................................................................... 11

*Grayson v. Anderson*,
   816 F.3d 262 (4th Cir. 2016) ....................................................... 11

*Great Am. Ins. Co. v. Hinkle Contracting Corp.*,
   497 F. App'x 348 (4th Cir. 2012) ............................................ 22, 23

*Guaranteed Rate, Inc. v. Conn*,
   264 F. Supp. 3d 909 (N.D. Ill. 2017) ............................................ 17

*Hall & Wilson Constr., Inc. v. Sockwell*,
   2009 WL 10689465 (E.D. Va. May 5, 2009) ................................. 19

*Hansen v. Stanley Martin Companies, Inc.*,
   585 S.E.2d 567 (Va. 2003) ........................................................... 24

*Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*,
   2006 WL 5908727 (E.D. Va. Feb. 10, 2006) ................................ 30

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002) ....................................................................... 21

*Indep. Printers Worldwide, Inc. v. Cole*,
   2015 WL 4705507 (E.D. Va. Aug. 6, 2015) ................................. 17

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
   206 F.3d 411 (4th Cir. 2000) .................................................. 21, 22

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*,
   863 F.2d 315 (4th Cir. 1988) ....................................................... 22

*Kleinwort Benson Ltd v Lincoln CC* ................................................... 28
   [1999] 2 A.C 349 ........................................................................ 28

*Liberty Mut. Fire Ins. Co. v. KB Home*,
   2013 WL 6185882 (E.D. Va. Nov. 25, 2013) ............................... 18

v

*Lipkin Gorman (A Firm) v Karpnale Ltd. Lipkin Gorman (A Firm) v Karpnale Ltd*
[1991] 2 A.C. 548 ............................................................................................... 28

*Martin v. Eide Bailly LLP,*
2016 WL 4496570 (S.D. Ind. Aug. 26, 2016) ................................................. 17

*Meridian Imaging Sols., Inc. v. OMNI Bus. Sols. LLC,*
250 F. Supp. 3d 13 (E.D. Va. 2017) .......................................................... 21, 22

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
473 U.S. 614 (1985) ........................................................................................... 20

*Muriithi v. Shuttle Exp., Inc.,*
712 F.3d 173 (4th Cir. 2013) ............................................................................ 21

*Mylan Lab'ys, Inc. v. Akzo, N.V.,*
2 F.3d 56 (4th Cir. 1993) .................................................................................. 11

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,*
591 F.3d 250 (4th Cir. 2009) ............................................................................ 25

*New Venture Holdings, L.L.C. v. DeVito Verdi, Inc.,*
376 F. Supp. 3d 683 (E.D. Va. 2019) ............................................................... 16

*Newbauer v. Jackson Hewitt Tax Serv. Inc.,*
2019 WL 1398172 (E.D. Va. Mar. 28, 2019) .................................................. 19

*OBG v Allan*
[2007] UKHL 21 ..................................................................................... 24, 25, 26

*Pepe's Piri Piri Ltd v Junaid*
[2019] EWHC 2097 (QB) .................................................................................. 26

*Perdue Foods LLC v. BRF S.A.,*
814 F.3d 185 (4th Cir. 2016) .......................................................... 12, 13, 14, 15

*Periera v. Creative Artists Agency,*
2016 WL 9450433 (E.D. Va. Sept. 29, 2016)................................................... 13

*Portman Building Society v Hamlyn Taylor Neck (A Firm)*
[1998] P.N.L.R ................................................................................................... 28

*Power Paragon, Inc. v. Precision Tech. USA, Inc.,*
605 F. Supp. 2d 722 (E.D. Va. 2008) ............................................................... 19

*Project Honey Pot v. John Does,*
2012 WL 1854184 (E.D. Va. May 21, 2012) ................................................... 17

*Punchbowl, Inc. v. AJ Press LLC,*
2021 WL 1178070 (E.D. Va. Mar. 26, 2021) .................................................. 20

*Savage v. Bioport, Inc.,*
460 F. Supp. 2d 55 (D.D.C. 2006) .................................................................... 18

*Simone v. VSL Pharm., Inc.*,
    2017 WL 658711 (D. Md. Feb. 16, 2017) ............................................................ 11, 18

*Sonoco Prod. Co. v. ACE INA Ins.*,
    877 F. Supp. 2d 398 (D.S.C. 2012) ...................................................................... 16

*Southprint, Inc. v. H3, Inc.*,
    208 F. App'x 249 (4th Cir. 2006) ........................................................................ 29

*Straight Line Drive, Inc. v. Vanatta*,
    2020 WL 7647637 (E.D. Va. Dec. 23, 2020) ...................................................... 17

*Walden v. Fiore*,
    571 U.S. 277 (2014) .............................................................................................. 17

*Zeneca Ltd. v. Mylan Pharm., Inc.*,
    173 F.3d 829 (Fed. Cir. 1999) ............................................................................. 18

## **Rules / Statutes**

9 U.S.C. § 2 .......................................................................................................................... 20

28 U.S.C. § 1391(b) .............................................................................................................. 18

28 U.S.C. § 1391(f) ............................................................................................................... 18

Md. Code Ann., Cts. & Jud. Proc. § 5-101 ......................................................................... 24

Rule 12(b)(2) ......................................................................................................................... 11

Rule 12(b)(3) ..................................................................................................................... 2, 18

Rule 12(b)(6) ........................................................................................................................... 2

Va. Code Ann. § 8:01–246(4) ............................................................................................... 27

Virginia Code § 18.2-499 ..................................................................................................... 29

Virginia Code § 18.2-500 ..................................................................................................... 29

## PRELIMINARY STATEMENT

Almost five years after Plaintiffs conceded they could not live up to their end of the agreements to finance three satellites and that Airbus should proceed to build a South Korean military satellite without their involvement, Plaintiffs filed this fantasy-based Complaint in this Court without jurisdiction or venue.  Despite having agreed to arbitrate any dispute in London, these two small Guernsey-based entities have sued Europe-based Airbus in a location where neither Blenheim entity nor Airbus had any contact, much less purposeful availment.  Blenheim presumably chose the U.S. to avoid application of England's loser-pays rules for this Complaint without factual or legal merit.

Factually, Blenheim's claims make no sense.  Airbus would have been happy to have Blenheim finance *three* satellites, rather than have Lockheed pay directly for just *one* of those satellites.  Similarly, Lockheed would have preferred to have Blenheim's Project Archer financing pay for a large portion of the South Korean military satellite rather than have Lockheed pay the entire amount.  Financially, South Korea presumably would have been indifferent to how the military satellite was paid for, as long as it was built to the proper specifications.  No party undermined or interfered with Blenheim; instead, Blenheim could not deliver the financing and breached its agreements with Airbus.  In 2016, recognizing that it could not come up with financing, Blenheim voluntarily walked away as long as Lockheed agreed not to sue Blenheim. The allegations are improbable and dismissal would be appropriate on that basis.

But the Court need not reach whether Blenheim can state a claim with these nonsensical allegations because Blenheim has forum-shopped a district without jurisdiction or venue.  ***First***, this Court lacks subject matter jurisdiction over this dispute.  Plaintiffs' sole basis for federal jurisdiction is the FSIA's "commercial activity" exception.  Tellingly, after filing suit four months ago, Plaintiffs have yet to even serve South Korea despite the foreign sovereign being Plaintiffs' only colorable claim for federal jurisdiction.  Plaintiffs have not alleged South Korea had any substantial contacts with the U.S., let alone commercial contacts with the U.S. forming the basis of Plaintiffs' allegations.  As a result, Plaintiffs' claims do not fit within any of the exceptions set

out in FSIA granting U.S. courts jurisdiction over South Korea for this matter.  Without South Korea serving as a means of entry into federal court, Plaintiffs claims against the remaining Defendants fail as there is no cause for supplemental jurisdiction without FSIA.

*Second*, this Court lacks personal jurisdiction over Airbus.  Airbus performs all its operations including building, testing, and delivering satellites in Europe.  Plaintiffs do not allege even one instance where Airbus had a presence Virginia—let alone facts sufficient to believe that Airbus availed itself of jurisdiction in Virginia.  *Third*, for the same reasons, this Court is an improper venue for Plaintiffs' claims and warrants dismissal pursuant to Rule 12(b)(3).  Here, venue would be proper if a substantial part of the events or omissions giving rise to the claim occurred in this district, but that is simply not the case.  Plaintiffs have not, and cannot, allege a significant portion of events occurred in this district.  *Fourth*, the claims at issue are governed by three arbitration agreements, two of which relate to Airbus, that preclude bringing suit in court at all.  Notably, Plaintiffs make no mention of the arbitration clauses governing these claims.

Even if this Court had subject matter jurisdiction, personal jurisdiction over Airbus, proper venue, and the claims were not subject to arbitration, this Court would still be compelled to dismiss pursuant to Rule 12(b)(6).  Blenheim's implausible allegations, even when read in the most favorable light to Blenheim, do not state a claim under applicable English law for tortious interference, unjust enrichment, or civil conspiracy.  This Court should dismiss with prejudice.

## BACKGROUND

Airbus Defence and Space SAS ("Airbus" or "Airbus DS France") joins in the background provided in Lockheed's motion to dismiss and writes separately to provide additional detail on certain facts specific to Airbus and its relationship with Plaintiffs.

### A.      Airbus DS France And Plaintiffs

Airbus is a French company located in Toulouse, France.  Compl. ¶ 13.  Airbus's business lies in the complex, and highly specialized, industry of manufacturing satellites, both commercial and military.  *Id.* ¶¶ 7, 8, 13.  It does so in tandem with its corporate affiliate Airbus Defence and Space Ltd, which is based in the United Kingdom ("Airbus DS UK").  *Id.*  Both Airbus and Airbus

DS UK are ultimately owned by Airbus SE, a "global leader in the defense and space industry." *Id.* ¶ 13.

Plaintiffs are small Guernsey companies. *Id.* ¶¶ 2, 10, 11. Although Plaintiffs purport to be nascent competitors of Airbus in the satellite industry, *id.* ¶ 9, 94, they have zero alleged experience in satellites, or their manufacture, sale, or operation. Rather, Plaintiffs are middlemen whose business lies in brokering "offset" transactions between foreign military sales defense contractors and various countries' military procurement entities. *Id.* ¶ 2, 37. Offsets are best understood as secondary benefits governments ask suppliers to provide in addition to whatever the supplier is obligated to procure under the core supply transaction. *Id.* ¶ 2. According to Plaintiffs, offsets act as "sweeteners," *id.* ¶ 39, and they can be related to the core transaction, such as providing fuel with a tank, or they can be entirely unrelated, like being asked to supply a military satellite in connection with a contract for F-35 fighter jets. *Id.* ¶ 6.

**B.     Airbus's Introduction To Project Archer And Related Contracts**

As described in Lockheed's motion, Dkt. 34 (LM MOL), Lockheed and Plaintiffs worked together, pursuant to an International Broker Agreement, on a plan to fulfill Lockheed's offset obligation of procuring a military satellite for South Korea at a fraction of the usual price for such a satellite. *Id.* ¶ 55. Under this plan, termed Project Archer, Blenheim was to achieve savings for Lockheed by commissioning two commercial satellites, in addition to the military one required by South Korea, and using the anticipated future revenue from the two commercial satellites to offset the manufacturing costs of all three. *Id.* ¶ 56. Project Archer's viability depended on Blenheim securing financing to pay the "upwards of a billion dollars" the three satellites were projected to cost. *Id.* ¶ 8.

**1.     2013 NDA And Teaming Agreement**

On November 28, 2013, in connection with its efforts to secure a satellite manufacturer for Project Archer, Blenheim Capital entered into a non-disclosure agreement with Airbus DS UK's predecessor entity, Astrium Limited, which the parties later amended to add Airbus DS France

(f/k/a Astrium SAS).  Ex. 1 (2013 NDA);[1] Ex. 2 (2013 NDA Amendment).  After engaging in discussions pursuant to the NDA, Blenheim Capital selected Airbus DS UK as its partner in Project Archer, with Airbus DS France to act as the manufacturer of the military satellite.  Compl. ¶¶ 7, 61.  Accordingly, on October 31, 2014, Blenheim Capital entered into a Teaming Agreement with Airbus DS UK.  *Id.* ¶ 62; Ex. 3 (TA).

As described in the Teaming Agreement, Blenheim was "envisaging to procure three satellites (the 'Programme')," and recognizing that "Airbus Defence and Space has extensive capabilities in the area of telecommunications satellites design, development, manufacture, test and integration," Blenheim Capital and Airbus DS UK expressed that they "wish[ed] to team together in order to develop an optimal approach for the implementation of the Programme …." Ex. 3 (TA), at 1.  As relevant here, Blenheim Capital agreed that it was to be responsible for "structuring and implementing the financing required for the Programme and providing details of such financing and the associated business plan as [Airbus DS UK] may reasonably require …." *Id.* § 1.1.  The Teaming Agreement incorporates the 2013 NDA, and both the Teaming Agreement and 2013 NDA contain broad English choice-of-law clauses and provide for jurisdiction in English courts.[2]  *See* Ex. 3 §§ 4.10, 4.12, Ex. 1 §§ 10.1–10.2.

---

[1]  True and correct copies of Exhibits 1–8 are attached to the Declaration of Robert Longtin filed as Appendix A to this Memorandum.  The Complaint refers to and necessarily relies on these documents, and their terms are integral to the allegations in the Complaint.  *See, e.g.*, Compl. ¶¶ 62, 67, 68, 103, 106, 133.  They are therefore properly before the Court on this Motion to Dismiss.  *See Am. Chiropractic Ass'n v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004).

[2]  The 2013 NDA provides:  "[t]his agreement and any disputes or claims arising out of it, or in connection with its subject matter or formation (including non-contractual disputes or claims), are to be governed by and construed in accordance with English law" and that the "[t]he Parties irrevocably agree that the courts of England and Wales have non-exclusive jurisdiction to settle any dispute that arises out of or in connection with this agreement or its formation (including non-contractual disputes or claims)."  Ex. 1 §§ 10.1–10.2.  The Teaming Agreement provides that "[t]his Agreement shall be governed in all respects by the laws of England and the Parties submit to the jurisdiction of the courts of England."  Ex. 3 §§ 4.12.

### 2.      2015 NDA And Satellite Procurement Agreement

On February 23, 2015, for the purposes of "discussing, reviewing, and/or evaluating" providing a military satellite to South Korea, Airbus DS France, Airbus DS UK, and Blenheim Capital entered into another NDA, along with Lockheed Martin Aeronautics Company, and SES TechCom Services.  Compl. ¶ 67; Ex. 4 (2015 NDA).  Pursuant to this NDA, Blenheim Capital provided Lockheed, Airbus DS UK, and Airbus DS France with its "confidential and competitively sensitive information regarding the progression of Project Archer," including "Blenheim Capital's financial models and details of Blenheim Capital's negotiations regarding the two commercial satellites."  Compl. ¶ 67.  As with the 2013 NDA and the Teaming Agreement, this agreement contains an English choice-of-law provision. Ex. 4 § 11.[3]  The 2015 NDA also mandates that, in the event of any "dispute arising between the Parties in connection with this Agreement," "each Party may request that the dispute be finally settled under the Rules of Arbitration of the International Chamber of Commerce" in London.  *Id.*

On February 26, 2015 Blenheim Capital and Airbus DS UK entered into a Satellite Procurement Agreement intended to formalize the parties' agreement to cooperate, as set out in the Teaming Agreement.  Compl. ¶ 68; Ex. 5 (SPA).  As provided in the SPA, Blenheim Capital "desire[d] to procure, and [Airbus DS UK] desire[d] to provide" a military satellite as well as two "commercially operated satellite[s.]"  Ex. 5, at 1–2.  Because a number of specifics were still being negotiated, including the Technical Assistance Agreement between Lockheed and South Korea that would provide the specifications for the military satellite, the parties agreed that the SPA was subject to change, and that they would "negotiate diligently and in good faith toward the goal of finalizing the [s]pecifications, [statements of work], contract documentation requirements lists, and the [t]erms as soon as reasonably practicable following the finalization" of the Technical Assistance Agreement between Lockheed and South Korea. Ex. 5 § 4.  The parties further agreed

---

[3]  The provision of the 2015 NDA provides: "This Agreement shall be governed by and interpreted in accordance with the laws of England & Wales."  Ex. 4 § 11

to schedule Project Archer so as to "lead[] to an in orbit handover" of the military satellite to South Korea by a date certain.  *Id.* § 3.

Although Blenheim Capital entered into the SPA with Airbus DS UK, an Airbus DS France employee, Hugues de Galzain (Head of Marketing & Sales Space Systems) executed the SPA for Airbus DS UK, Compl. ¶ 68; Ex. 5, at 12; Airbus DS France was designated as the recipient of any communication to Airbus DS UK related to the contract, Ex. 5 § 16; and Blenheim understood that Airbus DS France was to manufacture the military satellite, Compl. ¶ 7.  Airbus DS France also falls within the SPA's broad limitation of liability clause, pursuant to which Blenheim agreed:

> *In no event shall either Party or its affiliates* and subcontractors and its and their officers, employees and directors *be liable, directly or indirectly, in contract, in tort* (including negligence), or otherwise, *to the other Party or any of its affiliates* and its and their respective officers, employees and directors, *for any amounts representing loss of profits or revenue, loss of business or indirect, special, incidental, exemplary, consequential or punitive damages arising from the performance or non-performance of its obligations under this SPA or any acts or omissions associated therewith* or related to the use, non- use or incorrect use of any deliverable items furnished hereunder, whether the basis of the liability is breach of contract, tort (including negligence of any type and strict liability), statute or any other legal theory, or with respect to any defect in design or manufacture, non-conformance or deficiency in any information, instruction, service, or other thing provided pursuant to this SPA.

Ex. 5 § 21 (emphases added).  As with the 2013 NDA, the 2015 NDA, and the Teaming Agreement, the SPA contains an English choice-of-law clause, which provides "[t]his SPA shall be governed by and construed in accordance with the laws of England and Wales."  *Id.* § 7.  As with the 2015 NDA, the SPA contains an arbitration agreement that provides "[a]ll disputes arising out of or in connection with this SPA … shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce … in London …."  *Id.*  The SPA further incorporates both the Teaming Agreement and the 2015 NDA.  *Id.* §§ 1, 15.

## C.   Airbus Commences Work; Blenheim Falls Short

Even prior to the SPA's execution, Airbus had begun the process of manufacturing the military satellite for Project Archer.  Compl. ¶¶ 71, 127.  Starting around January 2015, Airbus engaged in certain "Head Start Activities," which included the initial engineering work and the

procurement of "long lead items" that needed to be started well in advance in order to ensure timely delivery to South Korea. *Id.* Indeed, Airbus began these efforts to support Project Archer at its own risk before receiving *any* payment from Plaintiffs, who at this time, had yet to secure the financing necessary to execute Project Archer. *Id.* ¶¶ 64, 71, 93, 127, 131.

While Airbus was responsible for manufacturing the satellites, which it had begun before payment was even arranged, Blenheim Capital was responsible for securing the requisite financing to effect payment under Project Archer. Ex. 3 § 1.1; Compl. ¶¶ 56, 71. Blenheim Capital was obligated to raise "third party commercial funding and the procurement of two commercially operated satellites … the revenue from which [it would] repay such third party commercial funding." Ex. 5 (SPA). As Plaintiffs themselves note, Project Archer entailed Plaintiffs committing that they "would borrow senior debt from banks"; "would then use these funds to finance production of both the military satellite and two commercial satellites"; and "would sell the communications capacity of the two commercial satellites, providing a revenue stream over the life of the commercial satellites in order to finance its debt obligations and earn profits." Compl. ¶ 56. Plaintiffs failed to do any of these things. Although they purport to have met with banks to procure senior debt, *id.* ¶ 71, and communications capacity purchasers to procure revenue streams, *id.* ¶ 146, Plaintiffs were unable to secure commitments from either. *Id.* ¶¶ 98, 146. Indeed, the furthest Plaintiffs allege to have progressed in finding a commercial satellites capacity purchaser is "***transmit[ting]***" a "***draft*** Memorandum of Agreement" to an unspecified sovereign nation. *Id.* ¶ 146 (emphases added). Plaintiffs make no allegation whatsoever of substantive progress in obtaining senior debt, and by late 2016, they were still "work[ing] on securing funding partners …." *Id.* ¶ 131.

Building three satellites is an extremely expensive process. The parties contemplated Plaintiffs "pa[ying] upwards of a billion dollars for three satellites … built by [Airbus DS UK's] corporate affiliate, Airbus DS France." *Id.* ¶ 8. The military satellite for South Korea alone was expected to cost Blenheim Capital hundreds of millions of dollars. Ex. 5 § 3. On March 30, 2015, representatives from Blenheim Capital, LM Aero, Airbus DS UK, and Airbus DS France met in

Texas to discuss Project Archer and its financing.  Compl. ¶ 73.  Because Airbus DS UK and Airbus DS France had been working since at least January 2015 without payment, or even an initial funding commitment, *id.* ¶¶ 73, 127, Airbus sought assurances as to the parties' interest, and warned that Project Archer's schedule would begin to slip after April 30, 2015 until initial funding was committed.  *Id.* ¶ 74.

Despite Airbus's warning, Plaintiffs failed to provide any assurances regarding Project Archer's financing.  Around June 2015, Plaintiff's inability to secure the "upwards of a billion dollars" necessary to pay Airbus to manufacture the three satellites contemplated by Project Archer became apparent.  Compl. ¶ 8.  After Airbus had spent months expending its own resources on Head Start activities, Blenheim Capital was to make its first payment of $30 million on June 1, 2015.  Ex. 6 (App. L).  Blenheim Capital defaulted on this obligation.  Instead, despite receiving $45 million from Lockheed, Compl. ¶¶ 64, 90, Blenheim Capital only paid Airbus $20 million of the $30 million owed, two weeks late on June 16, 2015.  *Id.* ¶ 93.  Blenheim Capital's second payment of $20 million was due on July 6, 2015.  Ex. 6.  Blenheim Capital defaulted on this obligation as well, and indeed failed to provide ***any*** further funding to Airbus.  Even after Blenheim Capital missed two payments, Airbus continued to attempt to work with Plaintiffs to salvage Project Archer.  Indeed, just two days after the missed second payment, on July 8 and 9, representatives from Airbus DS UK and France met with Plaintiffs and LMOC in Toulouse, France to have a kick-off conference.  Compl. ¶ 96.

After Blenheim Capital had defaulted on its first two obligated payments, *see* Ex. 6, and failed to secure financing, Compl. ¶ 98, and despite the fact that Airbus DS UK and France had been investing their own resources on the Head Start Activities without payment and "at risk," *id.* ¶ 127, Plaintiffs demanded that Airbus DS UK further commit to Project Archer by providing a term sheet for mezzanine financing by July 15, 2015.  *Id.* ¶ 97.  Plaintiffs requested this mezzanine term sheet, under a purportedly executed Appendix J to the SPA, even though Plaintiffs were "unable to present any mature plan for closing of the off-take contract for the commercial satellite capacity"—*i.e.* secure revenue from the commercial satellites to show Blenheim could pay a loan

back—and Plaintiffs had been unable to arrange "the principal terms and structure of the senior debt financing and associated ECA arrangements that would normally underpin the mezzanine debt arrangements." *Id.* ¶ 98.  Absent these necessary components of mezzanine financing, Airbus DS UK was unable to issue a term sheet.  *Id.*

### D.      The Parties Attempt To Work With Blenheim

Between July 24 and July 28, 2015, Lockheed, LM Aero, Airbus DS France, and Blenheim held a second series of meetings in Toulouse, France with officials from South Korea in attendance.  *Id.* ¶ 100.  During these meetings, Airbus made "strenuous efforts to identify the minimum amount of additional funding required to keep [Project Archer] on track."  Ex. 7 (Aug. 2015 Letter).  After these meetings concluded, it had become apparent that Blenheim had failed to secure financing; was unable to pay the remaining payments, much less make up the amount still outstanding on its first two defaulted payments; and would not meet the minimum additional funding requirements Airbus identified at the meetings.  *Id.*  Accordingly, Airbus was forced to suspend work on Project Archer.  *See id.*; Compl. ¶ 106.

The delay caused by the suspension, as well as Blenheim's past inability to fulfill its payment obligation, was unacceptable to South Korea.  Compl. ¶¶ 103, 119.  South Korea "urgent[ly]" needed the military satellite to replace its existing one, which was reaching the end of its lifetime, and threatened Lockheed with negative press if it failed to procure one.  *Id.* ¶¶ 119–20.  In spite of Blenheim's inability to secure financing or make payments, Airbus and Lockheed Martin engaged with Blenheim in several attempts to salvage Project Archer.  *Id.* ¶¶ 129–30. Blenheim refused.  *Id.*

### E.      Lockheed Terminates The IBA And The Parties Enter Into A Direct Procurement Agreement With Blenheim's Knowledge

As a result of Blenheim's default, on October 6, 2016, Lockheed Martin terminated the IBA for cause.  *Id*. ¶ 132; Dkt. 31-6 (LM Oct. 2016 Letter).  Lockheed Martin reiterated this in a second letter on January 9, 2017, and noted that even if the termination had not been for cause, it was "nevertheless effective" as the IBA permitted "termination without cause under thirty (30)

days written notice."  Compl. ¶ 132; Dkt. 31-7 (LM Jan. 2017 Letter).  After Lockheed terminated the IBA, Airbus and Lockheed entered into a direct procurement agreement to supply South Korea with its "desperately[ ]needed military satellite."  Compl. ¶ 139.  Under this direct procurement arrangement, instead of receiving the "upwards of a billion dollars" in payment for the three satellites contemplated by Project Archer, Airbus was only paid for the one military satellite.  *Id.* ¶ 8, 21.

Airbus and Lockheed kept Blenheim apprised of the direct procurement arrangement.  *Id.* ¶¶ 132–33.  Indeed, although Blenheim asserts that it "declined" to release Airbus DS France of liability related to the direct procurement arrangement, *id.* ¶ 131, on November 24, 2016, Blenheim wrote that "should Airbus Defence & Space [] conclude an agreement with [Lockheed] in relation to the recommencement of the build and delivery of K-Milsat which includes an enforceable undertaking by LM not to seek recovery from the Blenheim Group of the USD 20 million paid by Blenheim to ADS under our existing contract with ADS for the K-Milsat then, to the extent that LM do not make such a claim against the Blenheim Group for recovery of the USD 20 million, Blenheim Group will not seek recovery of the USD 20 million from ADS."  Ex. 8 (Nov. 2016 Email).  Plaintiffs do not allege Lockheed made any attempt to recover the $20 million it paid Blenheim.  Nevertheless, four years later Plaintiffs filed this Complaint on December 31, 2020 over the direct procurement arrangement.

## **ARGUMENT**

Airbus joins in Lockheed's arguments in its motion to dismiss that this Court lacks subject matter jurisdiction and is an improper venue for this action.

## **I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION**

For the all reasons fully set out in Lockheed's motion to dismiss, which Airbus joins, this Court lacks subject matter jurisdiction and the complaint must be dismissed.

## II.   PLAINTIFFS' ALLEGATIONS FAIL TO ESTABLISH JURISDICTION OVER AIRBUS

Airbus is a French company.  Compl. ¶ 13.  Under Rule 12(b)(2), to bring suit against Airbus in Virginia, Plaintiffs are required to show that specific or general jurisdiction exists. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 915 (2011).  Once challenged, "plaintiff bears the burden of demonstrating personal jurisdiction at every stage …." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016).  Plaintiffs cannot meet this burden here.  Plaintiffs do not allege, nor could they, that Airbus is subject to general jurisdiction in Virginia.  *See Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014).  As for specific jurisdiction, Plaintiffs make no allegations that Airbus purposely availed itself of Virginia as a forum.  Instead, Plaintiffs attempt to connect Airbus to Virginia with meager assertions that Airbus "intended that Lockheed would lobby DoD" in Virginia and that Airbus "sought and received the import and launch approvals from DoD," Compl. ¶ 29.  These are too limited to create specific jurisdiction, and in any event, cannot be counted for jurisdictional purposes under Fourth Circuit precedent regarding government contacts.  *See Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278–80 (4th Cir. 2009) (rejecting specific jurisdiction); *Simone v. VSL Pharm., Inc.*, 2017 WL 658711, at *6 (D. Md. Feb. 16, 2017) (applying government contacts principle).[4]

### A.   <u>Plaintiffs Fail To Allege Airbus Is Subject To General Jurisdiction</u>

Plaintiffs do not allege Airbus is subject to general jurisdiction in Virginia nor could they. As a foreign corporation, Airbus can only be subject to general jurisdiction if its "affiliations with the State in which suit is brought are so constant and pervasive as to render [it] essentially at home in the forum State."  *Daimler*, 571 U.S. at 122 (internal quotations omitted).  Far from "constant and pervasive," Plaintiffs have alleged a single, indirect contact (Compl. ¶ 29) insufficient to even establish specific jurisdiction, much less that Airbus was "essentially at home in the forum state."

---

[4]   Plaintiffs do not allege that Airbus's affiliates have contacts with this District unrelated to Blenheim, Lockheed, South Korea, and Project Archer.  In any event, any such contacts could not serve as a basis for personal jurisdiction in this matter.  *See Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 62–63 (4th Cir. 1993).

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 134 (4th Cir. 2020) (holding even "systematic and continuous" contacts did not establish general jurisdiction because "they [were] not substantial enough to render [defendant] essentially at home in the forum State") (internal quotations omitted). General jurisdiction is thus absent.

### B.   Airbus's Alleged Contacts With Virginia Are Insufficient To Establish Specific Jurisdiction

Pursuant to the Due Process Clause, in order to be subject to personal jurisdiction, a "defendant must have 'purposefully established minimum contacts in the forum State' such 'that it should reasonably anticipate being hauled into court there.'" *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S.Ct. 1017, 1025 (2021) ("The plaintiff's claims, we have often stated, must arise out of or relate to the defendant's contacts with the forum.") (internal quotations omitted).  In determining the presence of minimum contacts for specific jurisdiction, courts in the Fourth Circuit analyze three prongs:  "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods*, 814 F.3d at 189.  Critically, "[t]he plaintiff must prevail *on each prong*." *Id.* (emphasis added).  Here, Plaintiffs cannot prevail on a single prong, much less all three.

### 1.   Plaintiffs Have Not Alleged Airbus Purposefully Availed Itself Of Jurisdiction in Virginia.

Plaintiffs fail to allege that Airbus "purposefully availed" itself of jurisdiction in Virginia. In assessing purposeful availment, courts in the Fourth Circuit look to numerous factors, including whether the defendant  (i) "maintain[ed] offices or agents in the forum state," (ii) "own[ed] property in the forum state," (iii) "reached into the forum state to solicit or initiate business," (iv) "deliberately engaged in significant or long-term business activities in the forum state," (v) "made in-person contact with the resident of the forum in the forum state regarding the business relationship," (vi) "contractually agreed that the law of the forum state would govern disputes,"

(vii) "[agreed that] the performance of contractual duties was to occur within the forum," or (viii) "communicat[ed]" with the parties in or regarding the forum state "about the business being transacted." *Perdue Foods,* 814 F.3d at 189 (internal quotations omitted).

Not one factor is present here. Nowhere do Plaintiffs allege Airbus has a presence in Virginia, caused harm in Virginia, submitted itself to Virginia's law, or came to Virginia in connection with this dispute. *Id.* The Complaint alleges that a Maryland company (Lockheed), a French company (Airbus), an English company (Airbus DS UK), two Guernsey companies (Plaintiffs), and two South Korean entities (DAPA and ROK) contracted for the English and French company to build three satellites in France, one of which would go to South Korean entities, the other two would be owned by the Guernsey companies. Compl. ¶¶ 10–14, 29, 55. Plaintiffs assert Airbus met some of the parties in Toulouse, France (twice) and Texas, but nowhere else, and certainly not within Virginia. *Id.* ¶¶ 73, 96, 100. The contracts related to the transaction are governed by the laws of England and Maryland, and two provide for arbitration in England. Exs. 4, 5. Accordingly, there are no grounds to find Airbus purposefully availed itself of jurisdiction in Virginia. *See Perdue Foods*, 814 F.3d at 189 (refusing to find purposeful availment when only one factor was present); *Periera v. Creative Artists Agency*, 2016 WL 9450433, at *1 (E.D. Va. Sept. 29, 2016) ("[P]laintiff makes no attempt to allege any facts indicating that defendants availed themselves of the privilege of conducting activities in Virginia.").

Rather than allege a concrete purposeful availment factor, Plaintiffs attempt to connect Airbus to Virginia through the bare allegation that Airbus "intended that Lockheed would lobby DoD" in Virginia and that Airbus "sought and received the import and launch approvals from DoD." Compl. ¶ 29. These allegations about DoD are far from being "so substantial that they amount to a surrogate for presence and thus render the exercise of sovereignty just." *Consulting Eng'rs*, 561 F.3d at 280 (internal quotations omitted). For one, "[a] defendant's relationship with a third party alone does not confer specific jurisdiction over a non-state defendant." *ECPI Univ., LLC v. Med. Career Inst., Inc.*, 2020 WL 469661, at *3 (E.D. Va. Jan. 29, 2020). Moreover, Plaintiffs do not even allege that these interactions with DoD took place **in Virginia.** Compl ¶ 29.

Vague assertions of communications, not even alleged to have taken place in the forum state, with a non-party only tangentially involved in the transactions at issue, do not create purposeful availment. *See Decision Insights, Inc. v. Quillen*, 2005 WL 2757930, at *5 (E.D. Va. Oct. 21, 2005) (refusing to exercise jurisdiction over foreign defendant who 'remitted []payments to [plaintiff] in [] Virginia"); *Babiak v. Mizuho Bank, Ltd.*, 2018 WL 4473584, at *3 (E.D. Va. Sept. 17, 2018) (O'Grady, J.) (refusing to exercise over foreign defendant whose only contacts with Virginia were when a "Virginian would wire money to [it]").

*Consulting Engineers* and *Perdue Foods* are instructive.   In *Consulting*, a Virginia corporation, CEC, brought tort and contract claims, including tortious interference and conspiracy, against a Colorado and an Indian company.   561 F.3d at 275-88.   CEC alleged that defendants "intentionally directed electronic communications into Virginia with the clear intent of transacting business there," with CEC, "a Virginia corporation."  *Id.* at 275, 297.   Moreover, one of the contracts at issue contained a Virginia choice of law clause.  *Id.* at 281.   Even with these communications, the Virginia contract, and the fact that CEC suffered its alleged "economic injury *in Virginia*," *id.* at 280, the Court of Appeals refused to find specific jurisdiction over either defendant.   As CEC had not alleged "any in-person contact [] in Virginia," neither defendant had independent connections to Virginia, and the work contemplated by the contracts at issue was to take place in India, the Court of Appeals held "it would be a manifest injustice to hale [defendant] into Virginia court."  *Id.* at 280-81.   Likewise, in *Perdue Foods*, the plaintiff, Perdue, a Maryland corporation attempted to sue a Brazilian entity in Maryland over a trademark agreement that had a Maryland choice of law clause.  *Perdue Foods*, 814 F.3d at 187–88.   Even though the defendant had contracted with a Maryland company, agreed to a Maryland choice-of-law clause, and sent invoices under the contract to Perdue in Maryland, *id.*, the Court of Appeals refused to exert jurisdiction because defendant had "neither purposefully directed activities toward Maryland nor established regularly recurring and ongoing interactions with Perdue in Maryland."  *Id.* at 191.

Plaintiffs here have alleged even fewer connections between Airbus and Virginia than what the Fourth Circuit already rejected in *Consulting Engineers* and *Perdue*.   Unlike CEC or Perdue,

Plaintiffs are not located in the forum state and thus cannot claim they suffered a harm in Virginia. Compl. ¶¶ 10–11 (describing Plaintiffs as "Guernsey compan[ies]"). Furthermore, the purported communications allegedly connecting Airbus to Virginia were not even aimed at Plaintiffs, or directly related to any of the contracts, but rather were with DoD, a nonparty, unrelated to alleged tortious conduct. *Id.* ¶ 29; *see Consulting Eng'rs*, 561 F.3d at 279; *Perdue Foods*, 814 F.3d at 188.[5] And unlike in *Perdue*, none of the contracts at issue contemplate Virginia *in any way*. *See Perdue Foods*, 814 F.3d at 188.

With none of the usual factors present, and Plaintiffs' sole ground for asserting personal jurisdiction is less substantial than those rejected by the Fourth Circuit in *Perdue* and *Consulting Engineers*, Airbus cannot be found to have purposefully availed itself of jurisdiction in Virginia.

### 2. Plaintiffs' Claims Do Not Arise Out Of Contacts With Virginia

Even if the alleged interactions with DoD took place in Virginia and were sufficient for purposeful availment, they are insufficiently connected to Plaintiffs' claims for personal jurisdiction. To create jurisdiction, Plaintiffs must allege "an act or omission in Virginia" causing tortious injury or "an act or omission outside Virginia causing tortious injury in Virginia." *Cent. Virginia Aviation, Inc. v. N. Am. Flight Servs., Inc.,* 23 F. Supp. 3d 625, 629 (E.D. Va. 2014) (analyzing "act or omission" for tortious interference with contract and business expectancy). However, none of the alleged conduct in Virginia relates to Plaintiffs' claims, especially as against Airbus, who was merely the satellite builder. Compl. ¶ 29 ("Airbus DS France, which built the military satellite …"). Plaintiffs' allegations of tortious activity, even if accurate, have nothing to do with Lockheed's lobbying of DoD or Airbus's receipt of launch approval from DoD. Compl. ¶ 29. The IBA and profits Airbus is alleged to have interfered with dealt with a *South Korean* offset obligation related to a *South Korean* military satellite, *id.* ¶¶166–79, 196–201, not DoD. Likewise, Plaintiffs' purported reputational harm and Airbus's alleged unjust enrichment arose

---

[5]   *CEM Corp. v. Pers. Chemistry, AB*, 55 F. App'x 621, 625 (4th Cir. 2003) (affirming dismissal where alleged contacts "have nothing to do with the dispute at issue in the case and thus are irrelevant in any consideration of *specific* personal jurisdiction").

from the manufacture and sale of a ***South Korean military*** satellite in France, unrelated to DoD. *Id.* ¶ 202–12. Overall, "[P]laintiffs are not [Virginia] residents and do not claim to have suffered harm in that State. In addition, … all the conduct giving rise to the nonresidents' claims occurred elsewhere. It follows that the [Virginia] courts cannot claim specific jurisdiction." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.*, 137 S. Ct. 1773, 1782 (2017); *see also See ECPI Univ.*, 2020 WL 469661, at *3 (E.D. Va. Jan. 29, 2020) (rejecting specific jurisdiction when the purported contacts had "no relationship to the alleged conduct").

### 3. Exercising Jurisdiction Over Airbus Would Not Be Constitutionally Reasonable

Finally, even if purposeful availment and Virginia contacts were present, and they are not, exercising jurisdiction based on Plaintiffs' bare allegations would not be constitutionally reasonable. There are five factors to evaluate in making this determination: "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." *Consulting Eng'rs*, 561 F.3d at 279. As a foreign defendant, the "unique burden" Airbus faces in "defend[ing] [it]self in a foreign legal system" is a "significant weight" against exercising jurisdiction under the first factor. *Id.* at 282 n.12. As this dispute involves foreign parties, foreign contracts, and a foreign manufactured satellite to be provided to a foreign nation, the remaining factors do not countermand this weight, and indeed tilt in Airbus's favor against exercising jurisdiction in Virginia, which has no real connection to, or interest in, this dispute. *See New Venture Holdings, L.L.C. v. DeVito Verdi, Inc.*, 376 F. Supp. 3d 683, 697 (E.D. Va. 2019) (holding exercising jurisdiction over New York company was not constitutionally reasonable when the parties met and reached their agreement elsewhere, even though plaintiff was a Virginia corporation); *Sonoco Prod. Co. v. ACE INA Ins.*, 877 F. Supp. 2d 398, 409 (D.S.C. 2012) (holding exercising jurisdiction over foreign company with "no[]

presence" in the forum state in connection with foreign agreements between foreign parties was not "constitutionally reasonable").

Given this dispute's lack of connection to Virginia, Plaintiffs' assertion that Airbus is subject to "conspiracy jurisdiction" in Virginia fails as well. *See Galustian v. Peter*, 750 F. Supp. 2d 670, 674 (E.D. Va. 2010) (refusing to entertain conspiracy jurisdiction when plaintiff "alleged no facts to support the conclusion that [defendant] purposefully availed himself of the Virginia forum"). With respect to Airbus in particular, there are no allegations suggesting that Airbus "could reasonably expect to have consequences in [Virginia]," which this Court requires to subject a defendant to conspiracy jurisdiction, *see Indep. Printers Worldwide, Inc. v. Cole*, 2015 WL 4705507, at *8 (E.D. Va. Aug. 6, 2015) (internal quotations omitted),[6] and as discussed below, Plaintiffs have not adequately alleged the requisite conspiracy. Even if the requirements for conspiracy jurisdiction were met, there are strong reasons to conclude that exercising conspiracy jurisdiction based on other defendants' actions violates due process pursuant to the Supreme Court's decision in *Walden v. Fiore*, which noted that "[d]ue process requires that a defendant be hailed into court in a forum State based on *his own affiliation with the State* ...." 571 U.S. 277, 286 (2014) (emphasis added).[7]

---

[6]  *See also Straight Line Drive, Inc. v. Vanatta*, 2020 WL 7647637, at *4 (E.D. Va. Dec. 23, 2020) ("Plaintiff still must plead some connection between [Defendant] and Virginia in furtherance of the alleged conspiracy.") (internal quotations omitted); *Project Honey Pot v. John Does*, 2012 WL 1854184, at *6 (E.D. Va. May 21, 2012) ("[P]laintiff must allege facts indicating that the defendant knew (or should have known) that a coconspirator was acting in the forum state and had a reasonable expectation that it could be brought into court in that state.").

[7]  *See also In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115, at *7 (E.D.N.Y. Sept. 20, 2017) ("I reject conspiracy jurisdiction out of hand—it is highly unlikely that any concept of conspiracy jurisdiction survived the Supreme Court's ruling in *Walden* ...."); *Martin v. Eide Bailly LLP*, 2016 WL 4496570, at *3 (S.D. Ind. Aug. 26, 2016) ("Many courts that have considered the viability of vicarious conspiracy jurisdiction post-*Walden* have rejected it, holding that participation in a conspiracy cannot provide a standalone basis for jurisdiction.") (internal quotations omitted); *Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 918 (N.D. Ill. 2017) ("The Supreme Court in *Walden* firmly established that, regardless of how foreseeable it may be that the defendant might be sued in a particular forum, due process is not satisfied where the plaintiff is the only link between the defendant and that forum.").

### C.   In Any Event, Airbus's Alleged Connections To DoD Cannot Establish Jurisdiction Under The Government Contacts Principle

Even if Plaintiffs' allegations regarding Airbus's contacts with DoD were sufficient, and they are not, lobbying DoD cannot create personal jurisdiction.  Pursuant to the "government contacts" principle, "petitioning the national government does not 'count' as a jurisdictional contact …."  *Flexible Benefits Council v. Feltman*, 2008 WL 2465457, at *4 (E.D. Va. June 16, 2008) (quoting *Zeneca Ltd. v. Mylan Pharm., Inc.*, 173 F.3d 829, 831 (Fed. Cir. 1999)); *Simone*, 2017 WL 658711, at *6 ("[B]ased on the government contacts exception, the Court is satisfied that there is no basis for personal jurisdiction over Mendes in Virginia.").  Plaintiffs' solely rely on interactions with Virginia-based DoD to assert jurisdiction against each Defendant.  Against Airbus specifically, Plaintiffs base jurisdiction on a purported connection to Lockheed's "lobby[ing] [*of*] *DoD*" and Airbus's "s[eeking] and receiv[ing] [] launch approval *from DoD*," Compl. ¶ 29 (emphases added).  The government contacts exception thus bars personal jurisdiction.  *See Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55, 62 (D.D.C. 2006) ("[Plaintiff's] contacts with DoD were made in an attempt to influence government action …; therefore, its contacts are excluded by the government contacts principle from establishing jurisdiction in [this forum.]); *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 25 (D.D.C. 2014) (refusing to find jurisdiction based on negotiations and contract with DoD).

## III.   PLAINTIFFS' ALLEGATIONS FAIL TO ESTABLISH VENUE IN THE EASTERN DISTRICT OF VIRGINIA

The Court should dismiss the Complaint pursuant to Rule 12(b)(3) as Plaintiffs' chosen venue is improper because a substantial part of the events related to Plaintiffs' allegations did not occur in the Eastern District of Virginia.  Plaintiffs erroneously allege that this Court is the correct venue for its claims "under 28 U.S.C. § 1391(b) and (f)" because "a substantial part of the events giving rise to the claim occurred in the district."  Compl. ¶ 31.   "When venue is challenged, it is the burden of the plaintiff to prove its propriety," *Liberty Mut. Fire Ins. Co. v. KB Home*, 2013 WL 6185882, at *3 (E.D. Va. Nov. 25, 2013), and Plaintiffs alleged contacts cannot be "insubstantial in relation to the totality of the events giving rise to this lawsuit," *id.* at *6.

The few connections Plaintiffs allege to the Eastern District of Virginia are insufficient for the Court to find that a substantial part of the events underlying Plaintiffs' claims occurred in Virginia. In cases where even more activity occurred in the relevant district than Plaintiffs allege here, courts have found venue to be improper.[8] In a similar case, *Power Paragon, Inc. v. Precision Tech. USA, Inc.*, this Court considered the sequence of events underlying Plaintiffs' claim to determine whether a substantial portion occurred in Virginia, as the Court here should do as well. 605 F. Supp. 2d 722 (E.D. Va. 2008). In *Power Paragon, Inc.*, the contract at issue centered on the sale of a ship, *id.* at 722, whereas Plaintiffs allege that the contract at issue here was for three satellites. The court in *Power Paragon, Inc.* considered the following acts:

> (1) the contract, the breach of which gave rise to this claim, was neither negotiated nor executed in the Eastern District; (2) both delivery and manufacture of the Product occurred outside of the Eastern District; (3) functional testing prior to final acceptance and installation occurred outside of the Eastern District; (4) payments for the Product under the contract occurred in the Western District; (5) field support services for the Product were performed outside of the Eastern District; and (6) final delivery of the Product and installation in the Ship occurred in the Eastern District. Though this is merely a skeletal outline of events leading to the claim, Plaintiff need only establish that one of the events that occurred in the Eastern District is substantial enough to support venue.

*Id.* at 726. Although *Power Paragon* involved a breach of contract case, the analysis there is similar to that this Court must undertake. The contracts at issue here, which ultimately gave rise to this claim as it did in *Power Paragon*, were neither executed nor terminated in the Eastern District. And none of Airbus's negotiations with Plaintiffs or even Lockheed occurred in the district. As in *Power Paragon* the delivery, manufacture, testing, and support services offered under the contract occurred outside of the Eastern District. In fact, these events would not have

---

8  *See, e.g.*, *Hall & Wilson Constr., Inc. v. Sockwell*, 2009 WL 10689465, at *6 (E.D. Va. May 5, 2009) (finding venue improper even if "[defendants] managed and coordinated the project from Virginia, and provided some nominal services from its Virginia office" because the "bulk of the project" took place elsewhere); *Newbauer v. Jackson Hewitt Tax Serv. Inc.*, 2019 WL 1398172, at *8 (E.D. Va. Mar. 28, 2019) (finding venue improper when many "purported class member allegedly reside[d] in and were allegedly harmed by the defendants in the Eastern District of Virginia").

even occurred within the United States as the satellites were being "manufactured by Airbus DS France …." Compl. ¶ 7.

Further, Plaintiffs themselves allege that the significant events occurred between foreign companies outside the Eastern District. *See, e.g.*, Compl. ¶¶ 73–74 ("[R]epresentatives from Blenheim Capital, LM Aero, Airbus DS UK, and Airbus DS France met in *Texas* to discuss Project Archer."), 77 ("[O]n April 30, 2015, Blenheim hosted a dinner in *London*"), 96 ("Lockheed, Airbus DS UK, Airbus DS France, and Blenheim held a Project Archer kick-off conference in *Toulouse, France*."), 100-03 ("Lockheed, LM Aero, Airbus DS France, and Blenheim held a second series of meetings in *Toulouse, France*, this time with officials from South Korea in attendance."), 113 (discussing meeting in *Toulouse, France*). Notably, absent from Plaintiffs' allegations is any connection between Airbus and this district. Plaintiffs have not—nor can they— allege that Airbus had any contact in Virginia or went to DoD at any point during Project Archer. This Court should thus dismiss for improper venue. *See Punchbowl, Inc. v. AJ Press LLC*, 2021 WL 1178070, at *3 (E.D. Va. Mar. 26, 2021) (O'Grady, J.) (dismissing for lack of venue when "[n]either party in the instant action is incorporated in Virginia or claims to conduct business in Virginia" and "the extent of their connections to this venue" was operating websites accessed by customers in Virginia).

## IV.   PLAINTIFFS SHOULD BE COMPELLED TO ARBITRATE THEIR CLAIMS AGAINST AIRBUS

Both the 2015 NDA and SPA have arbitration agreements that preclude Plaintiffs' claims. The Federal Arbitration Act governs arbitration agreements in contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. The Act declares a "liberal federal policy favoring arbitration" and provides that such agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation and quotation marks omitted); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (holding that the Act emphatically favors arbitration). "[D]ismissal is a proper remedy when all of the issues

presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001). Generally, a court must determine two issues before deciding whether the issues presented in a lawsuit are arbitrable: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *Muriithi v. Shuttle Exp.*, Inc., 712 F.3d 173, 178–79 (4th Cir. 2013). Both are true here.

### A.   <u>Two Agreements Compel the Parties to Arbitrate</u>

Here Blenheim signed not just one, but two separate agreements to arbitrate: the 2015 NDA and the SPA. Airbus is a party to the 2015 NDA, which mandates the arbitration of "any dispute arising between the Parties in connection with this Agreement …." Ex. 4 § 11. The 2015 NDA thus satisfies the first prong.

Even if the Court puts the 2015 NDA aside, the SPA likewise satisfies the first prong even though Airbus DS UK is the named party. The SPA mandates arbitration of "[a]ll disputes arising out of or in connection with this SPA …." Ex. 5 § 7. The 2015 NDA, to which Airbus DS France is a party, was also wholly "made a part of" and "appended [to]" the SPA, *id.* § 15, and therefore the SPA, and its arbitration clause, encompass Airbus DS France as well. But even if Airbus DS France is considered a non-signatory to the SPA, it can compel arbitration under it. Federal common law governs the enforcement of arbitration agreements under the FAA by non-signatories. *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416–17 (4th Cir. 2000) ("Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or bound by, an arbitration provision within a contract executed by other parties."); *Meridian Imaging Sols., Inc. v. OMNI Bus. Sols. LLC*, 250 F. Supp. 3d 13, 21–23 (E.D. Va. 2017). Enforcement is permitted where, as here, (i) Plaintiffs' claims against Airbus are "founded in and intertwined with" the SPA, *Int'l Paper Co.*, 206 F.3d at 417; (ii) an Airbus DS France employee "executed" the SPA "on behalf of Airbus DS UK," Compl. ¶ 68; (iii) Airbus DS France is a party to the NDA, which was "made a part of the SPA," Ex. 5 § 15; (iv) Airbus DS France is a beneficiary of the SPA's limitation on liability regarding "affiliates" of Airbus DS UK,

*id.* § 21, which as discussed below precludes Plaintiffs' claims; and (v) Airbus DS France was contemplated as a participant in the SPA because Plaintiffs understood Airbus DS France was responsible for manufacturing the satellite, Compl. ¶ 8, assert that Airbus DS France was bound by one of the SPA's appendices, *id.* ¶ 92, and Airbus DS France was named as the party to receive all communications under the SPA, Ex. 5 § 16.[9] *See Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 373 (4th Cir. 2012) (permitting nonsignatory to enforce arbitration agreement "when the signatory to the contract containing the arbitration clause raises allegations of ... substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract"); *Dennie v. MedImmune, Inc.*, 2017 WL 2930462, at *4 (D. Md. July 10, 2017) ("[T]he arbitration clause must be read broadly enough to cover nonsignatories or else the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.") (citations omitted); *Meridian Imaging Sols., Inc.. LLC*, 250 F. Supp. 3d at 21–23.

### B.    The Arbitration Provisions in Both Agreements Encompass This Dispute

The 2015 NDA and SPA's arbitration provisions cover Plaintiffs' claims.   Arbitration provisions such as the ones at issue here, which include an "in connection with" clause (Ex. 4, Article 11) and an "arising out of or in connection with" clause (Ex. 5 § 7), are broadly construed to encompass all claims that have a "significant relationship" to the contract.  *See Great Am. Ins. Co. v. Hinkle Contracting Corp.*, 497 F. App'x 348, 354 (4th Cir. 2012); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988).  Having referenced, and relied on, both the 2015 NDA and SPA in their Complaint, Compl. ¶¶ 67–70, Plaintiffs cannot contest their "significant relationship" to Plaintiffs' claims against Airbus.  *See Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 630 (4th Cir. 2006) ("[O]ur conclusion that the [plaintiff's] underlying

---

[9]    Blenheim Holding likewise cannot use its nonsignatory status to avoid enforcement of the arbitration agreements given that its claims are intertwined with those contracts.  *See Int'l Paper Co.*, 206 F.3d at 418 (concluding that "[nonsignatory plaintiff was] estopped from refusing to arbitrate its dispute" because the contract provides part of the factual foundation for every claim asserted by [plaintiff]").

complaint 'rel[ies] on the Subscription Agreement … forecloses any argument that the [plaintiff's] claims do not fall within the scope of the arbitration clause.") (internal citation omitted).  Indeed, it was pursuant to the 2015 NDA that Blenheim Capital allegedly provided the "confidential and competitively sensitive information," which Plaintiffs purport Airbus tortiously abused.  Compl. ¶ 67.  And the SPA underlies Plaintiffs' assertion that Airbus interfered with their contractual rights, relationships, and purported entitlement to mezzanine financing.  Compl. ¶¶ 97, 106, 142–44, 176.  Further, the SPA's limitation on liability, Ex. 5 § 21, affects (by precluding) Plaintiffs' claims against Airbus.  *See Great Am. Ins. Co.*, 497 F. App'x at 354 (finding claims "premised on" contract and claims that required "an examination of [defendant's] obligations under the [contract]" were encompassed by broad arbitration clause); *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996) (finding claims of tortious inducement were encompassed by broad arbitration clause).  Since the 2015 NDA and SPA's arbitration clauses bind the parties, and Plaintiffs' claims fall within their broad language, Plaintiffs must arbitrate their claims.

## V.   PLAINTIFFS FAIL TO STATE A CLAIM AGAINST AIRBUS

The parties agreed that English law should govern disputes arising in the 2013 NDA, 2015 NDA, the Teaming Agreement, and SPA, and this Court should apply English law accordingly. *ADESA, Inc. v. Lewis*, 2021 WL 201283, at *2 (W.D. Va. Jan. 20, 2021) ("Virginia generally honors contractual choice of law provisions."); *Fiona Trust & Holdings Corp v Privalov* [2007] EWCA Civ 20, Longmore LJ at paragraph 18 ("The words 'arising out of' should cover 'every dispute.'").[10]

### A.   Plaintiffs' Claims Are Precluded By Agreed-Upon Limitations On Liability

Plaintiffs' action is brought in plain violation of the limitation on liability agreed to in the SPA, which demonstrates the parties' clear intent to avoid the exact actions that Plaintiffs bring now.  The SPA's limitation on liability clause provides:

---

[10]   True and correct copies of the English cases cited below are attached alphabetically as Exhibits 9–20 to the Declaration of David Burke filed as Appendix B to this Memorandum.

> ***In no event shall either Party or its affiliates*** and subcontractors and its and their officers, employees and directors ***be liable, directly or indirectly, in contract, in tort*** (including negligence), ***or otherwise, to the other Party*** or any of its affiliates and its and their respective officers, employees and directors, ***for any amounts representing loss of profits or revenue, loss of business*** or indirect, special, incidental, exemplary, consequential or punitive damages arising from the performance or non-performance of its obligations under this SPA or any acts or omissions associated therewith or related to the use, non- use or incorrect use of any deliverable items furnished hereunder, ***whether the basis of the liability is*** breach of contract, ***tort*** (including negligence of any type and strict liability), statute ***or any other legal theory***, or with respect to any defect in design or manufacture, non-conformance or deficiency in any information, instruction, service, or other thing provided pursuant to this SPA.

Ex. 5 § 21 (emphases added).  Since Plaintiffs' claims attempt to hold Airbus DS UK's "affiliate," Airbus DS France, liable for "loss of profits[,] revenue, [and] loss of business" "related to the performance or non-performance of [Airbus DS UK's] obligations under this SPA or [] acts or omissions associated therewith," Plaintiffs' claims are expressly barred by the SPA.  *Id.*

### B.   Plaintiffs' Claim For Inducing Breach of Contract Fails

To succeed on a claim of inducing breach of contract, under English law, a plaintiff must prove (i) that a defendant actually knew that it was inducing a breach of contract and that the defendant intended to procure that breach, and (ii) the intentional inducement of breach of an existing and valid contractual obligation.  *OBG v Allan* [2007] UKHL 21, Lord Hoffman at paragraphs 39 to 44.  However, Plaintiffs have not claimed that Lockheed breached the IBA, as necessary for an inducing ***breach*** of contract claim.  *Id.*  Nor could they, as the IBA is governed by Maryland law (Dkt. 31-1 § 15), which has a three-year statute of limitation for breach of contract claims that has long since expired.[11]  Rather, Lockheed properly terminated the IBA "for cause" due to Blenheim's inability to provide financing, and additionally by "provid[ing] a thirty-day notice of termination without cause."  Compl. ¶ 132; Dkt. 31-7 (Jan. 2017 Letter).  Indeed,

---

[11]   Compl ¶ 132 (noting IBA terminated on October 6, 2016); *see Curry v. Trustmark Ins. Co.*, 600 F. App'x 877, 880 (4th Cir. 2015) ("In Maryland, a breach of contract action must be filed within three years of the date it accrues.") (citing Md. Code Ann., Cts. & Jud. Proc. § 5-101); *Hansen v. Stanley Martin Companies, Inc.*, 585 S.E.2d 567, 572 (Va. 2003) (enforcing Maryland's statute of limitation on contract actions under Virginia's borrowing statute).

Plaintiffs' own cause of action provides that "Airbus DS France tortiously and intentionally interfered with the IBA, causing LMOC to **terminate** the IBA," Compl. ¶ 168 (emphasis added), not breach it.  Lockheed's proper termination of its contract with Blenheim is not equivalent to a breach of contract and cannot support a claim for inducing a breach of contract (which would be untimely in any case).  *See OBG v Allan* [2007] UKHL 21, Lord Hoffman at paragraph 5 ("Liability depend[s] upon the contracting party having committed an actionable wrong").

Even if the IBA was breached rather than terminated, Plaintiffs' allegation that Airbus intentionally caused the breach is facially implausible.  *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) ("[T]he complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims across the line from conceivable to plausible.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  If Blenheim had been able to fulfill its financing obligations under Project Archer, Airbus would have received "upwards of a **billion** dollars" to manufacture **three s**atellites.  Compl. ¶ 8 (emphasis added).  Instead, under direct procurement, Airbus would only manufacture, and get paid for, **one military satellite**, costing Airbus hundreds of millions of dollars in revenue from the two commercial satellites contemplated by Project Archer.  *Id.*  It is not plausible that Airbus would intentionally interfere with Project Archer to secure this alternative.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (requiring that a complaint be plausible on its face); *Feeley v. Total Realty Mgmt.*, 660 F. Supp. 2d 700, 708 (E.D. Va. 2009) (finding allegations that defendant acted against its own interest to tortiously conspire against plaintiff "d[id] not meet the *Ashcroft v. Iqbal* plausibility standard required to survive a motion to dismiss").[12]  Likewise, Plaintiffs

---

[12]     *See also Bank of Am. v. Lykes*, 2010 WL 2640454, at *5 (W.D.N.C. May 20, 2010) ("Defendants' proffered theory is not only implausible, it would require BANA to act in a manner that would patently be against its own financial self-interest, flying in the face of well-established fundamental economic principles."), *report and recommendation adopted,* 2010 WL 2640411 (W.D.N.C. June 30, 2010); *Goldstein v. Bank of Am., N.A.*, 2010 WL 1252641, at *4–5 (W.D.N.C. Jan. 19, 2010) ("BOA's participation in this type of scheme would make no sense and it does not appear that plaintiffs can make any plausible allegation that would support any such conclusion."), *aff'd,* 2010 WL 1252629 (W.D.N.C. Mar. 24, 2010); *Adams v. White*, 2011 WL

conclusory allegation that Airbus, a "global leader in the defense and space industry," forwent hundreds of millions of dollars because it was afraid that Blenheim—a "small" Guernsey company "formed in 2006" that "specializes in … 'offset' transactions," with zero alleged expertise in satellite manufacture or sale—would become a "competitor" is absurd and implausible.  Compl. ¶¶ 2, 13, 40, 171; *Twombly*, 550 U.S. at 556.

### C.     Plaintiffs' Claim For Causing Loss by Unlawful Means Fails

Under English law, for Plaintiffs' claim against Airbus for causing loss by unlawful means to succeed, Plaintiffs must demonstrate "acts intended to cause loss to the claimant by interfering with the freedom of a third party in a way which is unlawful as against that third party and which is intended to cause loss to the claimant."  *OBG v Allan* [2007] UKHL 21, Lord Hoffmann at paragraph 51.  However, Plaintiffs have not alleged any unlawful actions taken by Airbus to harm Blenheim.  *Id.*  The closest Plaintiffs get is alleging that Airbus "pursu[ed] a direct procurement deal" with Lockheed, and "induced Airbus [DS UK] to refuse to provide promised mezzanine financing term sheets …."  Compl. ¶¶ 177–78.  Neither of these are unlawful acts, and they certainly are not "unlawful as against [Lockheed or Airbus DS UK]," as required under English law.  *See OBG v Allan* [2007] UKHL 21, Lord Hoffmann at paragraph 51; *Pepe's Piri Piri Ltd v Junaid* [2019] EWHC 2097 (QB), at paragraph 202 (holding that the claim of causing loss by unlawful means failed due to "the absence of an intention to injure the Claimant's business, the requisite intention being … to injure by unlawful means" and the requirement that "the unlawful means employed by the alleged tortfeasor for the purpose of this tort must be unlawful against the third party").  Likewise, neither of these purported actions impeded a third party's ability to contract with Blenheim.  Blenheim's own inability to secure financing led to Airbus DS UK being unable to provide a mezzanine term sheet,[13] and Lockheed needing to directly procure South

---

3875422, at *8 (E.D. Va. Aug. 31, 2011) ("That a company would choose to extend a loan with knowledge that it is contrary to its financial interests is implausible.").

[13]   Plaintiffs also do not allege any facts connecting Airbus DS France with Airbus DS UK's refusal to provide a mezzanine term sheet, Compl. ¶ 97–98, which Plaintiffs attribute to "senior executives at Airbus [DS UK] and Airbus Corporate Financial," *id.* ¶ 99.

Korea's satellite, which cost more (for Lockheed) and resulted in less profits (for Airbus).  Finally, as noted above, Plaintiffs have not plausibly alleged that Airbus intentionally interfered with Project Archer, under which it stood to make "upwards of a billion dollars" to arrange for a direct procurement arrangement worth a fraction of the price.  Compl. ¶ 8; *see Twombly*, 550 U.S. at 556. *Future Investments SA v Federation Internationale de Football Association* [2010] EWHC 1019 (Ch), Floyd J at paragraph 25 ("Damage which is suffered by the claimant which is not the consequence of interference with the third party's freedom of action … is not within the purview of the tort.")

### D.  Plaintiffs' Claim For Unjust Enrichment Fails

Plaintiffs' unjust enrichment claims fails for three distinct reasons:  ***First***, Plaintiffs' claim for unjust enrichment is untimely.  Virginia's statute of limitation for unjust enrichment claims is three years, and begins to run at the time the unjust enrichment occurred, not when a party "knew or should have known" of the unjust enrichment."  *Blankenship v. Consolidation Coal Co.*, 850 F.3d 630, 635 (4th Cir. 2017); Va. Code Ann. § 8:01–246(4).  Plaintiffs allege Airbus and Lockheed's unjust enrichment occurred upon "cutting Blenheim out and proceeding with a direct procurement," Compl. ¶ 212, both of which allegedly happened in 2016, *id.* ¶¶ 20 (noting LMOC terminated the IBA on October 6, 2016), 100 (noting Airbus and Lockheed's work together commenced at "the end of 2016").  Because the Complaint was filed four years later, on December 31, 2020, Plaintiffs are barred from bringing their claim.

***Second***, English courts will refuse a claim for unjust enrichment where it would undermine the contracts that governs the parties' relationship.  *See Costello v MacDonald* [2011] EWCA Civ 930, Etherton LJ at paragraph 23 ("[T]he unjust enrichment claim … must fail because it would undermine the contractual arrangements between the parties ….").  Here four different agreements, the 2013 NDA, the 2015 NDA, the Teaming Agreement, and the SPA governed Plaintiffs' relationship with Airbus DS UK and Airbus DS France.  Since Plaintiffs unjust enrichment claim attempts to circumvent these agreements, it necessarily fails.  *Id.*  To the extent Plaintiffs argue that Airbus DS France was not a party to the SPA or Teaming Agreement, and the Court chooses

to disregard the 2013 and 2015 NDAs, Plaintiffs' claims still fail.  Even if the Court disregards Airbus DS France's numerous connections to those agreements—including that the 2013 and 2015 NDAs, to which Airbus DS France was a signatory, were incorporated into the Teaming Agreement and SPA respectively, and that an Airbus DS France employee signed the SPA— Plaintiffs cannot undermine its contracts with Airbus DS UK by bringing a claim against its affiliate.  *See id.* at paragraph 21 (The obligation [and] … the risk of non-payment, was contractually confined to [the contracting party].  If a claim was permitted directly against [nonparties] it would shatter that contractual containment.").

   ***Third***, under English law, unjust enrichment requires that the defendant be (i) enriched (ii) unjustly (iii) at the expense of the claimant.  *See Benedetti v Sawiris* [2013] UKSC 50, Lord Clarke at paragraph 10.  None are present here.  Regarding enrichment, even if Plaintiffs could claim credit for Project Archer, its three satellites structure was never utilized, and far from "enriched," Airbus is in a worse position than it would have been had Blenheim succeeded at Project Archer's implementation.[14]  Airbus was paid for one military satellite under the direct procurement arrangement, but would have been paid "upwards of a billion dollars" for all three satellites contemplated by Project Archer, Compl. ¶ 8.  *See Lipkin Gorman (A Firm) v Karpnale Ltd. Lipkin Gorman (A Firm) v Karpnale Ltd* [1991] 2 A.C. 548, per Lord Goff at page 580. Regarding "unjust," nothing Airbus did could be considered "unjust"—it was Blenheim that failed to secure financing for Project Archer, and Lockheed properly terminated the IBA.  Dkt. 31-7 (LM Jan. 2017 Letter); *see Deutsche Morgan Grenfell Plc v Inland IRC* [2006] UKHL 49, per Lord Hoffman at paragraph 21 ("[T]he circumstances in which the payment was made come [must] within one of the categories which the law recognizes as sufficient to make retention by the

---

[14]   *See Deutsche Morgan Grenfell Plc v IRC* [2005] EWCA Civ 78, Buxton LJ at paragraph 294  (A claim in unjust enrichment "is not sufficiently pleaded unless it asserts the payment [or other mode of enrichment] on which it rests ….  Indeed, the fact of the payment is not merely material to success, but the whole essence of the action.").  *Portman Building Society v Hamlyn Taylor Neck (A Firm)* [1998] P.N.L.R., Millett LJ at page 668 (''[A] person cannot be unjustly enriched if he has not been enriched at all …and the fact that a payment may have been made … is not by itself sufficient ….'').

recipient unjust."); *Kleinwort Benson Ltd v Lincoln CC* [1999] 2 A.C 349, Lord Goff at page 409. And as noted above, Plaintiffs' have not plausibly alleged that Airbus intentionally interfered with Project Archer. *See Twombly*, 550 U.S. at 556. Regarding the "expense of the claimant," Plaintiffs have not plausibly that they stood to gain anything from Project Archer because they were never able to secure the requisite financing in the first place. Compl. ¶¶ 98, 146; *see Southprint, Inc. v. H3, Inc.*, 208 F. App'x 249, 253 (4th Cir. 2006) ("The plaintiff must establish a probability of future economic benefit, not a mere possibility.") (internal quotations omitted).

### E.   Plaintiffs' Conspiracy Claims Fail

Plaintiffs bring two causes of action for conspiracy: unlawful means conspiracy governed by English law and conspiracy under Virginia's civil conspiracy statute. Neither have merit.

Each conspiracy claim requires an intent to harm the Defendant. *See Baxendale-Walker v Middleton* [2011] EWHC 998, Supperstone J at paragraph 60 ("Unlawful means conspiracy … is committed where two or more persons combine and take action which is unlawful in itself with the intention of causing damage to a third party who does incur the intended damage"); Virginia Code §§ 18.2-499 and 18.2-500 (requiring a combination "for the purpose of willfully and maliciously injuring" the plaintiff in "his[] business"). As noted above, Plaintiffs' failure to plausibly allege that Airbus and Lockheed conspired against their own interest to arrange for direct procurement, which was both less profitable (for Airbus) and more costly (for Lockheed). *See Feeley*, 660 F. Supp. 2d at 708 (rejecting as "simply implausible" allegations that defendant colluded against its own interests); *Goldstein,* 2010 WL 1252641, at *4–5. Plaintiffs' unlawful means conspiracy claim additionally fails because Plaintiffs have not alleged "unlawful" means. And Plaintiffs' attempt to use Virginia's civil conspiracy statute likewise fails because "none of the acts on which the claim arises occurred in Virginia." *Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*, 893 F. Supp. 2d 761, 777–80 (E.D. Va. 2012), *aff'd,* 533 F. App'x 200 (4th Cir. 2013). Plaintiffs, as Guernsey companies suing over purported wrongs that occurred outside the United States, cannot utilize Virginia's civil conspiracy statute. *See id.* ("[B]ecause none of the acts on which the claim arises occurred in Virginia, the claim fails as a matter of law. Indeed, a contrary

conclusion would offend the longstanding rule that the laws of one State have no operation outside of its territory.") (citation omitted); *Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*, 2006 WL 5908727, at *8 (E.D. Va. Feb. 10, 2006) (dismissing statutory business conspiracy claims because it could not 'survive under [the applicable foreign] law").

## CONCLUSION

For the foregoing reasons, Plaintiffs' complaint should be dismissed in its entirety.

DATED:  April 29, 2021                       Respectfully submitted,

By/s/ *K. Kevin Chu*
_____
K. Kevin Chu (VSB # 85746)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Ste. 900
Washington, D.C. 20005
(202) 538-8000
(202) 538-8100 (Fax)
kevinchu@quinnemanuel.com

Marc Greenwald (*pro hac vice*)
Robert Longtin (*pro hac vice*)
Shira Steinberg (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, N.Y. 10010
(212) 849-7000
(212) 849-7100 (fax)
marcgreenwald@quinnemanuel.com
robertlongtin@quinnemanuel.com
shirasteinberg@quinnemanuel.com

*Attorneys for Defendant Airbus Defence and Space SAS*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 30, 2021, I electronically filed the foregoing using the Court's

NextGen CM/ECF system, which caused service on all counsel of record.


DATED:  April 30, 2021


*/s/ K. Kevin Chu*
K. Kevin Chu (VSB # 85746)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Ste. 900
Washington, D.C. 20005
(202) 538-8000
(202) 538-8100 (Fax)
kevinchu@quinnemanuel.com

*Attorney for Defendant Airbus Defence and Space SAS*
