**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **BLENHEIM CAPITAL HOLDINGS LTD., ET AL.,** )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>**LOCKHEED MARTIN CORPORATION, ET AL.,** )<br>)<br>Defendants. )<br>————————————————— ) | **Civil Action No. 1:20-cv-1608-LO-JFA** |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT LOCKHEED MARTIN CORPORATION'S
<u>MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

Brian Tully McLaughlin, VA Bar No. 71258
Cheryl A. Falvey, *pro hac vice*
Astor H.L. Heaven, *pro hac vice*
Lyndsay A. Gorton, VA Bar No. 80409
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
BMcLaughlin@crowell.com
CFalvey@crowell.com
AHeaven@crowell.com
LGorton@crowell.com

*Counsel for Defendant Lockheed Martin Corporation*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................2

ARGUMENT ...........................................................................................................................8

I.      THE FAC MUST BE DISMISSED FOR LACK OF JURISDICTION
        UNDER RULE 12(B)(1) ..............................................................................................8

        A.      There Is No FSIA Jurisdiction for Tortious Interference Claims
                Unless the Commercial Activity Exception Applies ...........................................9

        B.      The Claims Are Not "Based Upon" a "Commercial Activity" by
                South Korea ......................................................................................................9

                1.      South Korea Did Not Engage in Commercial Activity ........................10

                2.      Blenheim's Claims Are Not "Based Upon" the FMS
                        Transaction ......................................................................................12

        C.      Jurisdiction Is Dependent Upon Service of South Korea ..................................14

        D.      Count V's "Antitrust" Claim Does Not Provide Jurisdiction ...........................14

II.     THE COURT LACKS PERSONAL JURISDICTION OVER
        LOCKHEED MARTIN ...............................................................................................14

III.    THE FAC MUST BE DISMISSED FOR IMPROPER VENUE ...................................18

IV.     BLENHEIM'S CLAIMS AGAINST LOCKHEED MARTIN MUST BE
        ARBITRATED ...........................................................................................................21

V.      BLENHEIM'S CLAIMS MUST BE DISMISSED UNDER THE IBA'S
        FORUM-SELECTION CLAUSE.................................................................................23

VI.     THE FAC FAILS TO STATE A CLAIM UNDER RULE 12(B)(6) ............................24

        A.      The IBA's Limitation of Liability Clause Precludes Blenheim's
                Claims .............................................................................................................25

        B.      Counts I and II Should Be Dismissed Because Blenheim Has Not
                Adequately Alleged Tortious Interference Against Lockheed
                Martin.............................................................................................................26

                1.      Lockheed Martin Is No Stranger to the Business
                        Relationship Here.............................................................................27

2.  Lockheed Martin's Contractual Actions Do Not Support a Tort Claim ................................................................................. 30

3.  Blenheim's Allegations of Intentional Interference Are Implausible and Fail to Establish Intent, Interference, or Causation ........................................................................................ 31

4.  Blenheim Fails to Allege Facts to Demonstrate That Lockheed Martin Tortiously Interfered with Any Business Expectancy ..................................................................................... 34

C.  Counts VIII and IX for Civil and Statutory Conspiracy Fail ............................. 35

D.  Count X for Unjust Enrichment Fails ................................................................. 38

1.  Blenheim's Unjust Enrichment Claim Is Untimely ................................. 38

2.  The Unjust Enrichment Claim Is Precluded by an Express Contract ...................................................................................... 39

3.  Blenheim Did Not Confer a Benefit on  Lockheed Martin that Was Retained Without Payment ...................................................... 40

E.  Count V for Antitrust Violations Fails ............................................................... 40

CONCLUSION ................................................................................................................ 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*17th St. Assocs., LLP v. Markel Int'l Ins.*
Co., 373 F.Supp.2d 584 (E.D. Va. 2005) ..........................................................................26, 34

*Abbott v. Gordon,*
No. DKC 09-0372, 2009 WL 2426052 (D. Md. Aug. 6, 2009).............................................26

*Acorn Structures, Inc. v. Swantz,*
846 F.2d 923 (4th Cir. 1988) ................................................................................................39

*Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.,*
650 A.2d 260 (Md. 1994) .......................................................................................................28

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,*
293 F.3d 707 (4th Cir. 2002) ................................................................................................15

*Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.,*
367 F.3d 212 (4th Cir. 2004) ..................................................................................................3

*Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,*
96 F.3d 88 (4th Cir. 1996) .....................................................................................................22

*Am. W. Airlines, Inc. v. GPA Grp., Ltd.,*
877 F.2d 793 (9th Cir. 1989) ................................................................................................13

*Arbaugh v. Y & H Corp.,*
546 U.S. 500 (2006)............................................................................................................8, 14

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..........................................................................................................24, 33

*Ass'n for Supervision & Curriculum Dev., Inc. v. Int'l Council for Educ. Reform*
*& Dev., Inc.,*
No. 1:10cv74, 2011 WL 1225750 (E.D. Va. Mar. 14, 2011) ................................................26

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.,*
571 U.S. 49 (2013).................................................................................................................23

*Babiak v. Mizuho Bank, Ltd.,*
No. 1:18-cv-352, 2018 WL 4473584 (E.D. Va. Sept. 17, 2018) ...........................................15

*Baron Fin. Corp. v. Natanzon,*
471 F.Supp.2d 535 (D. Md. 2006) ...................................................................................34, 35

iii

*Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*,
   261 F.Supp.2d 483 (E.D. Va. 2003) ...............................................36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................24, 27, 32, 33

*Best Med. Belgium, Inc. v. Kingdom of Belgium*,
   913 F.Supp.2d 230 (E.D. Va. 2012) ...............................................10

*Blankenship v. Consolidation Coal Co.*,
   850 F.3d 630 (4th Cir. 2017) ...............................................38

*Blondell v. Littlepage*,
   968 A.2d 678 (Md. Ct. Spec. App. 2009) ...............................................26

*Blumenthal-Kahn Elec. Ltd. v. Am. Home Assurance Co.*,
   236 F.Supp.2d 575 (E.D. Va. 2002) ...............................................22

*Brass Metal Prods., Inc. v. E-J Enters., Inc.*,
   984 A.2d 361 (Md. Ct. Spec. App. 2009) ...............................................26

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ...............................................15

*Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*,
   454 A.2d 367 (Md. Ct. Spec. App. 1983) ...............................................37

*CEM Corp. v. Pers. Chemistry, AB*,
   55 F. App'x 621 (4th Cir. 2003) ...............................................17

*Cent. Va. Aviation, Inc. v. N. Am. Flight Servs., Inc.*,
   23 F.Supp.3d 625 (E.D. Va. 2014) ...............................................16, 17

*Chaves v. Johnson*,
   335 S.E.2d 97 (Va. 1985) ...............................................26

*Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*,
   252 F.3d 707 (4th Cir. 2001) ...............................................21

*Cicippio v. Islamic Republic of Iran*,
   30 F.3d 164 (D.C. Cir. 1994) ...............................................10, 12

*CMA CGM (Am.), LLC v. RLI Ins. Co.*,
   No. 12-cv-03306, 2013 WL 588978 (D. Md. Feb. 13, 2013) ...............................................19

*Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*,
   747 A.2d 600 (Md. 2000) ...............................................39

iv

*Cole v. Daoud*,
No. 2:15cv419, 2016 WL 11410410 (E.D. Va. Feb. 17), *report & recommendation adopted*, 2016 WL 1213230 (E.D. Va. Mar. 24, 2016) ........................28, 29

*Com. Bus. Sys., Inc. v. Halifax Corp.*,
484 S.E.2d 892 (Va. 1997)................................................................................34, 35

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
561 F.3d 273 (4th Cir. 2009) ..................................................................................15

*Crosby v. City of Gastonia*,
635 F.3d 634 (4th Cir. 2011) ..................................................................................14

*Deckelbaum v. Cooter, Mangold, Tompert & Chapman, P.L.L.C.*,
292 B.R. 536 (D. Md. 2003) ...................................................................................37

*Dunlap v. Cottman Transmission Sys., LLC*,
754 S.E.2d 313 (Va. 2014)......................................................................................26

*Dunn, McCormack & MacPherson v. Connolly*,
708 S.E.2d 867 (Va. 2011)......................................................................................30

*E. W. LLC v. Rahman*,
873 F.Supp.2d 721 (E.D. Va. 2012) .......................................................................38

*Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*,
189 F.Supp.2d 385 (E.D. Va. 2002) .......................................................................24

*Fare Deals, Ltd. v. World Choice Travel.Com, Inc.*,
180 F.Supp.2d 678 (D. Md. 2001) ..........................................................................36

*Feeley v. Total Realty Mgmt.*,
660 F.Supp.2d 700 (E.D. Va. 2009) .......................................................................31

*Firestone v. Wiley*,
485 F.Supp.2d 694 (E.D. Va. 2007) .......................................................................36

*Flexible Benefits Council v. Feltman*,
No. 1:08CV371, 2008 WL 2465457 (E.D. Va. June 16, 2008)...............................20

*FLF, Inc. v. World Publ'ns, Inc.*,
999 F.Supp. 640 (D. Md. 1998)...............................................................................39

*Ford Motor Co. v. Nat'l Indem. Co.*,
972 F.Supp.2d 850 (E.D. Va. 2013) .......................................................................24

*Fox v. Deese*,
362 S.E.2d 699 (Va. 1987)......................................................................................28

v

*France.com, Inc. v. French Republic*,
 992 F.3d 248 (4th Cir. 2021) ....................................................................10, 13

*Francis Hosp., Inc. v. Read Props., LLC*,
 820 S.E.2d 607 (Va. 2018)....................................................................................28

*Freedman v. Am. Online, Inc.*,
 325 F.Supp.2d 638 (E.D. Va. 2004) ...................................................................23

*Gatekeeper Inc. v. Stratech Sys., Ltd.*,
 718 F.Supp.2d 664 (E.D. Va. 2010) .............................................................15, 16

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA,
 LLC*,
 140 S.Ct. 1637 (2020)............................................................................................22

*Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*,
 533 F. App'x 200 (4th Cir. 2013) ........................................................................25

*Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*,
 893 F.Supp.2d 761 (E.D. Va. 2012), *aff'd*, 533 F. App'x 200 (4th Cir. 2013).......................36

*Glasson v. Children's Surgical Specialty Grp., Inc.*,
 73 Va.Cir. 480 (2007) ...........................................................................................30

*Goulmamine v. CVS Pharmacy, Inc.*,
 138 F.Supp.3d 652 (E.D. Va. 2015) ..............................................................32, 34

*Gov't Emps. Ins. Co. v. Google, Inc.*,
 330 F.Supp.2d 700 (E.D. Va. 2004) ....................................................................38

*Grayson v. Anderson*,
 816 F.3d 262 (4th Cir. 2016) ................................................................................15

*Greenberry's Franchising Corp. v. Park*,
 No. 3:10-cv-00045, 2010 WL 5141285 (W.D. Va. Dec. 10, 2010) .....................19

*Gulf Ins. Co. v. Glasbrenner*,
 417 F.3d 353 (2d Cir. 2005)..................................................................................19

*Hallinan v. Republic Bank & Tr. Co.*,
 No. 06 Civ. 185, 2006 WL 1495232 (S.D.N.Y. June 1, 2006)........................28, 29

*HCI Techs., Inc. v. Avaya, Inc.*,
 446 F.Supp.2d 518 (E.D. Va. 2006) ..............................................................21, 22

*Heroth v. Kingdom of Saudi Arabia*,
 565 F.Supp.2d 59 (D.D.C. 2008), *aff'd*, 331 F. App'x 1 (D.C. Cir. 2009).............................11

*Hunt v. Branch Banking & Tr. Co.*,
  480 F. App'x 730 (4th Cir. 2012) ...................................................................8, 14

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
  206 F.3d 411 (4th Cir. 2000) ................................................................................22

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*,
  863 F.2d 315 (4th Cir. 1988) ...............................................................................22

*Jam v. Int'l Fin. Corp.*,
  139 S.Ct. 759 (2019) ............................................................................................10

*Jason v. Nat'l Loan Recoveries, LLC*,
  134 A.3d 421 (Md. Ct. Spec. App. 2016) ...........................................................38

*K & K Mgmt., Inc. v. Lee*,
  557 A.2d 965 (Md. 1989) .....................................................................................28

*Kumar v. Republic of Sudan*,
  880 F.3d 144 (4th Cir. 2018) ...............................................................................14

*L-3 Commc'ns Corp. v. Serco, Inc.*,
  926 F.3d 85 (4th Cir. 2019), *reh'g denied* (July 16, 2019).....................20, 28, 29

*Lawson v. Merscorp Holdings, Inc.*,
  No. 1:18-cv-640, 2018 WL 10156105 (E.D. Va. Oct. 24, 2018) .........................21

*Leutwyler v. Office of Queen Rania Al-Abdullah*,
  184 F.Supp.2d 277 (S.D.N.Y. 2001).....................................................................9

*Lovern v. Edwards*,
  190 F.3d 648 (4th Cir. 1999) .................................................................................8

*Lyon v. Campbell*,
  707 A.2d 850 (Md. Ct. Spec. App. 1998) .......................................................32, 34

*McDonald's Corp. v. Turner-James*,
  No. 05CV804, 2005 WL 7873649 (E.D. Va. Nov. 29, 2005) ...............................35

*McDonnell Douglas Corp. v. Islamic Republic of Iran*,
  758 F.2d 341 (8th Cir. 1985) ................................................................................12

*Milton v. IIT Rsch. Inst.*,
  138 F.3d 519 (4th Cir. 1998) ................................................................................24

*Mitrano v. Hawes*,
  377 F.3d 402 (4th Cir. 2004) ................................................................................18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ...................................................................................................21

*MTGLQ Invs., L.P. v. Guire*,
  286 F.Supp.2d 561 (D. Md. 2003) .........................................................................20

*Murray v. United Food & Com. Workers Int'l Union*,
  289 F.3d 297 (4th Cir. 2002) ..................................................................................21

*Myers v. Bright*,
  609 A.2d 1182 (Md. 1992) ......................................................................................34

*Nedrich v. Jones*,
  429 S.E.2d 201 (Va. 1993)......................................................................................39

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ..................................................................................24

*Newbauer v. Jackson Hewitt Tx Serv. Inc.*,
  No. 2:18cv679, 2019 WL 1398172 (E.D. Va. Mar. 28, 2019) ....................18, 19, 20

*Nichols v. G.D. Searle & Co.*,
  991 F.2d 1195 (4th Cir. 1993) ................................................................................18

*NorthStar Aviation, LLC v. Alberto*,
  332 F.Supp.3d 1007 (E.D. Va. 2018) .....................................................................35

*OBB Personenverkehr AG v. Sachs*,
  577 U.S. 27 (2015)......................................................................................10, 12, 13

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,
  905 F.Supp.2d 675 (D. Md. 2012) .........................................................................36

*Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*,
  397 S.E.2d 804 (Va. 1990)......................................................................................23

*Power Paragon, Inc. v. Precision Tech. USA, Inc.*,
  605 F.Supp.2d 722 (E.D. Va. 2008) .......................................................................19

*Priority Auto Grp., Inc. v. Ford Motor Co.*,
  757 F.3d 137 (4th Cir. 2014) .............................................................................30, 31

*Punchbowl, Inc. v. AJ Press LLC*,
  No. 1:21-cv-00136, 2021 WL 1178070 (E.D. Va. Mar. 26, 2021)....................18, 21

*RAR, Inc. v. Turner Diesel, Ltd.*,
  107 F.3d 1272 (7th Cir. 1997) ................................................................................17

*Regency Photo & Video, Inc. v. Am. Online, Inc.*,
    214 F.Supp.2d 568 (E.D. Va. 2002) ..................................................................25

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992)..................................................................................9, 10

*Rosetta Stone Ltd. v. Google, Inc.*,
    676 F.3d 144 (4th Cir. 2012) .................................................................39, 40

*Run Them Sweet, LLC v. CPA Glob. Ltd.*,
    224 F.Supp.3d 462 (E.D. Va. 2016) .............................................................23

*Salman v. Saudi Arabian Cultural Mission*,
    No. 1:16cv1033, 2017 WL 176576 (E.D. Va. Jan. 17, 2017)..........................8

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ...................................................................10, 12, 13

*Schlegel v. Bank of Am., N.A.*,
    505 F.Supp.2d 321 (W.D. Va. 2007) ......................................................36, 38

*Sec'y of State for Def. v. Trimble Navigation Ltd.*,
    484 F.3d 700 (4th Cir. 2007) ...............................................................11, 12

*SecureInfo Corp. v. Telos Corp.*,
    387 F.Supp.2d 593 (E.D. Va 2005) ......................................................31, 34

*Sewraz v. Morchower*,
    No. 3:08CV100, 2009 WL 211578 (E.D. Va. Jan. 28, 2009)........................24

*Simmons v. Miller*,
    544 S.E.2d 666 (Va. 2001).........................................................................38

*Size, Inc. v. Network Sols., Inc.*,
    255 F.Supp.2d 568 (E.D. Va. 2003) ............................................................25

*Skillstorm, Inc. v. Elec. Data Sys., LLC*,
    666 F.Supp.2d 610 (E.D. Va. 2009) ..................................................36, 37, 38

*Southprint, Inc. v. H3, Inc.*,
    208 F. App'x 249 (4th Cir. 2006) ...............................................................34

*Spengler v. Sears, Roebuck & Co.*,
    878 A.2d 628 (Md. Ct. Spec. App. 2005) ....................................................30

*State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*,
    381 F.Supp.3d 536 (D. Md. 2019) .......................................................38, 40

*Straight Line Drive, Inc. v. Vanatta*,
    No. 3:20CV779, 2020 WL 7647637 (E.D. Va. Dec. 23, 2020)............................................16

*Stratton v. Mecklenburg Cty. Dep't of Soc. Servs.*,
    521 F. App'x 278 (4th Cir. 2013) ....................................................................................13

*Symbology Innovations, LLC v. Lego Sys., Inc.*,
    282 F.Supp.3d 916 (E.D. Va. 2017) ................................................................................18

*Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*,
    299 F.Supp.2d 565 (E.D. Va. 2004) ................................................................................38

*Tech. & Supply Mgmt., LLC v. Johnson Controls Bldg. Automation Sys., LLC*,
    No. 1:16-cv-303, 2017 WL 57134 (E.D. Va. Jan. 4, 2017).....................................................30

*Terra Holding GmbH v. Unitrans Int'l, Inc.*,
    124 F.Supp.3d 745 (E.D. Va. 2015) ................................................................................22

*Thornapple Assocs., Inc. v. Izadpanah*,
    No. 1:14cv767, 2014 WL 4925838 (E.D. Va. Sept. 30, 2014)................................................15

*TKA Inc. v. Bowers*,
    No. 1185, 2019 WL 517209 (Md. Ct. Spec. App. Feb. 11, 2019)...........................................26

*Tower Oaks Blvd., LLC v. Va. Com. Bank*,
    223 Md. App. 781 (2015) ................................................................................................26

*Tribalco, LLC v. Hue Tech., Inc.*,
    No. CIV. JFM-11-935, 2011 WL 3821074 (D. Md. Aug. 26, 2011) ......................................26

*Tysons Toyota, Inc. v. Commonwealth Life Ins.*,
    20 Va. Cir. 399 (1990)....................................................................................................33

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966)..........................................................................................................8

*Volcjak v. Wash. Cnty. Hosp. Ass'n*,
    723 A.2d 463 (Md. Ct. Spec. App. 1999) ..........................................................................30

*Walden v. Fiore*,
    571 U.S. 277 (2014)................................................................................................15, 17

*Wallace v. Baylouny*,
    No. 1:16-cv-0047, 2016 WL 3059996 (E.D. Va. May 31, 2016)...........................................33

*Weiland v. Palm Beach Cty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ......................................................................................24

*William v. AES Corp.*,
   28 F.Supp.3d 553 (E.D. Va. 2014) ..................................................................36

*Willis v. Clark*,
   No. 3:05CV325, 2005 U.S. Dist. LEXIS 25877 (E.D. Va. Oct. 31, 2005) ...........18

*Wilmington Tr. Co. v. Clark*,
   424 A.2d 744 (Md. 1981) .................................................................................28

*Wye Oak Tech., Inc. v. Republic of Iraq*,
   666 F.3d 205 (4th Cir. 2011) ......................................................................10, 12

*Wye Oak Tech., Inc. v. Republic of Iraq*,
   No. 1:09CV793, 2010 WL 2613323 (E.D. Va. June 29, 2010), *aff'd*, 666 F.3d
   205 (4th Cir. 2011).........................................................................................19

*Zamma Canada Ltd. v. Zamma Corp.*,
   No. 3:20cv353, 2020 WL 7083940 (E.D. Va. Dec. 3, 2020) ............................30

**Statutes**

9 U.S.C. § 2.....................................................................................................21

22 U.S.C. § 2751-54 .........................................................................................12

22 U.S.C. § 2753 ..............................................................................................11

22 U.S.C. § 2778...........................................................................................11, 12

28 U.S.C. § 1330...........................................................................................8, 14

28 U.S.C. § 1367.......................................................................................8, 13, 14

28 U.S.C. § 1391.........................................................................................18, 19

28 U.S.C. § 1406 ..............................................................................................18

28 U.S.C. § 1603 ................................................................................................9

28 U.S.C. § 1604 ................................................................................................8

28 U.S.C. § 1605.......................................................................................8, 9, 11

28 U.S.C. § 1608..............................................................................................14

D.C. Code § 12-301 ...........................................................................................7

Md. Code, *Cts. & Jud. Proc.* § 5-101 ..............................................................7, 23

Va. Code § 8.01-328.1 ..................................................................................................15, 18

**Regulations**

48 C.F.R. § 225.7303-2 (2019) ........................................................................................3, 20

48 C.F.R. § 225.7306 (2019) .............................................................................................20

**Rules**

Fed. R. Civ. P. 12(b)(1) .......................................................................................................8

Fed. R. Civ. P. 12(b)(2) .....................................................................................................14

Fed. R. Civ. P. 12(b)(3) .....................................................................................................18

Fed. R. Civ. P. 12(b)(6) .....................................................................................................24

## INTRODUCTION

Lockheed Martin Corporation ("Lockheed Martin") moves to dismiss the First Amended Complaint (Dkt. No. 53) ("FAC") filed by Plaintiffs Blenheim Capital Holdings Limited and Blenheim Capital Partners Limited ("Blenheim") against it and co-Defendants Airbus Defence and Space SAS ("Airbus") as well as the Republic of Korea and South Korea's Defense Acquisition Program Administration (collectively, "South Korea"), alleging tortious interference with contract and prospective business expectancy, common law and statutory civil conspiracy, unjust enrichment, and, most recently, antitrust violations under federal and Virginia law.

This is a case that should not have been filed. Blenheim failed to obtain the commercial financing and insurance that were express prerequisites for moving the overarching offset project among the parties—then partners—forward. Blenheim does not contest this. Instead, it seeks to mask its own non-performance by alleging that Lockheed Martin and Airbus interfered with each other's respective contracts due to a purported fear of Blenheim as a "nascent competitor" in the satellite industry. This speculative assertion is nonsensical and implausible, especially given that Blenheim had never before (or after) sold or manufactured a satellite. At bottom, Blenheim's FAC is a desperate, thirteenth-hour attempt to achieve a windfall for a job that Blenheim never completed due to its own failings—not any action or inaction by Airbus or Lockheed Martin.

Blenheim's FAC is forum shopping at its worst. In the most recent example, Blenheim manufactures a new "antitrust" claim in the FAC after Lockheed Martin demonstrated that the Court lacked jurisdiction over the claims in the original complaint. Moreover, Blenheim brings no claim for breach of contract, even while conclusorily asserting that Lockheed Martin and Airbus "breached" their agreements with Blenheim. Nor could it, as the controlling provisions of Lockheed Martin's IBA with Blenheim require the application of Maryland law, for which the limitation period has long since run for contract *or* tort claims. And so Blenheim seeks a more

favorable forum here for its contract dispute masquerading as a tort action.  But Blenheim's claims are founded upon events occurring *outside* Virginia, and no party is located here either.

Blenheim's forum shopping and implausible pleading compels dismissal of the FAC for a multitude of reasons.  **First**, the Court does not have subject matter jurisdiction because South Korea's acquisition of F-35 fighter aircraft from the U.S. Government and the offset obligations deriving therefrom are not commercial activity under the Foreign Sovereign Immunities Act and, in any event, do not form the basis for Blenheim's claims.  Tellingly, Blenheim has not even bothered to serve South Korea.  **Second**, Blenheim's addition of a federal antitrust claim does not provide jurisdiction over Blenheim's state law claims, as it is plainly barred by the statute of limitations and is facially implausible.  **Third**, the Court lacks personal jurisdiction over Lockheed Martin because none of the claims against it arise out of Lockheed Martin's activities in this District.  **Fourth**, venue is improper because no substantial part of the events giving rise to Blenheim's claims occurred here—in fact, *none* of the events material to the causes of action occurred in Virginia at all.  **Fifth**, Blenheim's claims are subject to mandatory arbitration and forum-selection clauses that apply to all disputes arising out of or in connection with Blenheim's offset agreements with Lockheed Martin.  **Finally**, Blenheim wholly fails to state a claim for tortious interference, conspiracy, unjust enrichment, or antitrust conspiracy.

Accordingly, Blenheim's claims should all be dismissed with prejudice.

## FACTUAL BACKGROUND[1]

In 2013, the Lockheed Martin F-35 fighter aircraft won a competition to be the next fighter for South Korea, to be acquired from the United States under a Foreign Military Sales ("FMS") transaction between the U.S. Department of Defense ("DoD") and South Korea.  FAC

---

[1]  Lockheed Martin also joins the "Background" section of Airbus' Motion to Dismiss.

¶¶ 39, 54, 60.  Due to the highly sensitive and classified technology of the aircraft and its related intellectual property, the F-35s could only be procured by South Korea through a unique government-to-government FMS transaction with DoD rather than via a direct commercial agreement with Lockheed Martin.  *See, e.g.*, *id.* ¶¶ 6, 39-41; Security Assistance Management Manual, DCSA Manual 5105.38-M ("SAMM") §§ C4.3.5, C4.3.5.2 (FMS-Only list), C4.3.5.3-4, *available at* https://samm.dsca.mil/ (last visited June 16, 2021).

Coincident with the FMS transaction, South Korean law required Lockheed Martin to provide South Korea with a prescribed amount of "offset" (the "Offset Transaction").  FAC ¶¶ 45, 60.[2]  The offset obligation "would arise from the FMS contract," (*id.* ¶ 45), and its costs were allowable as part of Lockheed Martin's separate contract with the U.S. Government in support of the FMS transaction, (*id.* ¶ 46) (citing 48 C.F.R. § 225.7303-2(a)(3)(ii)).

Pursuant to a 2007 International Broker Agreement ("IBA") between Lockheed Martin and Blenheim governing the non-exclusive use of Blenheim's services to design and perform offset obligations in various defense procurement transactions, Blenheim proposed "Project Archer" to deliver the majority of the offset obligation for the F-35 sale.  *Id.* ¶¶ 5, 7, 47-50; Ex. 1A (2007 IBA).[3]  Project Archer was an overarching transaction that would create "significant benefits for four parties," Blenheim, Lockheed Martin, Airbus, and South Korea, effectuated through a series of agreements, most pertinently the Lockheed Martin-Blenheim IBA

---

[2]  As described by Blenheim, an "offset transaction is generally one in which the supplier agrees to undertake activities in order to satisfy a second objective of the procuring entity, distinct from the acquisition of the goods or services that form the core transaction."  FAC ¶ 2.

[3]  True and correct copies of Exhibits 1-7 are attached to the Declaration of Brian Tully McLaughlin filed as Appendix A to this Memorandum.  The FAC refers to and necessarily relies on these documents, and their terms are integral to the FAC's allegations.  *See, e.g.*, FAC ¶¶ 5, 49, 73, 115-16.  They are thus properly before the Court on this Motion to Dismiss.  *See Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 235 (4th Cir. 2004).

and the Satellite Purchase Agreement ("SPA") between Airbus and Blenheim that itself made specific reference to the IBA.  *See* FAC ¶ 8; Ex. 1A (IBA); Airbus Ex. 5 (SPA).[4]  Under the terms of Project Archer, Blenheim would secure financing, insurance, and related assurances through approved investors and banks to procure from Airbus one military satellite and two additional commercial satellites, at a total price of "upwards of a billion dollars."  FAC ¶¶ 8, 11, 62; Ex. 2A at 92-93 (Original Amend. 7 to the IBA); Airbus Ex. 5 at 4 (SPA).  Lockheed Martin would pay Blenheim $150 million total for the Offset Transaction, Airbus would manufacture and deliver the military satellite, South Korea would provide offset credits to Lockheed Martin, and Blenheim would keep the commercial satellites for its own gain.  FAC ¶¶ 6-9, 63; Ex. 2A at 113.

Amendments 5 through 7 to the IBA formalized the terms of the portions of Project Archer between Lockheed Martin and Blenheim.  Exs. 2A (Amend. 7), 3A (Amendment 5 to the IBA).  Amendment 7, executed on December 4, 2014, set forth the military satellite requirements ("MILSATCOM project"), (Ex. 2A at 3-13), the funding and commercial satellite financing approach (*id*. at 113-14, 116-20), and the ongoing negotiations among Lockheed Martin, Blenheim, "the Satellite System Supply contractor" (later, Airbus), and South Korea related to the military satellite (*id.* at 4, 113-14).  Blenheim's primary obligations in the Project Archer arrangement were (1) to establish a Special Purpose Vehicle ("SPV") to secure financing to build the military and commercial satellites; (2) procure the satellites from a satellite system supplier; and (3) provide insurance for the satellite production and launch.  FAC ¶¶ 8(c), 63, 78-79, 81; Ex. 2A at 113-14.  These terms were critical to the requirement that the military satellite be

---

[4]  All citations to the SPA in this Memorandum refer to Ex. 5 of the Declaration of Robert Longtin attached to Airbus' Memorandum of Law in Support of Its Motion to Dismiss.

"produced, delivered, launched and orbit tested no later than December 31, 2017."  Ex. 2A at 4.

IBA Amendment 7 contemplated a series of five payments by Lockheed Martin to Blenheim from April 30, 2015 through November 30, 2017, totaling $150 million.  *Id.* at 116.  On March 31, 2015, Blenheim and Lockheed Martin mutually agreed to change the initial $45 million payment date to May 29, 2015, rather than April 30th.  Ex. 4 (Amend. 7 (Rev. – 1)).  On June 1, 2015, Blenheim and Lockheed Martin mutually agreed to incorporate a Phased Payment / milestone structure.  Phase One was the initial $45 million payment and Phase Two included the remaining four payments, subject to express milestones as reasonable preconditions that Blenheim was to meet to ensure progression of Project Archer.  FAC ¶ 88; Ex. 5 (Amend. 7 (Rev. – 2)).  The first Phase Two Payment was scheduled for July 31, 2015, "or such subsequent date as the parties may agree," and required Blenheim, *inter alia*, to produce executed term sheets for the senior debt financing, executed term sheets for the mezzanine debt financing, and satisfactory confirmation that the combination of financing and Lockheed Martin's payments would constitute all funds required to complete Project Archer.  Ex. 5 at 1-2.[5]

On June 15, 2015, Lockheed Martin paid Blenheim the substantial $45 million Phase One Payment.  FAC ¶ 101.  Blenheim failed to meet the IBA's conditions and milestones for release of the Phase Two payments, however, starting with the securing of senior debt financing essential to Project Archer's progression and December 31, 2017 deadline to produce, deliver, launch, and orbit test the military satellite for South Korea.  Ex. 2A at 4; Ex. 5 at 4.[6]

---

[5]  Blenheim was also required to procure commercial insurance by July 31, 2015, to cover all risk of loss with respect to the military satellite.  Ex. 5 at 2.  It never did so.

[6]  Absent from Blenheim's conjecture (FAC ¶ 115) that Lockheed Martin "began contriving road-blocks to prevent Blenheim from securing the financing" is any factual allegation that Blenheim *ever* met the Phase Two Payment conditions to produce executed term sheets, confirm that the secured financing would be sufficient, or obtain any of the required insurances.  *See* Ex. 5 at 2-3.

Airbus began manufacturing the military satellite even before receiving any payment from Blenheim.  FAC ¶¶ 81, 141.  But in June and July 2015, Blenheim failed to make required payments to Airbus pursuant to the SPA.  *Id.* ¶ 120.  This in spite of its prior receipt of the $45 million payment from Lockheed Martin, only $20 million of which Blenheim later passed to Airbus.  *Id*. ¶ 104.[7]  After several meetings with Blenheim about its default / failures to pay, Airbus stopped work on the satellite.  *Id.* ¶ 120.  With the project stalled, South Korea threatened Lockheed Martin with negative press if the military satellite did not progress.  *Id*. ¶ 134.

In spite of Blenheim's multiple defaults, Lockheed Martin engaged with Blenheim, proposing several "restart agreements" in 2016 to salvage Project Archer so that Lockheed Martin could meet its offset obligation.  *Id.* ¶¶ 143-44.  Blenheim refused, insisting on shifting the risk of failure to secure financing to Lockheed Martin.  Blenheim apparently "continued to work on securing funding partners" but does not allege that it succeeded in doing so.  *Id.* ¶ 145.  Accordingly, on October 6, 2016, Lockheed Martin terminated the IBA for cause.  *Id*. ¶ 146; Ex. 6 (Oct. 2016 Correspondence).  Lockheed Martin reiterated this in a second letter, noting that "[t]he Korean government has withheld any award of credits . . . as a direct consequence of Blenheim's failure to arrange financing."  Ex. 7 (Jan. 2017 Correspondence); FAC ¶ 146.

Ultimately, Lockheed Martin was required to enter into a more expensive, direct procurement with Airbus to obtain the military satellite owed to South Korea.  Lockheed Martin and Airbus informed Blenheim of the direct procurement.  FAC ¶¶ 147, 273; Ex. 7 ("Project Archer failed and has been replaced (at great expense to Lockheed Martin) with a direct procurement approach[.]").  As a result, Lockheed Martin did not obtain the lower cost of the

---

[7] Per Amendment 7, "[a]ny compensation received by [Blenheim from Lockheed Martin] for Project Archer will be used solely for progression and implementation of Project Archer."  Ex. 5 at 2.  Blenheim has never provided a detailed accounting of the other $25 million it retained.

Project Archer approach and Airbus sold only one satellite, not three.[8]

In response to the terminations of the IBA and SPA in 2016—which Blenheim now characterizes as "breaches"—Blenheim took no action.  Now, years later, and out of time to bring a breach claim, Blenheim asserts that the true cause of each termination was tortious interference by the same parties to the single Project Archer transaction.  Because even tort-based claims against Lockheed Martin would be untimely under the governing law and agreed forum for disputes, Blenheim filed in Virginia.[9]

The IBA is "governed by, subject to, and interpreted according to the laws of the State of Maryland."  Ex. 1A ¶ 15.  Amendment 5 modified the IBA's Disputes Clause to require Blenheim and Lockheed Martin to arbitrate any dispute "arising out of or in connection with this Agreement."  Ex. 3A at 2, ¶ 21.  Further, Amendment 7 (Revised – 2) attached an "Undertaking" assigning rights and duties of the IBA to its SPV and which stated that "[t]he exclusive forum for any and all disputes arising out of or in connection with this Undertaking shall be the US Federal District Court located in the City of Baltimore, State of Maryland, USA."  Ex. 5 at Undertaking.  Finally, the parties also agreed in the IBA to a Limitation of Liability clause (at ¶ 7):

> LMOC's liability for costs or damages allegedly incurred by BROKER arising out of, or in connection with, BROKER's performance of its duties under this Agreement shall be strictly limited to broker fees which may be deemed owing . . . In no event shall either party be liable for lost profits, or any other consequential, indirect, incidental, or punitive damages arising out of, or in connection with, claims made against it by the other party, whether such claims are alleged to arise in contract or in tort.

---

[8] Without the financing arrangement that Blenheim had promised, Lockheed Martin's cost for the military satellite was far greater than the $150 million agreed to in Project Archer.  *See, e.g.*, Airbus Ex. 5 § 3 (providing a military satellite not to exceed price of $370 million).

[9] For instance, Lockheed Martin resides in Maryland, (FAC ¶ 18), but the statute of limitations for tortious interference there is 3 years.  Md. Code, *Cts. & Jud. Proc.* § 5-101.  With respect to South Korea, under the FSIA, the District of Columbia is an available forum, 28 U.S.C. § 1391(f)(4), but the same 3-year limitation period applies.  D.C. Code § 12-301.

## **ARGUMENT**

Blenheim's First Amended Complaint is deficient for a host of reasons.  The Court should dismiss this action for lack of subject-matter jurisdiction, lack of personal jurisdiction, improper venue, the parties' arbitration/forum-selection clauses, and failure to state a claim.

## I.   **The FAC Must Be Dismissed for Lack of Jurisdiction Under Rule 12(b)(1)**

A court has "an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).  The court is "obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999); *Arbaugh*, 546 U.S. at 514 ("when a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety").  Further, "when 'federal claims are dismissed before trial . . . state claims should be dismissed as well.'" *Hunt v. Branch Banking & Tr. Co.*, 480 F. App'x 730, 732 (4th Cir. 2012) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).  The plaintiff bears the burden of proving jurisdiction. *Salman v. Saudi Arabian Cultural Mission*, No. 1:16cv1033, 2017 WL 176576, at *2 (E.D. Va. Jan. 17, 2017).

As in the original complaint, Blenheim alleges in the FAC that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 *et seq.*, provides this Court with jurisdiction over its claims against South Korea, and it bootstraps supplemental jurisdiction over its state law claims against Lockheed Martin and Airbus pursuant to 28 U.S.C. § 1367.  FAC ¶¶ 22, 31.  But the FSIA's commercial activity exception does not apply here.  *See* 28 U.S.C. §§ 1604, 1605. Lacking FSIA jurisdiction, there is no basis to exercise supplemental jurisdiction over the state law claims against Lockheed Martin and Airbus.

Blenheim now adds a federal antitrust claim to the FAC in a transparent attempt to avoid dismissal from the failed FSIA connection.  But that claim is barred by the statute of limitations

and fails to state a claim.  Accordingly, it provides no basis for jurisdiction over any of the claims against Lockheed Martin or Airbus.  Dismissal is the appropriate remedy.

### A.     There Is No FSIA Jurisdiction for Tortious Interference Claims Unless the Commercial Activity Exception Applies

The FSIA expressly precludes a waiver of immunity for claims "arising out of . . . interference with contract rights."  28 U.S.C. § 1605(a)(5)(B).  Blenheim therefore alleges, as it must, that its tortious interference claims are instead based upon South Korea engaging in "commercial activity" under § 1605(a)(2).  *See id.* § 1605(a)(5) (referring to (a)(2)'s commercial activity exception).  Any such commercial activity must bear a "clear and strong connection" to the tort alleged, lest Blenheim be allowed "to sneak [a tort claim] into federal court under the 'commercial activity' exception[.]"  *Leutwyler v. Office of Queen Rania Al-Abdullah*, 184 F.Supp.2d 277, 295 (S.D.N.Y. 2001).  Here, South Korea did not engage in commercial activity in the United States, nor are Blenheim's tort claims based on the sovereign activity of South Korea in the FMS transaction for F-35 jets and its requisite offset obligation.

### B.     The Claims Are Not "Based Upon" a "Commercial Activity" by South Korea

A foreign state is not immune from suit under the FSIA where "the action is based upon a commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(2).  Commercial activity is "a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  To be "carried on in the United States by a foreign state" requires "substantial contact with the United States."  *Id*. § 1603(e).  Further, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  *Id*. § 1603(d); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (same).

At its core, the test is a determination of whether the actions performed are the type of

actions in which a private party could engage.  *Id.*  "A foreign sovereign engages in 'commercial activity' *only* when it exercises 'those powers that can also be exercised by private citizens,' not when it employs 'powers peculiar to sovereigns.'"  *France.com, Inc. v. French Republi*c, 992 F.3d 248, 252 (4th Cir. 2021) (quoting *Weltover*, 504 U.S. at 614) (emphasis added).  On the other hand, "no commercial activity occurs where a foreign state acts in a manner unique to a sovereign."  *Best Med. Belgium, Inc. v. Kingdom of Belgium*, 913 F.Supp.2d 230, 237 (E.D. Va. 2012); *see Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994) ("When two governments deal directly with each other *as governments*, even when the subject matter may relate to the commercial activities of its citizens or governmental entities, . . . those dealings are *not* akin to that of participants in a marketplace.") (second emphasis added).

An action is "based upon" commercial activity if that "particular conduct . . . constitutes the gravamen of the suit."  *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) (internal quotation marks omitted).  The "basis" or "foundation" for a claim is conduct that includes "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993); *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 216 (4th Cir. 2011) (the commercial activity "must form the basis of the claim for which [plaintiff] seeks relief on the merits"); *Sachs*, 577 U.S. at 35 (commercial activity in United States did not constitute the gravamen of suit concerning tort that occurred abroad); *cf. Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 772 (2019) ("[I]f the 'gravamen' of a lawsuit is tortious activity abroad, the suit is not 'based upon' commercial activity within the meaning of the FSIA's commercial activity exception.") (citing *Sachs*, 577 U.S. at 34-35).

### 1.   South Korea Did Not Engage in Commercial Activity

Blenheim alleges that "South Korea and DAPA's acquisition of the F-35 fighter planes and the military satellite offset through the 'foreign military sales' process, a defense

procurement program offered by a U.S. Department of Defense ('DoD') program," constitutes "commercial activity carried on in the United States by a foreign state" under § 1605(a)(2).  FAC ¶¶ 26-27; *see id.* ¶¶ 28-30.  The notion that an FMS transaction to purchase F-35 fighter jets with classified weapons technology, coupled with the requisite offset obligation, could be a commercial activity is implausible on its face.  Rather, this is precisely the type of unique, government-to-government activity reserved only to sovereigns.

In fact, the D.C. Circuit has already held that FMS sales are *not* commercial activity.  *See Heroth v. Kingdom of Saudi Arabia*, 565 F.Supp.2d 59 (D.D.C. 2008), *aff'd*, 331 F. App'x 1 (D.C. Cir. 2009).  In *Heroth*, the district court held that a foreign sovereign's "participation in the FMS program, which is limited to foreign governments and international organizations, is the type of activity in which a private player cannot participate."  565 F.Supp.2d at 68 n.9.  On appeal, the D.C. Circuit affirmed, holding that participation in the FMS program is a "quintessentially sovereign activit[y]."  331 F. App'x at 2.  *Heroth* is on point here.

Indeed, the nature of the FMS program demonstrates why South Korea's FMS acquisition, including the requisite offset obligation, is not commercial activity.  Unlike a direct commercial sale, FMS transactions are exclusively between the U.S. Government and a foreign government; private citizens in the marketplace may not participate, and there is no privity of contract between the contractor and the foreign sovereign.  *See, e.g.*, *Heroth*, 331 F. App'x at 2; *Heroth*, 565 F.Supp.2d at 62; SAMM §§ C4.1, C4.3.5.3-4; 22 U.S.C. §§ 2753, 2778.[10]  Second,

---

[10]  In fact, the FAC admits that Lockheed Martin could not enter into an offset agreement "without U.S. government approval."  FAC ¶ 176.  And, in contrast to a direct commercial sale, any dispute between the foreign sovereign and the defense contractor in an FMS transaction— such as concerning an offset—would have to be addressed using the U.S. Government as an intermediary.  *See, e.g.*, *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 707 (4th Cir. 2007) (distinguishing FMS transactions from direct commercial sales and explaining

such transactions are subject to national security and defense policies and the foreign sovereign must meet a host of conditions not applicable to direct commercial sales to be eligible for an FMS-Only transaction.  *See, e.g.*, SAMM §§ C.4.1-4.3 (FMS criteria and policies); C.4.3.5 (FSM-Only Determinations); 22 U.S.C. §§ 2751-54, 2778.  Third, while DoD is "generally neutral" as to whether a country purchases defense articles commercially or through FMS channels, certain military-end items "are sold only via FMS" as designated by the President based on DoD recommendations.  *See, e.g.*, SAMM §§ C4.3.4, C4.3.5.  The SAMM Manual contains a list of items available "solely on an FMS-Only basis" that expressly includes "fighter aircraft" such as the F-35 jets at issue.  *Id.* § C4.3.5.2; *see also Trimble*, 484 F.3d at 703 ("Some items . . . because of their sensitive nature can only be purchased through the FMS program.").[11] In short, FMS transactions in general, and particularly this "FMS-Only" acquisition and its offset component, are sovereign and not commercial activity.  *See Cicippio*, 30 F.3d at 168.

## 2.    Blenheim's Claims Are Not "Based Upon" the FMS Transaction

Even if South Korea's involvement in the FMS program could be deemed "commercial activity carried on in the United States," Blenheim's claims against South Korea for tortious interference are not "based upon" that activity.  The commercial activity alleged must constitute "the gravamen of the suit," *Sachs*, 577 U.S. at 35; it must be conduct "that, if proven, would entitle [the] plaintiff to relief under his theory of the case."  *Nelson*, 507 U.S. at 357.  For

---

that affording third-party beneficiary status to a foreign state in an FMS transaction would undermine the FMS structure and run counter to U.S. policy and national security interests).

[11]   In contrast to FMS sales, direct commercial sales between domestic contractors and foreign governments may involve items more typically available commercially.  *See, e.g.*, *Wye Oak*, 666 F.3d at 216 (holding that military scrap sales between private company and foreign sovereign were commercial); *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 343 (8th Cir. 1985) (basic ordering agreement between private company and foreign state for damaged aircraft parts involved commercial activity).

example, in *Nelson*, the Supreme Court found that a claim for tortious conduct outside the United States was not based upon commercial activity because facts of that activity "alone entitle [plaintiffs] to nothing under their theory of the case." *Id.* at 358; *see Am. W. Airlines, Inc. v. GPA Grp., Ltd.*, 877 F.2d 793, 797 (9th Cir. 1989) (upholding sovereign immunity because the commercial acts did not include the "*specific* acts that form the basis of the suit") (internal quotation marks and citation omitted); *France.com*, 992 F.3d at 253 (court must examine the "core of the suit, that is, the acts that actually injured the plaintiff") (citations omitted).

Just as in *Nelson*, the alleged commercial activity by South Korea in the United States—the government-to-government FMS transaction—does not form the basis for Plaintiff's claims of tortious interference by South Korea.  Indeed, proof of South Korea's activities with the U.S. Government would not entitle Blenheim to relief on its tortious interference claims against South Korea.  And, like in *Nelson*, the alleged tortious conduct by South Korea occurred outside of the United States, further separating it from South Korea's engagement in the FMS transaction.  *See, e.g.*, FAC ¶¶ 129-38, 246, 252.  Because South Korea's allegedly "commercial" activity is not the basis of Blenheim's tortious interference claims, the FSIA exception to immunity does not apply.  *See Nelson*, 507 U.S. at 358; *Sachs*, 577 U.S. at 35; *Am. W. Airlines*, 877 F.2d at 797.

*            *            *

In sum, the commercial activity exception of the FSIA does not apply here because (1) South Korea's activity was sovereign, not commercial; and (2) that activity is not the gravamen of Blenheim's claims.  As a result, the Court lacks subject matter jurisdiction and must dismiss the FAC in its entirety.  *See* 28 U.S.C. § 1367(a); *Stratton v. Mecklenburg Cty. Dep't of Soc. Servs.*, 521 F. App'x 278, 291 n.25 (4th Cir. 2013) ("When a district court dismisses federal claims for lack of subject matter jurisdiction, there was never a valid claim to which the state

13

claims could be considered supplemental, and dismissal of the state claims is also required.")
(citing *Crosby v. City of Gastonia,* 635 F.3d 634, 644 (4th Cir. 2011)); *Arbaugh*, 546 U.S. at 514
("when a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss
the complaint in its entirety). For the same reasons, the Court should dismiss under 28 U.S.C.
§ 1367(c)(3). *See, e.g.*, *Hunt*, 480 F. App'x at 732.

**C.    Jurisdiction Is Dependent Upon Service of South Korea**

Even if the Court finds subject matter jurisdiction under the FSIA, it should nevertheless
dismiss the entire FAC based on Blenheim's failure to serve South Korea. Seven months after
filing this suit, Blenheim has yet to serve South Korea by any of the required methods listed in
28 U.S.C. § 1608(a). Strict compliance is required for personal jurisdiction over South Korea.
*See Kumar v. Republic of Sudan*, 880 F.3d 144, 154, 160 (4th Cir. 2018); 28 U.S.C. § 1330(b).
Blenheim should not be permitted to exploit the FSIA to create supplemental jurisdiction over
Lockheed Martin and Airbus while failing to make any reasonable effort to bring South Korea
into this suit. If the Court dismisses the claims against South Korea for failure to effect service,
as it should, it should also exercise its discretion to decline taking supplemental jurisdiction over
the claims against Lockheed Martin and Airbus under 28 U.S.C. § 1367(c)(3).

**D.    Count V's "Antitrust" Claim Does Not Provide Jurisdiction**

Finally, Blenheim's addition of a Sherman Act and state antitrust count to the FAC
provides no jurisdictional harbor. Lockheed Martin hereby joins and adopts Airbus' Motion to
Dismiss that count in full. Accordingly, the Court should decline to exercise supplemental
jurisdiction over the remaining claims against Lockheed Martin pursuant to 28 U.S.C. § 1367(c).

**II.    <u>The Court Lacks Personal Jurisdiction Over Lockheed Martin</u>**

Rule 12(b)(2) authorizes dismissal of an action where the court lacks personal
jurisdiction. It is plaintiff's "burden [to] demonstrate[e] personal jurisdiction at every stage

[after a defendant raises] a challenge" to personal jurisdiction. *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). The court must examine whether (1) personal jurisdiction is authorized by state law and (2) the exercise of jurisdiction comports with constitutional due process. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). Virginia's long-arm statute extends personal jurisdiction to the limits permitted by constitutional due process. *Id.* The constitutional due process inquiry considers: "(1) the extent to which the defendant 'purposefully avail [ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Babiak v. Mizuho Bank, Ltd.*, No. 1:18-cv-352, 2018 WL 4473584, at *2 (E.D. Va. Sept. 17, 2018) (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).

Specific personal jurisdiction is a claim-specific analysis. *Thornapple Assocs., Inc. v. Izadpanah*, No. 1:14cv767, 2014 WL 4925838, at *3 (E.D. Va. Sept. 30, 2014); *see also Gatekeeper Inc. v. Stratech Sys., Ltd.*, 718 F.Supp.2d 664, 667-68 (E.D. Va. 2010). To adequately allege it, "the litigation [must] result[ ] from alleged injuries that arise out of" the defendant's activities in the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985) (internal quotation marks and citation omitted); *Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."). Virginia's long-arm statute provides specific personal jurisdiction over a person as to a cause of action ***arising from*** the person's: transacting business in Virginia; causing tortious injury by an act or omission in Virginia; or causing tortious injury in Virginia by an act or omission outside Virginia if the person regularly does or solicits business in Virginia. Va. Code § 8.01-328.1(A)(1), (3), (4).

15

Instead, a plaintiff must show "an act or omission" in Virginia causing tortious injury or "an act or omission" outside Virginia causing tortious injury in Virginia. *Cent. Va. Aviation, Inc. v. N. Am. Flight Servs., Inc.*, 23 F.Supp.3d 625, 629 (E.D. Va. 2014); *Straight Line Drive, Inc. v. Vanatta*, No. 3:20CV779, 2020 WL 7647637, at *4 (E.D. Va. Dec. 23, 2020) (same requirement for personal jurisdiction over conspiracy claims).

Blenheim fails to allege that Lockheed Martin committed tortious interference or conspired to do so in Virginia or caused tortious injury in Virginia by an act or omission outside the Commonwealth.  Rather, the alleged interference and terminations or breaches of the IBA and SPA occurred outside Virginia (and outside the United States, for the most part), and Blenheim alleges no injury in Virginia (nor could it).  In fact, the FAC concedes that the alleged interference inducing or causing the alleged breach or termination of the IBA, SPA, or Blenheim's business expectancy occurred in Texas, France, England, Maryland, and South Korea, *id.* ¶¶ 83, 109, 111, 114-17, 120, 122-25, 127-28, 133, 136, 146-47; Exs. 6-7; s*ee Cent. Va. Aviation*, 23 F.Supp.3d at 629 ("[p]laintiff must establish the tortious conduct occurred while [d]efendant was in Virginia"); *Gatekeeper*, 718 F.Supp.2d at 668 (no personal jurisdiction where acts giving rise to tortious interference claim occurred outside Virginia).

Faced with Lockheed Martin's prior motion to dismiss, Blenheim adds a new section to the FAC alleging that a substantial part of the events giving rise to its claims occurred in Virginia.  FAC ¶¶ 165-85.  But much like Blenheim's placement of these allegations at the back of the FAC, these allegations are but an afterthought—they are of no moment in determining personal jurisdiction.  For starters, most of the new "Virginia" allegations relate to the negotiation and performance of the F-35 FMS transaction.  These activities do not form the basis of Blenheim's claims concerning interference with Project Archer and, thus, cannot confer

16

jurisdiction here. *See, e.g.*, *CEM Corp. v. Pers. Chemistry, AB*, 55 F. App'x 621, 625 (4th Cir. 2003) (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277-78 (7th Cir. 1997) (additional unrelated contacts cannot be aggregated for purposes of specific personal jurisdiction and, in breach cases, only the dealings between the parties with respect to the contract *at issue* are relevant)); *id.* at 624 (affirming dismissal where alleged contacts "have nothing to do with the dispute at issue in this case and thus are irrelevant in any consideration of *specific* personal jurisdiction"); *Walden*, 571 U.S. at 284.

Nor does Blenheim's new, vague allegation (FAC ¶ 172) that the original IBA was negotiated "largely" in Virginia constitute conduct giving rise to its interference and conspiracy claims. Tellingly, Blenheim cannot allege that the Project Archer amendments from 2013-2015 were negotiated or executed there, nor the 2015 revisions to those amendments about which Blenheim complains. In fact, Blenheim concedes that its Virginia office was only open until 2012. *Id.* ¶ 171; *see Cent. Va. Aviation*, 23 F.Supp.3d at 629 ("[p]laintiff must establish the tortious conduct occurred while [d]efendant was in Virginia"). Blenheim also fails to allege that the SPA with Airbus was negotiated in Virginia. Moreover, the parties to these agreements reside in Maryland, England, and France, and performance took place outside Virginia.

At most, Blenheim alleges that, on one occasion, South Korea personnel negotiated with Lockheed Martin in Virginia concerning the direct procurement of the military satellite. FAC ¶ 182. To the extent this vague, alleged meeting could be viewed as at all germane, it is hardly conduct giving rise to Blenheim's claims.[12]

---

[12]  Should the Court forgo dismissal on the multiple other available grounds, Lockheed Martin stands ready to provide jurisdictional evidence in the event the Court deems pertinent Blenheim's new vague allegations about Virginia. Lockheed Martin's dealings related to Project Archer occurred in Texas, Maryland, London, France, and Korea—but not Virginia.

In sum, neither Virginia's long-arm statute nor constitutional due process provide specific personal jurisdiction over Lockheed Martin.[13]  Dismissal should result.[14]

III.     **The FAC Must Be Dismissed for Improper Venue**

Pursuant to Rule 12(b)(3), the "plaintiff bears the burden of establishing that venue is proper."  *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F.Supp.3d 916, 925 (E.D. Va. 2017) (citations omitted).  Where there are multiple defendants and claims, venue must be proper as to each.  *Newbauer v. Jackson Hewitt Tx Serv. Inc.*, No. 2:18cv679, 2019 WL 1398172, at *4-5 (E.D. Va. Mar. 28, 2019).  The district court "shall dismiss" a case laying venue in the wrong district or transfer it to a district in which it could have been brought.  28 U.S.C. § 1406(a). Where a plaintiff's venue choice is "an attempt at forum-shopping," this Court has found that "dismissal is the appropriate result."  *Punchbowl, Inc. v. AJ Press LLC*, No. 1:21-cv-00136, 2021 WL 1178070, at *3 (E.D. Va. Mar. 26, 2021) (citation omitted).[15]  Like in *Punchbowl*, Blenheim is transparently forum-shopping to avoid statutes of limitation.  No party resides in Virginia, nor did the allegedly tortious conduct occur there.  Venue is improper and dismissal should result.

Under 28 U.S.C. § 1391(b)(2), venue is proper where "a substantial part of the events or omissions giving rise to the claim occurred."  In assessing venue, a court should "review the entire sequence of events underlying the claim."  *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (internal quotation marks and citation omitted).  However, courts "take seriously the

---

[13]  For the same reasons, no personal jurisdiction exists over Blenheim's conspiracy and unjust enrichment claims.  *See, e.g.*, *Willis v. Clark*, No. 3:05CV325, 2005 U.S. Dist. LEXIS 25877, at *7-8 (E.D. Va. Oct. 31, 2005) (no personal jurisdiction over common law fraud and civil conspiracy allegations under Va. Code § 8.01-328.1(A)(3) where "Plaintiff cannot establish that Defendants caused tortious injury while present in the Commonwealth of Virginia").

[14]  Lockheed Martin also joins the personal jurisdiction section of Airbus' Motion to Dismiss.

[15]  *See Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1201 (4th Cir. 1993) (dismissal appropriate where plaintiff's attorney "could reasonably have foreseen that the forum in which he/she filed was improper").

adjective 'substantial.'" *Newbauer*, 2019 WL 1398172, at *8 (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005)).  Events or omissions "that might only have some tangential connection with the dispute in litigation are not enough."  *Id.* (quoting *CMA CGM (Am.), LLC v. RLI Ins. Co.*, No. 12-cv-03306, 2013 WL 588978, at *2 (D. Md. Feb. 13, 2013)).  Rather, "*significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question[.]"  *Gulf Ins. Co.*, 417 F.3d at 357 (substantial part test requires more than minimum contacts test employed in personal jurisdiction inquiries); *Greenberry's Franchising Corp. v. Park*, No. 3:10-cv-00045, 2010 WL 5141285, at *4 (W.D. Va. Dec. 10, 2010) (dismissing where tortious conduct occurred elsewhere if at all).[16]

Blenheim alleges that venue is proper in Virginia under §§ 1391(b) and (f) because "a substantial part of the events giving rise to the claim occurred in th[is] district."  FAC ¶ 38.  The factual allegations in the FAC demonstrate, however, that *none* of the key events occurred in Virginia.  To the contrary, Blenheim's claims all center on disputes concerning the Project Archer transaction that occurred outside of the Commonwealth.  In fact, Blenheim's FAC admits that: (1) the alleged interference inducing or causing the alleged breach or termination of the IBA, SPA, or Blenheim's business expectancy occurred in Texas, France, England, Maryland, and South Korea, *id.* ¶¶ 83, 109, 111, 114-17, 120, 122-25, 127-28, 133, 136, 146-47; (2) all of the parties are located outside Virginia, *id.* ¶¶ 16-20; (3) the IBA Project Archer amendments and revisions, and the SPA, were negotiated and executed in Maryland, England, and France, *id.*

---

[16] *See also Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:09CV793, 2010 WL 2613323, at *11 (E.D. Va. June 29, 2010), *aff'd*, 666 F.3d 205 (4th Cir. 2011) (venue improper because no actions in the district "g[ave] rise to the [breach of contract] claim"; and finding plaintiff failed to explain how the Pentagon's "generally described and unquantifiable" role gave rise to the claims asserted); *Power Paragon, Inc. v. Precision Tech. USA, Inc.*, 605 F.Supp.2d 722, 726 (E.D. Va. 2008) (improper venue under § 1391(a)(2) where negotiation and execution of a contract, delivery and manufacture of a product, and performance all took place outside the district).

¶¶ 49, 59-61, 64, 71-73, 78-80, 129, 146-47; (4) Blenheim's alleged business expectancy was developed in England where Blenheim is located and through the IBA and SPA, *id*. ¶¶ 203-04; 224; and (5) all parties' performance obligations were in England, Maryland, or France, *id*. ¶¶ 36, 74, 76, 101, 104.  In short, venue would sooner be proper anywhere *but* here.

As noted above, the only events that Blenheim alleges involve some contact with Virginia—several of which it failed to raise in its original complaint—are not at all a "substantial" part of the events giving rise to Blenheim's claims.  Blenheim cites the FMS sale between South Korea and the U.S. DoD, *id*. ¶¶ 29, 32, 34-35, 40, 45, 173-75, but cannot show that transaction is material to claims of interference with the Project Archer agreements.[17]  *See, e.g.*, *Newbauer*, 2019 WL 1398172, at *8 (tangential connection with the claims "not enough" to confer venue); *MTGLQ Invs., L.P. v. Guire*, 286 F.Supp.2d 561, 565 (D. Md. 2003) (distinguishing factual background from the elements of an action relevant to the "substantial part" test).[18]  Nor could the allegation (*id*. ¶¶ 36, 185) that "Airbus France sought and received the import and launch approvals from DoD" for the 2020 satellite launch, years after the alleged tortious conduct, give rise to its claims.[19]  And Blenheim's passing assertion (*id*. ¶ 182) that South Korea came to Virginia, once, to negotiate "concerning" the direct procurement of the military satellite hardly provides a basis for venue.

---

[17]  Blenheim concedes that the DoD was not responsible for the offset transaction.  *Id*. ¶ 46. DoD does not administer offset agreement obligations, and "the decision whether to engage in offsets, and the responsibility for negotiating and implementing offset arrangements, reside with the companies involved."  48 C.F.R. § 225.7303-2(a)(3) (2019); 48 C.F.R. § 225.7306 (2019).

[18]  Blenheim also cites Lockheed Martin's alleged lobbying of the DoD regarding application of offset costs within FMS transactions, FAC ¶¶ 35, 89; but this, too, has no bearing on Blenheim's claims.  *Cf. Flexible Benefits Council v. Feltman*, No. 1:08CV371, 2008 WL 2465457, at *4 (E.D. Va. June 16, 2008) (petitioning government is irrelevant to personal jurisdiction analysis).

[19]  *See, e.g.*, *L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 93 (4th Cir. 2019), *reh'g denied* (July 16, 2019) (tortious interference claim accrues at breach or termination of the relationship and conspiracy accrues when plaintiff suffers an injury giving rise to the underlying tort claim).

Because Blenheim's own allegations demonstrate that a substantial part—if not all—of the events giving rise to its claims occurred *outside* Virginia, all claims against Lockheed Martin must be dismissed.  *Punchbowl*, 2021 WL 1178070, at *3 (dismissing for improper venue); *Lawson v. Merscorp Holdings, Inc.*, No. 1:18-cv-640, 2018 WL 10156105, at *1 (E.D. Va. Oct. 24, 2018) (dismissing for improper venue even if the court had personal jurisdiction).

## IV.   Blenheim's Claims Against Lockheed Martin Must Be Arbitrated

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, provides "a congressional declaration of a liberal federal policy favoring arbitration agreements[.]"  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  Where parties consent to an enforceable agreement to arbitrate and their dispute falls within that agreement, the court must compel arbitration.  *Murray v. United Food & Com. Workers Int'l Union*, 289 F.3d 297, 301 (4th Cir. 2002).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]"  *Moses*, 460 U.S. at 24-25.  "Dismissal is the appropriate remedy when all claims in a case are governed by an enforceable arbitration agreement."  *HCI Techs., Inc. v. Avaya, Inc.*, 446 F.Supp.2d 518, 525 n.4 (E.D. Va. 2006) (citing *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001)).

In the IBA, Blenheim and Lockheed Martin agreed to the following arbitration clause:

> *Any dispute, controversy or claim between the Parties arising out of or in connection with this Agreement shall be finally settled by arbitration* in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce . . . *The arbitrators shall have the power to rule on their own jurisdiction, including whether or not the claims asserted are arbitrable. This Paragraph shall survive any termination or expiration of this Agreement and shall apply to any dispute, controversy or claim relating to events or occurrences occurring (or alleged to have occurred) prior to such termination or expiration.*

Ex. 3A at 2 (Oct. 21, 2013) (emphasis added).[20]   Such broad language applying to all claims that "arise out of" or "in connection with" the IBA gives it an "expansive reach." *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996).   The IBA expresses the material terms and relationships at issue in Project Archer, including Airbus' role as the satellite manufacturer.   *See* FAC ¶¶ 49, 76-77.   As such, the IBA bears a significant relationship to all of Blenheim's claims against Lockheed Martin, each of which is centered on Project Archer, Lockheed Martin's alleged failures to perform on the project, and alleged interference with Blenheim's SPA with Airbus.   That Blenheim's claims primarily sound in tort, not contract, is of no moment.   *See Am. Recovery Corp.*, 96 F.3d at 94 (tortious interference claims bearing a "significant relationship" to the agreement were arbitrable, even if arising out of a second contract); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 319-20 (4th Cir. 1988) (affirming arbitration referral of tortious interference with contract claims).

Should Blenheim dispute whether its claims are arbitrable, the IBA "clearly and unmistakably" requires that question to be decided by the arbitrators, not the court.   Ex. 3A at 2 (providing authority to decide arbitrability); *see, e.g., Terra Holding GmbH v. Unitrans Int'l, Inc.*, 124 F.Supp.3d 745, 748-49 (E.D. Va. 2015) (finding "clear and unmistakable" standard to delegate arbitrability question to arbitrator was met when parties included explicit language to that effect).   In sum, the IBA's arbitration clause requires dismissal of all claims against Lockheed Martin.   *HCI Techs.*, 446 F.Supp.2d at 525 n.4.

---

[20]   Lockheed Martin, as the parent of wholly-owned subsidiary Lockheed Martin Overseas Corporation ("LMOC"), may enforce the IBA arbitration clause to compel arbitration where LMOC was the signatory and where, as here, the claims rely on the terms of the agreement. *See, e.g., GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S.Ct. 1637, 1643-44 (2020); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416-18 (4th Cir. 2000) (collecting cases); *Blumenthal-Kahn Elec. Ltd. v. Am. Home Assurance Co.*, 236 F.Supp.2d 575, 582 (E.D. Va. 2002).

## V.     Blenheim's Claims Must Be Dismissed Under the IBA's Forum-Selection Clause

In the alternative to the IBA's arbitration clause, the IBA's Undertaking also contains a forum selection clause that required Blenheim to file its claims in Maryland, not here.  Ex. 1A ¶ 20 ("The exclusive forum for the resolution of any and all disputes arising out of or in connection with this Undertaking shall be the US Federal District Court located in the City of Baltimore, State of Maryland, USA.").[21]  A forum-selection clause should be given controlling weight over the plaintiff's choice of forum "in all but the most exceptional cases."  *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013).

Forum-selection clauses are appropriately extended to tortious interference, unjust enrichment, and conspiracy claims sufficiently related to a contract between the parties or where contractual language demonstrates that the provision extends to tort as well as contractual claims. *See Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.2d 804, 806 (Va. 1990) (extending forum selection clause to tortious interference and conspiracy claims); *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F.Supp.3d 462, 466 (E.D. Va. 2016) (applying forum-selection clause to contractually-based tort claims); *Freedman v. Am. Online, Inc.*, 325 F.Supp.2d 638, 653 (E.D. Va. 2004) (same).  Again, that test is met here.

Accordingly, if the IBA's overarching arbitration provision does not control, the forum-selection clause in the Undertaking requires that Blenheim's claims be filed in Maryland federal court.  The Court should therefore dismiss them.

---

[21] The forum selection clause appears in an "Undertaking" executed in June of 2015, and is an attachment to the IBA assigning certain of Blenheim's rights and obligations to its affiliate Special Purpose Vehicle ("SPV").  Ex. 5 at Undertaking.  While the IBA's arbitration clause is controlling, whether by that provision or by Undertaking's forum selection clause, the case is not appropriately filed here.  And, regardless, Maryland law, as controlling precedent under either scenario, dictates that the case is time-barred given the three-year limitations period under Maryland law for the torts Blenheim has alleged.  *See* Md. Code, *Cts. & Jud. Proc.* § 5-101.

## VI.   The FAC Fails to State a Claim Under Rule 12(b)(6)[22]

To adequately state a claim, a complaint must be plausible on its face.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  "[T]he complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'"  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 680).  "[F]acts that are '"merely consistent with' a defendant's liability . . . 'stop[ ] short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  In reviewing a complaint, the Court need not accept legal conclusions, unwarranted inferences, or unreasonable conclusions.  *Nemet*, 591 F.3d at 253 (citation omitted).

A district court entertaining pendent state claims follows the choice of law rules of the forum state.  *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F.Supp.2d 385, 390 n.6 (E.D. Va. 2002).  Virginia courts apply *lex loci delicti*, the law of the place of the wrong, to tort actions.  *Milton v. IIT Rsch. Inst.*, 138 F.3d 519, 521 (4th Cir. 1998).  The place of the wrong is "the place the last event necessary to make an actor liable for an alleged tort takes place."  *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F.Supp.2d 850, 856 (E.D. Va. 2013) (alterations, internal quotation marks, and citations omitted).

---

[22] In addition to the arguments below, the FAC is deficient as an improper shotgun pleading and should be dismissed for that reason as well.  *See, e.g.*, *Sewraz v. Morchower*, No. 3:08CV100, 2009 WL 211578, at *1 (E.D. Va. Jan. 28, 2009) (dismissing where the causes of action "are all 'shotgun pleadings' by which each count incorporates by reference the allegations of its predecessors."); *see also Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015) (stating that the most common type of improper shotgun pleading is a complaint containing multiple counts where each count adopts the allegations of all preceding counts).

In this case, the *lex loci delicti* for the claims against Lockheed Martin is presumably

Maryland, its principal place of business, and the applicable law in the IBA.  Ex. 1A ¶ 15.

Because Blenheim brought this action in Virginia and claims violations of Virginia statutes,

Lockheed Martin also cites Virginia law.  Either way, Blenheim's claims fail to state a claim.

*See Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*, 533 F. App'x 200, 207 (4th Cir. 2013)

(declining to decide choice of law because tort claims failed irrespective of state law applied).

### A.    The IBA's Limitation of Liability Clause Precludes Blenheim's Claims

In the IBA, the parties agreed to the following, express Limitation of Liability clause:

> LMOC's liability for costs or damages allegedly incurred by BROKER
> arising out of, or in connection with, BROKER's performance of its duties
> under this Agreement shall be strictly limited to broker fees which may be
> deemed owing . . . In no event shall either party be liable for lost profits, or
> any other consequential, indirect, incidental, or punitive damages arising
> out of, or in connection with, claims made against it by the other party,
> whether such claims are alleged to arise in contract or in tort.

Ex. 1A ¶ 7.  In the IBA, Blenheim agreed that Lockheed Martin's liability for damages arising

out of or in connection Project Archer, *regardless of whether sounding in contract or tort*, is

"strictly limited to broker fees which may be deemed owing." *Id*.  Blenheim concedes that it

received the Phase One Payment and does not allege that it met any of the multiple conditions

precedent to receive the Phase Two Payments, after which point Lockheed Martin availed itself

of its right to terminate the IBA.  Even if Blenheim could state a claim, the IBA limitation

clause's repudiation of any damages or lost profits would nullify it.  The plain language of the

IBA precludes Blenheim's claims and prayer for relief.[23]

---

[23]  *Cf. Regency Photo & Video, Inc. v. Am. Online, Inc.*, 214 F.Supp.2d 568, 573-74 (E.D. Va. 2002) (enforcing limitation of liability); *see also Size, Inc. v. Network Sols., Inc.*, 255 F.Supp.2d 568, 574 (E.D. Va. 2003) (granting motion to dismiss where a limitation of liability clause precluded potential damages award sufficient to meet the threshold for diversity jurisdiction).

**B.      Counts I and II Should Be Dismissed Because Blenheim Has Not Adequately Alleged Tortious Interference Against Lockheed Martin**

Blenheim alleges two counts of tortious interference, one with contract and the other with business expectancy.  Both lack merit.  To state a claim for tortious interference, a plaintiff must allege: "'(1) a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy by the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.'"  *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014) (quoting *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)); *TKA Inc. v. Bowers*, No. 1185, 2019 WL 517209, at *5 (Md. Ct. Spec. App. Feb. 11, 2019) (citing *Brass Metal Prods., Inc. v. E-J Enters., Inc.*, 984 A.2d 361, 383 (Md. Ct. Spec. App. 2009); *Abbott v. Gordon*, No. DKC 09-0372, 2009 WL 2426052, at *5 (D. Md. Aug. 6, 2009) (citing *Blondell v. Littlepage*, 968 A.2d 678 (Md. Ct. Spec. App. 2009)).  Virginia also requires a plaintiff to allege a fifth element: "a competitive relationship between the party interfered with and the interferor."  *17th St. Assocs., LLP v. Markel Int'l Ins.* Co., 373 F. Supp. 2d 584, 600 (E.D. Va. 2005) (collecting cases).  The intentional interference prong requires (1) intent, (2) interference, (3) breach or termination, and, importantly, (4) causation.  *Ass'n for Supervision & Curriculum Dev., Inc. v. Int'l Council for Educ. Reform & Dev., Inc.*, No. 1:10cv74, 2011 WL 1225750, at *9 (E.D. Va. Mar. 14, 2011); *see Tower Oaks Blvd., LLC v. Va. Com. Bank*, 223 Md. App. 781, at *5 (2015); *Tribalco, LLC v. Hue Tech., Inc.*, No. CIV. JFM-11-935, 2011 WL 3821074, at *8 (D. Md. Aug. 26, 2011).[24]

Blenheim alleges that Lockheed Martin "interfere[d] with and induce[d] breach of the

---

[24]  Maryland law also specifies that the plaintiff must show that the defendant's conduct was "without justification."  *TKA*, 2019 WL 517209, at *5.

SPA" by: (1) "misrepresent[ing] the status of funding it had received from the Pentagon to create artificial and harmful delays in the progression of Project Archer under the SPA[;]" (2) "exclud[ing] Blenheim from Project Archer meetings with Airbus France and engag[ing] in secret meetings with Airbus France in order to conspire with Airbus France to pursue a direct procurement arrangement . . . without Blenheim's involvement[;]" (3) "caus[ing] LMOC to wrongfully impose Revision 2, which created new conditions on future payments of IBA fees to Blenheim[;]" (4) "impos[ing] further conditions on Blenheim . . . as a basis for refusing to release the Phase Two payment on July 31, 2015; (5) "induc[ing] Airbus France to pursue a direct procurement arrangement by promising it greater advantage than it could obtain under its existing contractual arrangement with Blenheim[;]" and (6) "convinc[ing] South Korea to support a direct procurement arrangement."  FAC ¶ 193.

None of these allegations support a plausible claim for tortious interference.  To the contrary, they highlight Blenheim's transparent attempt to turn what is (if anything) a contract matter into a tort case.  Blenheim tellingly avoids mentioning its own nonperformance in addressing Lockheed Martin's termination of the IBA, which in turn rendered the SPA with Airbus obsolete.  Blenheim does so because these facts demonstrate that Lockheed Martin's actions were intended not to harm Blenheim but to mitigate the damages from Blenheim's failure to deliver its offset obligation.  They further undermine the alleged causal link between the so-called tortious conduct and Airbus' legitimate termination of the SPA.  Lockheed Martin's contractual actions provide an "obvious alternative explanation" for what Blenheim labels tortious conduct.  *See Twombly*, 550 U.S. 568.

### 1.   Lockheed Martin Is No Stranger to the Business Relationship Here

Blenheim's tortious interference claims fail at the outset because Lockheed Martin is a party to the overall contractual relationship among Airbus, Blenheim, and Lockheed Martin—the

Project Archer offset transaction.  Tortious interference does not lie where a plaintiff pleads facts

demonstrating that the defendants were "part of the same series of related agreements that,

together, would constitute a single transaction."  *Cole v. Daoud*, No. 2:15cv419, 2016 WL

11410410, at *7 (E.D. Va. Feb. 17), *report & recommendation adopted*, 2016 WL 1213230

(E.D. Va. Mar. 24, 2016).  The "single transaction" concept derives from the well-established

proposition that a party cannot intentionally interfere with its own contract.  *Francis Hosp., Inc.*

*v. Read Props., LLC*, 820 S.E.2d 607, 610 (Va. 2018) ("An action for tortious interference with a

contract or business expectancy . . . does not lie against parties to the contract, but only lies

against those outside the contractual relationship, i.e., strangers to the contract or business

expectancy."); *see also Fox v. Deese*, 362 S.E.2d 699 (Va. 1987); *L-3 Commc'ns*, 926 F.3d at 91-

92 ("[O]nly a party outside the contractual or business-expectancy relationship with the plaintiff

may be held liable as an interferor."); *Wilmington Tr. Co. v. Clark*, 424 A.2d 744, 754 (Md.

1981); *see also Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260,

269-70 (Md. 1994) (Maryland courts have "refused to adopt any theory of tortious interference

with contract or with economic relations that 'converts a breach of contract into an intentional

tort.'") (quoting *K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 981 (Md. 1989)).

 In *Cole*, although there were multiple agreements at issue, the defendants were all "party

to the same contractual relationship" and that "series of related agreements" constituted a single

"contractual relationship and/or expectancy" that was the relationship "underlying [plaintiff's]

tortious interference claim."  2016 WL 11410410, at *7-8.  As a result, the court held that "while

these defendants may have breached, failed to perform or violated corporate duties, none of them

could have 'interfered with' [plaintiff's] contract."  *Id.* at *8 (citation omitted); *see also Hallinan*

*v. Republic Bank & Tr. Co.*, No. 06 Civ. 185, 2006 WL 1495232, at *5 (S.D.N.Y. June 1, 2006)

("To determine if multiple contracts constitute a single agreement for purposes of tortious interference, all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even though they were not all between the same parties.") (alterations, quotation marks, and citation omitted).

Cole and Hallinan are instructive here.  Blenheim's allegations concede that the IBA and the SPA are interrelated agreements making up the overarching Project Archer offset transaction to provide a military satellite to South Korea.  Indeed, the agreements specifically refer to each other.  See, e.g., FAC ¶ 8 ("Project Archer would create significant benefits for four parties."); id. ¶ 10 ("The purpose of this transaction was to create a long-term and mutually beneficial collaboration to accomplish the parties' respective goals."); id. ¶ 72 (Blenheim-Airbus teaming agreement for satellite production); id. ¶ 77 (four-party NDA re Project Archer); id. ¶¶ 78, 103 (Blenheim-Airbus SPA references Lockheed Martin's IBA); id. ¶¶ 88, 111 (IBA references the SPA); see also Exs. 1A and Airbus Ex. 5.  Because Lockheed Martin was a party to the same overall relationship that is the subject of the SPA between Airbus and Blenheim, it could not have tortiously interfered with the SPA.  See Cole, 2016 WL 11410410, at *8 (parties to same overall transaction could not tortiously interfere with plaintiff's contract even if they breached their respective agreements or violated duties); Hallinan, 2006 WL 1495232, at *5 (same).

Blenheim's additional claim, (FAC ¶ 154-55, 198), that Lockheed Martin intentionally interfered with its own IBA, fails for the same reasons.  See L-3 Commc'ns, 926 F.3d at 91-92.  Indeed, the notion that Lockheed Martin interfered with its subsidiary's contract makes no sense at all.  See FAC ¶¶ 5, 18 (LMOC is wholly-owned subsidiary of Lockheed Martin).  Even at face value, a parent company can only tortiously interfere with a subsidiary's contract when "the interference is 'contrary to the subsidiary's economic interest or . . . employs wrongful means.'"

*Tech. & Supply Mgmt., LLC v. Johnson Controls Bldg. Automation Sys., LLC*, No. 1:16-cv-303, 2017 WL 57134, at *5 (E.D. Va. Jan. 4, 2017) (quoting *Glasson v. Children's Surgical Specialty Grp., Inc.*, 73 Va.Cir. 480, at *1 (2007)).  Demonstrating wrongful means requires a showing of independently illegal or tortious conduct or conduct that goes against industry practices.  *See Dunn*, *McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011).  No factual allegations support this far-fetched claim.  To the contrary, the termination of the IBA was a contractually-available remedy that freed Lockheed Martin from making further payments to a party, Blenheim, that had failed to satisfy the conditions precedent to the Phase Two payments.

## 2.   **Lockheed Martin's Contractual Actions Do Not Support a Tort Claim**

Blenheim's tortious interference claims also fail because they rely on actions authorized by the IBA.  "[W]hen a defendant is 'engaged in the lawful exercise of [its] statutory and contractual rights which incidentally may have interfered with the [plaintiff's] private negotiations[, such conduct] is not actionable and will not support recovery for tortious interference with contractual relations.'"  *Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 144 (4th Cir. 2014) (citation omitted); *Spengler v. Sears, Roebuck & Co.*, 878 A.2d 628, 642 (Md. Ct. Spec. App. 2005) (Maryland courts have "declined to recognize that there exists such a wrongful act when there is merely a breach of contract that has an incidental effect on the plaintiff's business relations with third parties") (quoting *Volcjak v. Wash. Cnty. Hosp. Ass'n*, 723 A.2d 463, 479 (Md. Ct. Spec. App. 1999)).  Lockheed Martin's exercise of its contractual rights under the IBA—from payment terms to termination—cannot be an "improper method" of interference for a tort suit.  *Priority Auto Grp.*, 757 F.3d at 144; *see also Zamma Canada Ltd. v. Zamma Corp.*, No. 3:20cv353, 2020 WL 7083940, at *3-4 (E.D. Va. Dec. 3, 2020) (same).

For instance, Blenheim claims that Lockheed Martin "misrepresented the status of funding it had received from the Pentagon to create artificial and harmful delays in the

progression of Project Archer under the SPA." FAC ¶ 193. But the "delays" Blenheim posits are none other than the IBA's payment schedule and milestones to ensure progress of Project Archer. Blenheim *expressly agreed* to them. *See, e.g.*, *id.* ¶¶ 85, 88, 115-16, 121; Ex. 5 at 7. Blenheim's conclusory assertion of harm from "artificial delays" is belied by its plain agreement to the payment schedule in the IBA.[25]

### 3. Blenheim's Allegations of Intentional Interference Are Implausible and Fail to Establish Intent, Interference, or Causation

Blenheim's claims are also subject to dismissal because they are based on inconsistent, inaccurate factual allegations, and fail to plausibly demonstrate the intent, interference, or causal link required. *See, e.g.*, *SecureInfo Corp. v. Telos Corp.*, 387 F.Supp.2d 593, 617 (E.D. Va 2005) (Rule 8 does not permit plaintiff to allege inconsistent factual allegations in same claim); *see also Feeley v. Total Realty Mgmt.*, 660 F.Supp.2d 700, 708, 710 (E.D. Va. 2009) (granting motion to dismiss because allegations were "simply implausible" and "flawed on [their] face").

**First,** Blenheim claims that "Lockheed misrepresented the status of funding it had received from the Pentagon to create artificial and harmful delays in the progression of Project Archer under the SPA." FAC ¶¶ 193, 101. As stated above, this ignores that Blenheim agreed to the payment terms it now calls "delays." But the allegation is also implausible because, accepting the allegations as true, this means that Lockheed Martin made the initial $45 million payment at the same time that it was intentionally jeopardizing an offset transaction that was a critical component of the company's $7 billion sale of F-35 jets to South Korea, even though

---

[25] At most, Blenheim alleges that Lockheed Martin made the Phase I payment two weeks late. *Id.* ¶ 101. There is no basis for attributing this to Airbus' termination of the SPA. Further, that Lockheed Martin *made* the payment ($45 million) renders implausible any suggestion that its timing was intended as interference. Moreover, Blenheim's recourse for this "delay," if anything, was to assert a breach of contract, not to accept the payment and claim tortious interference nearly six years later. *Priority Auto Grp.*, 757 F.3d at 144 (proper recourse for dispute with a defendant's exercise of a contractual right is an action in contract, not tort).

Lockheed Martin had no direct procurement "plan" in place with Airbus.  *See id.* ¶ 57.  That is simply not plausible.  *See Twombly*, 550 U.S. at 556.

In any event, Blenheim fails to connect Lockheed Martin's "delayed" payment with Blenheim's issues related to the SPA.  Instead, Blenheim asserts that it was not actually delays by Lockheed Martin but Airbus' inability to obtain internal approvals that led to Blenheim's failure to provide term sheets to Lockheed Martin and delayed progress.  FAC ¶ 118; *see also id*. ¶¶ 103, 113.  Blenheim's own allegations undermine causation.  *See Goulmamine v. CVS Pharmacy, Inc.*, 138 F.Supp.3d 652, 672-73 (E.D. Va. 2015) (dismissing tortious interference claim for failure to "plead facts that show that [defendant]'s conduct was the cause of the loss alleged"); *Lyon v. Campbell*, 707 A.2d 850, 861-63 (Md. Ct. Spec. App. 1998) (reversing verdict finding tortious interference where plaintiffs failed to show causation of alleged loss).

**Second**, Blenheim alleges that Lockheed Martin conducted "secret meetings" in order "to conspire with Airbus France to pursue a direct procurement arrangement" and speculates that it "induced Airbus France to pursue a direct procurement by promising it greater advantage than it could obtain under its existing contractual arrangement with Blenheim."  *Id*. ¶ 193.  But Blenheim does not explain how a procurement for one satellite instead of three was of "greater advantage" to Airbus.  Nor does Blenheim's allegation that Lockheed Martin asked Airbus "to guarantee that it would deliver the military satellite regardless of Blenheim's status" support its desired conclusion.  *Id.* ¶ 109.  It is hardly improper for Lockheed Martin to seek an alternative in the event that Blenheim defaulted, having failed to produce any financing or insurance as required, and already in default on payments Blenheim owed to Airbus.

Nevertheless, Blenheim claims "on information and belief" that during the July 24-28 meetings, Lockheed Martin and Airbus "began in earnest to secretly discuss cutting Blenheim

completely out of the satellite transaction." *Id*. ¶ 114.  Such speculative, conclusory statements are insufficient under *Twombly* and *Iqbal*.  And having a meeting among partners to a project is not tortious conduct.  *See Wallace v. Baylouny*, No. 1:16-cv-0047, 2016 WL 3059996, at *7 (E.D. Va. May 31, 2016) (attendance at a meeting does not constitute tortious conduct without additional factual allegations).  Blenheim provides no information about anything unlawful being discussed and "without some further factual enhancement it stops short of the line between possibility and plausibility[.]"  *See Twombly*, 550 U.S. at 557.

Moreover, in light of Blenheim's failure to satisfy *any* of the milestone or conditions precedent to Phase Two payments under the IBA, including the financing critical to Project Archer, it was proper and lawful for Lockheed Martin to discuss an alternate path forward with Airbus.  *See Tysons Toyota, Inc. v. Commonwealth Life Ins*., 20 Va. Cir. 399 (1990) (economic self-interest does not sustain a conspiracy allegation).  Blenheim cannot show otherwise.

**Third**, Blenheim alleges that Lockheed Martin tortiously interfered by "caus[ing] LMOC to wrongfully impose Revision 2" and "impos[ing] further conditions on Blenheim . . . as a basis for refusing to release the Phase Two Payment on July 31, 2015[.]"  FAC ¶ 193.  As discussed above, Blenheim expressly agreed to the terms in Revision 2 and failed to satisfy the conditions necessary for Lockheed Martin to make any Phase Two payments.

**Fourth,** and finally, Blenheim claims that Lockheed Martin "convinced South Korea to support a direct procurement arrangement."  FAC ¶ 193.  But the FAC alleges the opposite:  that South Korea was not receiving information pertaining to the offset from Lockheed Martin, (*id*. ¶ 130); that "it now appears that South Korea . . . placed pressure on Lockheed and Airbus to proceed with a direct procurement," (*id*. ¶ 132); and that a DAPA official "demanded that 'LM must provide . . . direct funding to Airbus'" and "threatened LM Aero with press exposure" if it

did not concede, (*id.* ¶ 134).  In short, Blenheim unambiguously alleges that Lockheed Martin

had *no* role in "convincing" South Korea to support a direct procurement.  *See SecureInfo Corp.*,

387 F.Supp.2d at 617.  Nor does Blenheim plead that South Korea's "support" caused the

termination of the SPA or IBA.  *Goulmamine*, 138 F.Supp.3d at 672 (dismissing tortious

interference claim); *Lyon*, 707 A.2d at 863 ("causation evidence that is wholly speculative is not

sufficient") (citing *Myers v. Bright*, 609 A.2d 1182, 1186 (Md. 1992)).[26]

### 4.   Blenheim Fails to Allege Facts to Demonstrate That Lockheed Martin Tortiously Interfered with Any Business Expectancy

Count II, claiming tortious interference with business expectancy, fails for all the reasons

above.  It also fails because the "mere proof of a plaintiff's belief and hope" of a business

relationship or result is inadequate to sustain a tortious interference with business expectancy

cause of action.  *Southprint, Inc. v. H3, Inc.*, 208 F. App'x 249, 253 (4th Cir. 2006) (citing *Com.

Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 897 (Va. 1997)).  Rather, a plaintiff must

establish "a probability of future economic benefit, not a mere possibility."  *Id.*; *Baron Fin.

Corp. v. Natanzon*, 471 F.Supp.2d 535, 546 (D. Md. 2006) ("[P]laintiffs must identify a possible

future relationship which is likely to occur, absent the interference, with specificity.").

Blenheim's speculative aspirations fail to meet this threshold requirement.

Blenheim asserts that it "expected" to earn profits from the two commercial satellites

included in the Project Archer transaction.  *E.g.*, FAC ¶¶ 8, 62, 203-04.  But Blenheim fails to

identify a single, finalized contract or agreement with any entity related to the commercial

---

[26] Blenheim's tortious interference count also fails to demonstrate a competitive relationship between Lockheed Martin and Blenheim.  *See 17th St. Assocs.*, 373 F.Supp.2d at 600.  Indeed, Blenheim's own allegations refer to it as a "small," (FAC ¶ 2), company that is a "nascent competitor," (*id.* ¶ 153), and to Lockheed Martin as "a global security and aerospace company serving both U.S. and international customers with defense, civil, and commercial products and services," that is "one of the largest companies in the world," (*id.* ¶ 18).  Clearly, there is no actual or imagined competitive relationship between Blenheim and Lockheed Martin.

satellites. *See, e.g.*, *id.* ¶¶ 103-04, 111-12, 162-64, 203. In fact, Blenheim cannot even allege that it obtained the financing term sheets or met its other obligations under the Project Archer agreements that were critical prerequisites to the commercial satellites being manufactured or procured in the first place. *See, e.g.*, *id.* ¶¶ 88, 111. Moreover, Blenheim makes an unsupported, conclusory leap in asserting that being "cut out" of Project Archer somehow prevented it from obtaining a commercial satellite by any other means such that it was altogether thwarted from any theoretical business expectancy it hoped to create.

At best, Blenheim alleges that it "had engaged in significant negotiations with Malaysia to provide orbital slots to Blenheim and to purchase the communications capacity of both commercial satellites involved in Project Archer," "had also engaged in significant negotiations with a [unidentified] sovereign-owned satellite communications provider to combine the Malaysian orbital slots[,]" and that "these negotiations had progressed to the point of a draft Memorandum of Agreement having been transmitted to the sovereign nation." *Id.* ¶ 160. Even at face value, these allegations are a concession that Blenheim had no more than a "mere possibility" of future economic benefit. *Com. Bus. Sys., Inc.*, 484 S.E.2d at 897; *see McDonald's Corp. v. Turner-James*, No. 05CV804, 2005 WL 7873649, at *5 (E.D. Va. Nov. 29, 2005) ("potential" buyers insufficient to demonstrate expectancy); *Baron Fin.*, 471 F.Supp.2d at 546 (alleging "some future business [plaintiff] might have" is insufficient); *NorthStar Aviation, LLC v. Alberto*, 332 F.Supp.3d 1007, 1019 (E.D. Va. 2018) (expectancy was not "reasonably certain"). In sum, Blenheim's tortious interference claims must be dismissed.

### C.   Counts VIII and IX for Civil and Statutory Conspiracy Fail

Blenheim's two conspiracy counts also fail to state a claim. FAC ¶¶ 260-69. Common law conspiracy in Virginia and Maryland requires (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act through unlawful means; and

(3) resulting injury to the plaintiff. *Firestone v. Wiley*, 485 F.Supp.2d 694, 703 (E.D. Va. 2007);

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F.Supp.2d 675, 696 (D. Md. 2012).

Statutory conspiracy in Virginia requires (1) a combination of two or more persons "for the

purpose of willfully and maliciously injuring the plaintiff in his business[;]" and (2) resulting

damage. *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F.Supp.2d 610, 618 (E.D. Va. 2009).

First, Blenheim's statutory claim fails at the outset because "none of the acts on which

the claim arises occurred in Virginia." *Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*, 893

F.Supp.2d 761, 777-80 (E.D. Va. 2012), *aff'd*, 533 F. App'x 200 (4th Cir. 2013) ("the Virginia

Business Conspiracy Act is powerless to proscribe commercial activity allegedly constituting a

business conspiracy where, as here, that activity took place entirely outside Virginia").

Second, both conspiracy claims fail because Blenheim fails to plead an underlying

wrong—here, tortious interference.  "[W]here 'there is no actionable claim for the underlying

alleged wrong, there can be no action for civil conspiracy based on that wrong.'" *Firestone*, 485

F.Supp.2d at 703 (citation omitted); *see also William v. AES Corp.*, 28 F.Supp.3d 553, 574 (E.D.

Va. 2014) (dismissing conspiracy claim for failure to allege tortious interference); *Fare Deals,*

*Ltd. v. World Choice Travel.Com, Inc.*, 180 F.Supp.2d 678, 692 (D. Md. 2001) (same).

Third, for both counts, a plaintiff must "allege that the defendants combined together to

effect a 'preconceived plan and unity of design and purpose.'" *Bay Tobacco, LLC v. Bell*

*Quality Tobacco Prods., LLC*, 261 F.Supp.2d 483, 499 (E.D. Va. 2003) (no conspiracy where

plaintiff alleged "certain actions" by one defendant and "others" by another defendant but no

improper actions in concert); *Schlegel v. Bank of Am., N.A.*, 505 F.Supp.2d 321, 325-26 (W.D.

Va. 2007) ("Concerted action" means that a party "'combined, associated, agreed, mutually

undertook, or concerted together' with someone else in the injurious conduct.") (citation

omitted); *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 372 (Md. Ct. Spec. App. 1983) ("A plaintiff must establish 'a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'") (citation omitted); *Deckelbaum v. Cooter, Mangold, Tompert & Chapman, P.L.L.C.*, 292 B.R. 536, 541 (D. Md. 2003) (same). Blenheim's FAC does not meet this standard.

Blenheim claims that from July 24-28, 2015, Lockheed Martin and Airbus "began in earnest to secretly discuss cutting Blenheim completely out of the satellite transaction" and that Lockheed Martin "creat[ed] artificial and harmful delays in the progression of Project Archer under the SPA" in support of that "conspiracy." FAC ¶¶ 114, 193. Blenheim ignores that, far from any conspiratorial purpose, Lockheed Martin had an entirely legitimate reason to meet with Airbus—Blenheim's failure to provide financing to progress the offset transaction. And, as noted above, the "delays" by Lockheed Martin (to the extent a contractual payment schedule could constitute a delay) occurred ***prior to*** these meetings with Airbus, and thus do not support any meeting of the minds. Finally, Blenheim provides no factual allegations that Lockheed Martin's direct procurement with Airbus was other than a legal act to deliver on Lockheed Martin's offset obligation to South Korea in spite of Blenheim's failures. None of this shows a preconceived plan to participate in tortious conduct. *See Skillstorm*, 666 F.Supp.2d at 618 ("[T]here can be no conspiracy to do an act the law allows.") (citation omitted).[27]

---

[27]  The allegations that Korea participated in an alleged conspiracy are even less plausible. Blenheim alleges that Korea sought "detailed information from Blenheim, which it was not receiving from Lockheed," (*id.* ¶ 91); that "DAPA could not understand the delays in satellite execution schedule," (*id.* ¶ 119); and that Korea "threatened LM Aero with press exposure" that it claimed would have had "significant negative impact on LM's other businesses," (*id.* ¶ 120). Blenheim also alleges that "a DAPA official told Blenheim that Lockheed's withholding of the funding for Project Archer . . . was 'kind of criminal.'" *Id.* ¶ 116. Blenheim's factual allegations show that what limited communication occurred between Lockheed Martin and South Korea reflected their arms-length positions, not any "meeting of the minds" to harm Blenheim.

Finally, Blenheim's statutory conspiracy claim fails because it has not plausibly alleged that Lockheed Martin acted with malice. *See id.* (legal malice requires "that the defendant acted intentionally, purposefully, and without lawful justification" to injure the plaintiff) (citing *Schlegel*, 505 F.Supp.2d at 326); *see also Simmons v. Miller*, 544 S.E.2d 666, 677 (Va. 2001) (plaintiff must prove by clear and convincing evidence that the conspirators acted with legal malice). Conspiracy, "like fraud, must be pleaded with particularity, and with more than mere conclusory language" to "prevent[] every business dispute [from] becoming a business conspiracy claim." *Schlegel*, 505 F.Supp.2d at 329 (citing *Gov't Emps. Ins. Co. v. Google, Inc.*, 330 F.Supp.2d 700, 706 (E.D. Va. 2004)). The FAC has no factual allegations that Lockheed Martin acted to purposefully injure Blenheim's reputation, trade, or business. Blenheim instead alleges that the parties sought to pursue a direct procurement arrangement to "boost their own profits," (FAC ¶ 153)—not to harm Blenheim's business. This alone defeats Blenheim's claim, as does the obvious conclusion that Lockheed Martin acted unilaterally and in its own interest to salvage its offset obligation to South Korea. The conspiracy counts fail.

### D.    Count X for Unjust Enrichment Fails

#### 1.    Blenheim's Unjust Enrichment Claim Is Untimely

In Virginia, the statute of limitations for an unjust enrichment claim is three years. *E. W. LLC v. Rahman*, 873 F.Supp.2d 721, 730 (E.D. Va. 2012); *Blankenship v. Consolidation Coal Co.*, 850 F.3d 630, 635 (4th Cir. 2017).[28] The limitation period "begins to run at the time the unjust enrichment occurred . . . not when a party 'knew or should have known' of the unjust enrichment." *Rahman*, 873 F.Supp.2d at 730; *Tao of Sys. Integration, Inc. v. Analytical Servs. &*

---

[28] Maryland also has a three-year statute of limitations. *See Jason v. Nat'l Loan Recoveries, LLC*, 134 A.3d 421, 429 (Md. Ct. Spec. App. 2016); *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F.Supp.3d 536, 555 (D. Md. 2019).

*Materials, Inc.*, 299 F.Supp.2d 565, 576 (E.D. Va. 2004) (accrual begins "at the moment defendants received a benefit . . . without paying for its value").

Blenheim claims that Lockheed Martin was unjustly enriched "by proceed[ing] to cut Blenheim out and secure a direct procurement."  FAC ¶ 272.  The FAC alleges that Lockheed Martin did not make any of the "Phase Two" payments to Blenheim under the IBA, the first of which was due on July 31, 2015.  *Id*. ¶¶ 116-18; Ex. 5 at 2.  Blenheim alleges that Lockheed Martin formally "cut[ ] Blenheim out" on October 6, 2016, (FAC ¶ 146), and it formally "proceed[ed] with a direct procurement" with Airbus in December 2016, (*see id*. ¶ 125).  Blenheim's unjust enrichment claim, therefore, accrued at the *latest* by the end of 2016, more than four years prior to Blenheim bringing its claim on December 31, 2020.  It is time-barred.

## 2.      The Unjust Enrichment Claim Is Precluded by an Express Contract

A claim for unjust enrichment cannot stand where there is an express contract governing the underlying transaction.  *See Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 166 (4th Cir. 2012) ("[T]he concept of an implied-in-law contract, or quasi contract, applies only when there is not an actual contract[.]"); *Nedrich v. Jones*, 429 S.E.2d 201, 207 (Va. 1993) (same); *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988) (same); *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000) ("unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists"); *FLF, Inc. v. World Publ'ns, Inc.*, 999 F.Supp. 640, 642 (D. Md. 1998) (same).

As set forth above, the Project Archer offset transaction that is the basis of Blenheim's claims is governed by multiple agreements between the parties, including the IBA between Blenheim and Lockheed Martin setting forth the terms with respect to the benefit that Blenheim was to confer upon Lockheed Martin through the offset transaction.  *See* Ex. 1A.  Because Blenheim's claim against Lockheed Martin is governed by the IBA, it fails as a matter of law.

**3.      Blenheim Did Not Confer a Benefit on
Lockheed Martin that Was Retained Without Payment**

Blenheim also fails to plead that it conferred a benefit on Lockheed Martin for which it was not compensated.  A plaintiff asserting unjust enrichment must show (1) it conferred a benefit on the defendant; (2) the defendant knew of the benefit and should have reasonably expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for it.  *Rosetta Stone*, 676 F.3d at 165-66; *State Farm*, 381 F.Supp.3d at 559 (same).

Even taking as true the allegation that Blenheim developed the idea for Project Archer, Blenheim's claim of unjust enrichment for a transaction it did not perform is implausible. Blenheim concedes that it did not provide the financing at the heart of Project Archer; in fact, Blenheim never even met the required conditions for *any* of the Phase Two payments under the IBA, milestones that far preceded the project's ultimate goal—delivery of the military satellite and the resulting offset credits from South Korea.  FAC ¶¶ 111-12.  Instead, Lockheed Martin had to take it upon itself to procure the military satellite directly from Airbus.  *See id.* ¶ 127. This alone renders Blenheim's claim implausible.  Blenheim further admits that Lockheed Martin *paid* Blenheim $45 million, with Blenheim retaining $25 million.  *Id.* ¶¶ 101, 104.  To the extent that Blenheim's "develop[ment of] the idea for Project Archer" (*id.* ¶ 272) conferred a benefit on Lockheed Martin, Blenheim has been handsomely compensated.  In fact, if there is any viable unjust enrichment claim here, it is for Blenheim to return the $25 million *it* has unjustly retained on a financing project to which it admittedly provided no financing.

For all of the above reasons, Blenheim's unjust enrichment claim should be dismissed.

**E.      Count V for Antitrust Violations Fails**

As noted above, Lockheed Martin joins and adopts Airbus' Motion to Dismiss arguments concerning the federal and state claims set forth in the FAC's new Count V.

## **CONCLUSION**

For the reasons set forth herein, Lockheed Martin respectfully requests that this Court

dismiss the First Amended Complaint with prejudice.

Dated:  June 18, 2021                                  Respectfully Submitted,

*/s/ Brian Tully McLaughlin*
Brian Tully McLaughlin, VA Bar No. 71258
Cheryl A. Falvey, *pro hac vice*
Astor H.L. Heaven, *pro hac vice*
Lyndsay A. Gorton, VA Bar No. 80409
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
BMcLaughlin@crowell.com
CFalvey@crowell.com
AHeaven@crowell.com
LGorton@crowell.com

*Counsel for Defendant Lockheed Martin
Corporation*

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of June 2021, I electronically filed the foregoing

Memorandum of Law in Support of Lockheed Martin Corporation's Motion to Dismiss using the

Court's NextGen CM/ECF system, which caused service on all counsel of record.

*/s/ Brian Tully McLaughlin*
Brian Tully McLaughlin, VA Bar No. 71258
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
BMcLaughlin@crowell.com

*Counsel for Lockheed Martin Corporation*
