IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| BLENHEIM CAPITAL HOLDINGS LTD., ET. AL.,<br><br>*Plaintiffs,*<br>v.<br><br>LOCKHEED MARTIN CORPORATION, ET AL.,<br><br>*Defendants.* | Civil Action No. 1:20-cv-1608<br>Hon. Liam O'Grady |

## ORDER

This matter comes before the Court on Defendant Lockheed Martin Corporation's Motion to Dismiss Plaintiffs' Amended Complaint, Dkt. 58, and on Defendant Airbus Defense Space and SAS's Motion to Dismiss Plaintiffs' Amended Complaint, Dkt. 66. The matter has been fully briefed, and the Court held a hearing on Wednesday, September 22, 2021. Based on the following analysis, both Motions to Dismiss are **GRANTED**.

## I. BACKGROUND

### A. The Parties

Plaintiff Blenheim Capital is a company based in Guernsey. Blenheim is an experienced broker in structuring offset agreements for defense trade transactions. Plaintiff Blenheim Holdings is the 100% owner of Blenheim Capital. Dkt. 53 at 7.

Defendant Lockheed Martin is a Maryland corporation. Lockheed is a global security and aerospace company serving both U.S. and international customers with defense, civil, and commercial products and services. It is one of the largest companies in the world. Dkt. 53 at 7.

Defendant Airbus Defense and Space SAS ("Airbus France") is a French company. It is a division of Airbus SE, a global leader in the defense and space industry. Dkt. 53 at 8.

Defendant Republic of South Korea ("South Korea") is a foreign sovereign state. Defendant Defense Acquisition Program Administration ("DAPA") is an executive agency of the South Korean government within the Ministry of National Defense. Dkt. 53 at 8. South Korea is a member of the Hague Convention and has not yet been served in this lawsuit.

### B. Statement of Facts

In a Foreign Military Sale ("FMS"), a domestic producer sells military goods to a foreign government, using the U.S. Department of Defense ("DoD") as an intermediary. Often, as part of an FMS transaction, the foreign purchaser will require the domestic partner to provide the foreign government with an "offset." In an offset transaction, the domestic producer is required to directly provide the foreign purchaser with goods or services that partially "offset" the foreign government's procurement expenditures. Dkt. 76-1 at 23. Prior to the events at issue in this case, Plaintiff Blenheim had amassed significant experience in the field of offset agreements, having structured offset solutions for more than twenty multinational corporations, which satisfied approximately $18.5 billion in offset obligations. Dkt. 76-1 at 23.

In the 1990's, Lockheed developed the F-35 fighter jet. In 2011, South Korea announced an intent to enhance its stealth-fighter capabilities, and Lockheed thus had an opportunity to sell, via the FMS process, a fleet of F-35s to South Korea. Dkt. 76-1 at 24-25.

Lockheed engaged Blenheim to develop an offset offer – titled "Project Archer." In Project Archer, Blenheim developed an offset transaction whereby Lockheed Martin Overseas Corporation ("LMOC") would provide South Korea with a military satellite. LMOC would provide $150 million to Blenheim, which Blenheim would then use, in combination with

financing, to procure three satellites. One of these satellites would be provided to South Korea to satisfy Lockheed's F-35 offset obligation. Blenheim would own the remaining two commercial satellites, and would sell their bandwidth for use in secure government communications. Dkt. 76-1 at 24. Blenheim expected this arrangement to result in excess of $500 million in profits. Dkt. 76-1 at 92.

Blenheim then conducted a bidding process to identify the optimal original equipment manufacturer ("OEM") partner for Project Archer. Ultimately, Blenheim selected Airbus England, an affiliate of Airbus SAS, as the OEM for Project Archer. On November 22, 2013, South Korea accepted Lockheed's bid, which included the Project Archer offset offer, to provide South Korea's new fighter jets. Dkt. 76-1 at 25. LMOC and Airbus England both signed contracts obligating them to participate in Project Archer. Dkt. 76-1 at 25.

Ultimately, Lockheed and Airbus SAS decided to cut Blenheim out of the deal. Dkt. 76-1 at 26. South Korea also began to pressure the Defendants into a direct-procurement, on the basis that it would accelerate receipt of the military satellite, and to offer inducements to Lockheed. Dkt. 76-1 at 29. On October 6, 2016, LMOC provided Blenheim with a purported "formal notice… of the immediate termination" of the contract ("the IBA") for cause. Dkt. 76-1 at 29. Lockheed, Airbus France, and South Korea proceeded with the military satellite procurement and worked to obtain the necessary approvals and permits from the Defense Security Cooperation Agency, the Federal Aviation Administration, and other government agencies to do so. Lockheed paid Airbus for the satellite and South Korea credited billions of dollars to Lockheed's offset obligation. Dkt. 53 at 43.

As Plaintiff Blenheim writes, "In the end, Lockheed, Airbus SAS, and South Korea all achieved their goals: Lockheed, at no additional cost to itself, offset its obligations to South

Korea and kept a competitor out the market; Airbus SAS kept its sale of the military satellite and kept a competitor out of the market; and South Korea received its military satellite. Only Blenheim, the party that spent years of effort and significant resources on Project Archer, was left with nothing." Dkt. 76-1 at 30.

## II. LEGAL STANDARD

In its Amended Complaint, Dkt. 53, Plaintiff Blenheim asserts two bases for subject matter jurisdiction pursuant to a federal question. First, Plaintiff Blenheim asserts that this Court has subject matter jurisdiction over claims against Defendants Lockheed and Airbus because Plaintiffs' claims for violations of 15 U.S.C. § 1 – the Sherman Act – arise under federal law. Dkt. 53 at 8. Second, Plaintiff Blenheim asserts that this Court has subject matter jurisdiction over claims against South Korea and South Korea's Defense Acquisition Program Administration (DAPA) pursuant to the Foreign Sovereign Immunities Act ("FSIA"). *Id.* Each of these bases for subject matter jurisdiction is addressed in turn.[1]

### A. Plaintiffs' Antitrust Claim

Plaintiff Blenheim fails to adequately assert an antitrust claim for two reasons. First, the antitrust claim falls outside the four year statute of limitations period and, second, the antitrust claim is barred by the Foreign Trade Antitrust Improvements Act ("FTAIA").

### 1. Statute of Limitations on Plaintiffs' Antitrust Claim

A federal antitrust claim "shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. The same four year statute of limitations applies to claims brought under Virginia's state antitrust law. Va. Code Ann. § 59.1-9.14.

---

[1] Defendant Lockheed Martin Corporation's Motion to Dismiss, Dkt. 58, argues that this Court lacks subject matter jurisdiction under the Foreign Sovereign Immunity Act. Defendant Airbus SAS's Motion to Dismiss, Dkt. 66, argues that this Court lacks subject matter jurisdiction under the Sherman Act. Each Defendant adopts the other's arguments on these fronts.

The four year statute of limitations period begins to run when the cause of action accrues, which "generally [begins] when a defendant commits an act that causes economic harm to a plaintiff." *GO Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 177 (4th Cir. 2007) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). In other words, "… discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555 (2000).

At the latest, Blenheim was aware of its alleged injury by October 6, 2016. This is the date on which Lockheed "provided Blenheim with a purported 'formal notice… of the immediate termination' of the IBA for cause," Dkt. 53 at 42, thereby causing economic injury to Blenheim.

Plaintiff Blenheim first filed its antitrust claim in the Amended Complaint on May 21, 2021. Dkt. 53. More than four years transpired between October 6, 2016 and May 21, 2021. Even Plaintiff Blenheim's original Complaint, Dkt. 1, which was filed on December 31, 2020 and which notably did not state an antitrust claim, also falls outside the four year statute of limitations period. Therefore, Blenheim is barred from bringing its antitrust claim under both federal and Virginia state law.

### 2. Plaintiffs' Substantive Antitrust Claim

In addition to being barred by the four year statute of limitations period on its antitrust claim, Plaintiff Blenheim fails to sufficiently allege an antitrust claim.

*a. Legal Standard*

Plaintiff Blenheim alleges antitrust violations against Defendants Lockheed and Airbus under 15 U.S.C. § 1 – the Sherman Act. The Sherman Act is a federal antitrust statute that prohibits activities that restrict interstate commerce and competition in the marketplace. It

provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal." 15 U.S.C. § 1.

The Sherman Act is limited somewhat by the Foreign Trade Antitrust Improvements Act of 1982, which "excludes from the Sherman Act's reach much anticompetitive conduct that causes only foreign injury. It does so by setting forth a general rule stating that the Sherman Act 'shall not apply to conduct involving trade or commerce ... with foreign nations.' It then creates exceptions to the general rule, applicable where (roughly speaking) the conduct significantly harms imports, domestic commerce, or American exporters." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004) (internal citations omitted). So, generally, the Sherman Act does not reach foreign antitrust injuries. However, the U.S. may still have jurisdiction over an antitrust claim regarding foreign commerce where one of two exceptions applies: (1) the domestic effects exception or (2) the import exception.

First, the domestic effects exception applies when anticompetitive conduct: "(1) has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.'" *Id.* at 159. This exception does not apply when a claim rests solely on foreign harm. For example, in *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, the Supreme Court considered a price-fixing scheme that resulted in higher vitamin prices both in the United States and internationally. The Court explained that an international purchaser who suffered from higher prices was barred from bringing a Sherman Act claim under the FTAIA, while a U.S. purchaser suffering the same harm could bring such a claim. *Id.* The Court signaled a hesitancy to apply American antitrust laws and remedies to a foreign plaintiff for conduct that occurred abroad, particularly when the foreign injury was deemed independent of any potential

domestic injury. *Id.* at 165. The domestic effect of any anti-competitive conduct must be "direct, substantial, and reasonably foreseeable." 15 U.S.C. § 6a. The Seventh Circuit has explained, "Just as tort law cuts off recovery for those whose injuries are too remote from the cause of an injury, so does the FTAIA exclude from the Sherman Act foreign activities that are too remote from the ultimate effects on U.S. domestic or import commerce." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 857 (7th Cir. 2012) (cleaned up).

Second, the import exception to the general rule abrogating the Sherman Act's applicability to foreign commerce states that "the Sherman Act applies to a defendant's conduct abroad that constitutes, includes, or has as a necessary consequence the movement of goods into this country." *Biocad JSC v. F. Hoffman-La Roche*, 942 F.3d 88, 96 (2d Cir. 2019). Notably, "[c]onduct does not 'involve' import commerce if it has no direct or immediate consequence for domestic markets and is intended merely to have a domestic impact in the future. Nothing in the text of the FTAIA otherwise suggests intent-based analysis." *Id.* at 97.

Plaintiffs' antitrust claims are barred under the Foreign Trade Antitrust Improvements Act as Defendants' conduct meets neither the domestic effects exception nor the imports exception to the FTAIA. Plaintiffs' claim is too remote and too speculative to be considered an antitrust violation.

### b. Discussion

In Plaintiffs' Amended Complaint, Plaintiffs color a number of Defendants' behaviors as anticompetitive. For example, Plaintiffs state that "Multiple Lockheed executives repeatedly expressed concern about the competitive impact of the transaction, including that through Project Archer, Lockheed was essentially funding a new competitor for Lockheed's own satellite division, LM Space." Dkt. 53 at 27. Plaintiffs further allege that, "Like the Lockheed officials… various Airbus officials grew concerned that Blenheim would become a competitor with Airbus

7

France and its affiliates in the market for the sale and leasing of satellite capacity. It expressed such concerns on multiple occasions, including at a 2015 dinner attended by senior executives of Airbus France and Airbus England… An Airbus England official who was friendly to Blenheim, and supportive of Project Archer, told Blenheim's CEO to 'watch your back' because Airbus France officials were concerned with the competitive impact of providing the satellites to Blenheim." Dkt. 53 at 30.

More specifically, Plaintiffs allege an antitrust violation, stating that they "suffered an injury from a conspiracy that reduced output and eliminated a nascent competitor in the market for the sale of commercial satellite capacity, including but not limited to the X and Ka band satellite capacity in the region covered by MYGOVSAT." Dkt. 76-1 at 38. Plaintiffs allege that Defendant Airbus was a competitor and consumer in the market of selling or leasing capacity in X and Ka bands. Dkt. 76-1 at 39.

Defendants counter that Plaintiffs' antitrust claims are barred by the FTAIA. Defendants note that the Sherman Act protects against conspiracies to unreasonably restrain trade in the market, not the ending of a business relationship. Dkt. 67 at 33; *see Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 711 (4th Cir. 1991). Defendants note in particular that Plaintiffs' claims meet neither the import exception nor the domestic effects exception of the FTAIA. Defendants are correct in this assertion. Plaintiffs' claim is too remote and speculative to be properly considered an antitrust violation.

First, Defendants note that Plaintiffs' claims do not meet the import exception, as the purported market that Plaintiffs describe is entirely foreign. In Defendants' words: "Blenheim did not import anything to the United States; instead, Blenheim, based in Guernsey, contracted with a French and American company to build a satellite for South Korea." Blenheim alleges no conduct involving imports to the U.S. Dkt. 67 at 36.

8

Second, Defendants note that Plaintiffs' claims do not meet the domestic effects exception. Defendants note that Plaintiffs' plan to sell satellite capacity to Malaysia never extended beyond negotiations, and that there was never any effect on U.S. commerce. Dkt. 67 at 37. In Defendants' words: "The mere possibility that Blenheim eventually may have sold satellites to Malaysia, contracted with an unnamed satellite communications provider to use Malaysia's orbital positions, and participated in a constellation that could cover part of the U.S. 'is too remote and speculative' to fall within the purview of FTAIA." Dkt. 67 at 37.

Plaintiff Blenheim counters that, "Defendants base their argument on a misstatement of Blenheim's allegations... Instead, Blenheim alleges it intended to use Malaysia's orbital positions to lease and sell *satellite capacity* to other *third parties*... Moreover, Blenheim's allegations make clear that it was planning to combine coverage with another satellite provider to provide *global coverage*... This shows Blenheim would have been in the business of providing certain kinds of satellite capacity on a global basis, including in the United States – making the FTAIA inapplicable." Dkt. 76-1 at 49 (emphasis in original).

Ultimately, Plaintiff Blenheim's allegations here fail to meet either the import exception or the domestic effects exception of the FTAIA. They do not allege an "import." No good was ever imported into the United States. The fact that Plaintiffs intended to sell satellite capacity that might reach the United States does not suffice. *See Biocad JSC v. F. Hoffman-La Roche*, 942 F.3d 88, 97 (2d Cir. 2019). Nor do Plaintiffs allege any "direct, substantial and reasonably foreseeable effect" as required under 15 U.S.C. § 6a. Their claim is speculative, as Plaintiffs never actually provided satellite coverage. Even if they did, it is hard to fathom how such coverage could be considered a "direct" and "substantial" influence on United States commerce. The FTAIA cuts off recovery for "foreign activities that are too remote from the ultimate effects

on U.S. domestic or import commerce." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 857 (7th Cir. 2012) (cleaned up). As the Fourth Circuit has stated, "... the antitrust laws were not intended... as a vehicle for converting business tort claims into antitrust causes of action." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 711 (4th Cir. 1991). Here, Plaintiff Blenheim attempts to convert a business tort claim into an antitrust claim, but cannot do so.

### B. Plaintiffs' Foreign Sovereign Immunities Act Claim

Plaintiffs fail to state a claim under the Foreign Sovereign Immunities Act ("FSIA"). The sale at issue in this case is a sovereign-to-sovereign transaction and does not fit the FSIA's "commercial activity" exception.

#### 1. Legal Standard

The Foreign Sovereign Immunities Act provides that federal courts have original jurisdiction over all claims against a foreign state in which the state is not entitled to sovereign immunity. 28 U.S.C. § 1330(a). However, "[a] foreign state shall *not* be immune from the jurisdiction of courts of the United States in any case ... in which the action is based upon a *commercial activity* carried on in the United States by the foreign state..." 28 U.S.C. § 1605(a)(2) (emphasis added). This has been referred to as the "commercial activity" exception to the FSIA.

The "commercial activity" exception to the FSIA has been tailored by the Supreme Court. The Court has held that where the conduct constituting the *gravamen* of the plaintiff's suit occurs abroad, the "commercial activity" exception to the FSIA does *not* apply. *OBB Personenverkehr AG v. Sachs*, 136 S.Ct. 390 (2015). The Court does not apply an element by element analysis, but instead zeroes in on the core of the plaintiff's suit to identify the conduct that the suit was "based upon." *Id.* The Court has explained that "based upon" means those elements of a claim that, if proven, would entitle plaintiff to relief under his theory of the case. It requires more than a mere

10

connection with – or relation to – the commercial activity. *See Saudi Arabia v. Nelson*, 507 U.S. 349 (1993).

The Supreme Court has also limited the "commercial activity" exception to the FSIA to those cases in which a state exercises only those powers that can be exercised by private citizens. Where a state exercises powers that are particular only to sovereigns, the commercial activity exception does not apply. *Id. See also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) (explaining that when a foreign sovereign acts in the manner of a private player within a market, the actions are "commercial" within the meaning of the FSIA). The "commercial activity" exception concerns the *type* of actions engaged in by the government, rather than their purpose. *See* 28 U.S.C. § 1603(d); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).

### 2. Discussion

In this case, Plaintiffs assert that their claims against Defendant South Korea and South Korea's Defense Acquisition Program Administration (DAPA) are based on South Korea's commercial activity within the United States. Specifically, Plaintiffs allege that the funds that South Korea and DAPA provided to the U.S. Department of Defense for the purchase of a military satellite were passed to Lockheed, as the prime contractor, and then directly to Airbus; and that Blenheim was cut out of the deal. Dkt. 53.

In the Motion to Dismiss, Defendants counter that the "commercial activity" exception to the FSIA does not apply here. Defendants note, first, that the conduct alleged by Plaintiffs is not "commercial activity," and, second, the action is not "based on" commercial activity as the conduct alleged does not constitute the gravamen of the suit. Dkt. 59. Each of these assertions is considered in turn, below.

First, Defendants note – correctly – that a foreign sovereign engages in "commercial activity" only when it exercises "those powers that can also be exercised by private citizens," and not when it employs powers that are particular to sovereigns. *See France.com, Inc. v. French Republic*, 992 F.3d 248, 252 (4th Cir. 2021). Defendants note that the Pentagon's Foreign Military Sales ("FMS") transactions alleged by Plaintiffs are exclusively between the U.S. government and a foreign government – here, South Korea. Private citizens in the marketplace could not participate in this transaction. Further, there was no privity of contract between the contractor and the foreign sovereign. *See* Dkt. 59.

Second, Defendants note that, even if South Korea's involvement in the FMS program could be deemed "commercial activity," Plaintiff Blenheim's claims against South Korea are not "*based upon*" that activity because they do not form the gravamen of Plaintiffs' suit for tortious interference of contract. Dkt, 59 at 23. "Based upon" means those claims that, if proven, would entitle Plaintiff to relief. *See Saudi Arabia v. Nelson*, 507 U.S. 349 (1993). Here, the gravamen of Plaintiffs' claims is the tortious interference with contract by Defendants. The government-to-government FMS transaction does not form the basis of Plaintiffs' claims. *See* Dkt. 77.

Plaintiffs counter with two compelling – although nonbinding and distinguishable – cases defining "commercial activity": *Simon v. Republic of Hungary*, 443 F.Supp.3d 88 (D.D.C. 2020) and *BAE Systems Technology v. Republic of Korea's Defense Acquisition Program Administration*, 2016 WL 6167914 (D. Md. 2016). Plaintiffs argue that both *Simon* and *BAE* hold that FMS transactions constitute "commercial activity" under the FSIA, and the types of military equipment sold in those cases are subject to the same or similar "FMS-only" restrictions as those referred to by Defendants. Dkt. 76-1 at 33. Plaintiffs further note that the offset transaction was not government-to-government, as the satellite offset never called for the satellite to be transferred to or from the U.S. government. Dkt. 76-1 at 33.

These cases are both nonbinding and distinguishable. In *Simon*, the United States District Court for the District of Columbia considered a class action brought by fourteen Hungarian Jewish survivors of the Hungarian Holocaust against the Republic of Hungary and the Hungarian state-owned railway (MÁV) arising from Defendants' participation in and perpetration of the Holocaust. Plaintiffs sought restitution for property that was seized from them as part of Hungary's broader effort to eradicate the Jewish people. *Simon v. Republic of Hungary*, 443 F.Supp.3d 88, 92-94 (D.D.C. 2020). On remand, the Court held that the Plaintiffs' complaint "sufficiently alleges, in claims asserting genocidal takings of property from Hungarian Jews between 1941 and 1945, that each defendant, Hungary and MÁV, commingled that expropriated property in the country's treasury and thereby continue to possess such property to sustain their commercial activities, including Hungary's debt offerings and military purchases in the United States..." *Id.* at 116. The Court further noted that Hungary and the railway engaged in commercial activity in the United States as required to satisfy the commercial-activity nexus element of the expropriation exception to sovereign immunity under the FSIA. *Id.* at 109-110. The present case has a starkly different factual background; moreover, the present case does not deal with the "expropriation exception" to sovereign immunity, as is at issue in *Simon*. As the Court in *Simon* notes, "the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), 'waives foreign sovereign immunity in cases asserting that 'rights in property [were] taken in violation of international law...'" *Id.* at 99. The Court held, specifically, that "Plaintiffs' allegations regarding Hungary's bond offerings and military equipment purchases are sufficient to meet the commercial activity prong of the expropriation exception." *Id.* at 107. Moreover, as Defendants note, "*Simon* did not involve an FMS-Only transaction with equipment that is *not* available for purchase by private entities, as was the case here with the procurement of F-35 aircraft. *Simon* is therefore also distinguishable." Dkt. 77 at 9.

*BAE Systems Technology v. Republic of Korea's Defense Acquisition Program Administration*, 2016 WL 6167914 (D. Md. 2016), is similarly non-binding and distinguishable. That case involved a contract dispute between BAE Systems and the Republic of Korea and its Defense Acquisition Program Administration (DAPA). The Court held that, "[at] its 'core,' this case is about whether or not South Korea has a viable breach of contract claim against BAE for its failure pay DAPA $43,250,000 due to the contractor's asserted failure to prevent the U.S. Government from increasing the price of the F-16 fleet upgrades that were the subject of an underlying FMS contract." *Id.* at *6. The Court held that "commercial activity occurs 'in the United States' if there is a 'substantial contact' between the commercial activity and the United States." *Id.* at *5. Unlike in *BAE*, in the present case, the commercial activity at issue is not the gravamen of Plaintiffs' suit; there is no "substantial contact" between the commercial activity and the United States. Moreover, as Defendants note, *BAE* does not actually hold that the FMS transaction was a commercial activity, and is therefore inapposite. Dkt. 77 at 9.

Ultimately, this Court is compelled to follow the precedent set by the U.S. Supreme Court. That case law is clear: where the conduct constituting the *gravamen* of the plaintiff's suit occurs abroad, the "commercial activity" exception to the FSIA does *not* apply. *See OBB Personenverkehr AG v. Sachs*, 136 S.Ct. 390 (2015). The Supreme Court does not apply an element by element analysis, but instead zeroes in on the core of the plaintiff's suit to identify the conduct that the suit was "based upon." *Id.* The Supreme Court has also explained that "based upon" means those elements of a claim that, if proven, would entitle plaintiff to relief under his theory of the case. It requires more than a mere connection with – or relation to – the commercial activity. *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993). Finally, the "commercial activity" exception to the FSIA is limited to those cases in which a state exercises only those powers that

14

can be exercised by private citizens. Where a state exercises powers that are particular only to sovereigns, the commercial activity exception does not apply. *Id. See also Republic of Argentina v. Weltover*, 504 U.S. 607 (1992).

Following the law as set forth by the Supreme Court, this Court finds that the transaction at issue here does not meet the "commercial activity" exception of the FSIA. The transaction was sovereign-to-sovereign. South Korea could not purchase the F-35 fighter jets through a direct commercial sale. Additionally, Plaintiff Blenheim fails to show that its claims are "based upon" the conduct alleged by South Korea. The "gravamen" of Blenheim's suit is tortious interference with contract between Lockheed and Airbus – not the commercial activity by South Korea.

### III. CONCLUSION

As Plaintiff Blenheim has failed to allege an antitrust claim or a claim under the Foreign Sovereign Immunities Act, this Court lacks subject matter jurisdiction to hear this case. Therefore, Defendant Lockheed Martin Corporation's Motion to Dismiss Plaintiffs' Amended Complaint, Dkt. 58, and Defendant Airbus Defense Space and SAS's Motion to Dismiss Plaintiffs' Amended Complaint, Dkt. 66 are both hereby **GRANTED**. The Amended Complaint, Dkt. 53, is **DISMISSED**.

It is **SO ORDERED.**

September 30, 2021  
Alexandria, Virginia

Liam O'Grady  
United States District Judge